## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

NANCY C. JACOBSON., *et al.,*

      Plaintiffs,

v.                             Case No. 4:18-cv-00262-MW-CAS

SECRETARY LAUREL M. LEE,
in her official capacity only,

      Defendant.

_____/

## SECRETARY'S MOTION FOR SUMMARY JUDGMENT

Consistent with Federal Rule of Civil Procedure 56 and Local Rule 56.1, Defendant, Florida Secretary of State, Laurel M. Lee, in her official capacity only, moves for summary judgment on Counts I and II of the Complaint. ECF 1. Summary judgment is appropriate for the reasons discussed in the attached memorandum of law.

\*\*\*

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that the attached memorandum complies with the size and font requirements in the local rules. While at 9,931 words this memorandum exceeds the word limit, a request to exceed that limit has also been

filed.   Intervenors consent to that request.   Plaintiffs take no position on that

request.

Respectfully submitted by:

BRADLEY R. MCVAY (FBN 79034)
 *General Counsel*
brad.mcvay@dos.myflorida.com
ASHLEY E. DAVIS (FBN 48032)
 *Deputy General Counsel*
ashley.davis@dos.myflorida.com
FLORIDA DEPARTMENT OF STATE
R.A. Gray Building Suite, 100
500 South Bronough Street
Tallahassee, Florida 32399-0250
(850) 245-6536 / (850) 245-6127 (fax)

*/s/ Mohammad O. Jazil*
MOHAMMAD O. JAZIL (FBN 72556)
mjazil@hgslaw.com
GARY V. PERKO (FBN 855898)
gperko@hgslaw.com
JOSEPH A. BROWN (FBN 25765)
jbrown@hgslaw.com
HOPPING GREEN & SAMS, P.A.
119 South Monroe Street, Suite 300
Tallahassee, Florida 32301
Phone: (850) 222-7500
Fax:  (850) 224-8551

**Counsel for the Florida Secretary of State,
Laurel M. Lee**

Dated:  April 8, 2019

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served through the Court's CM/ECF system to all counsel of record on this 8th day of April 2019.

*/s/ Mohammad O. Jazil*

Attorney

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

NANCY C. JACOBSON., *et al.,*

      Plaintiffs,

v.                               Case No. 4:18-cv-00262-MW-CAS

LAUREL M. LEE,

      Defendant.

_____/

**MEMORANDUM OF LAW
IN SUPPORT OF SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

I.    **INTRODUCTION** ...................................................................................1

II.   **RELEVANT LEGAL STANDARD** .................................................6

III.  **STATEMENT OF MATERIAL FACTS** ........................................7

IV.   **ARGUMENT** ........................................................................................9

A.    THERE IS NO CONCEIVABLE CONSTITUTIONAL OR STATUTORY
      CLAIM .............................................................................................9

  1.  There is no claim for undue burden or vote denial under the Anderson-
      Burdick test. ..................................................................................9

     a.  There is no claim as a matter of law ......................................10

     b.  The undisputed material facts also show that there is no Anderson-
         Burdick claim .........................................................................12

     c.  Cases the Democrats have previously cited do not require a contrary
         result. ......................................................................................25

  2.  There is no standalone equal protection claim. .............................28

  3.  There is no vote dilution claim. ....................................................30

B.    THE 4-YEAR STATE OF LIMITATION HAS RUN. ................32

C.    CONSTITUTIONAL ESTOPPEL APPLIES. ..............................36

V.    **CONCLUSION** ..................................................................................42

## I.   __INTRODUCTION__

The Democrats challenge the constitutionality of a statute first enacted by a Democratic-controlled Florida Legislature in 1951.[1]  *See* Ch. 26870, s. 5, Laws of Fla. (1951) (originally codified at 101.151(4), Fla. Stat.).  Florida's Ballot Order Statute provides that "[t]he names of the candidates of the party that received the highest number of votes for Governor in the last election in which a Governor was elected shall be placed first for each [partisan] office on the general election ballot," and "the names of the candidates of the party that received the second highest vote for Governor shall be placed second for each [partisan] office." § 101.151(3)(a), Fla. Stat.  On its face, Florida's Ballot Order Statute favors neither a political party nor incumbents running for re-election; it places all candidates of the last successful gubernatorial candidate's party first regardless of whether that party is Democrat or Republican, Libertarian or Reform, and regardless of whether candidates are incumbents.

Over its 68-year history, Florida's Ballot Order Statute has resulted in candidates for the Democratic and Republican Parties being listed first in 20 and 14 elections respectively.  Florida's Ballot Order Statute is also nearly identical to

---

[1] This memorandum refers to the Plaintiffs as "the Democrats," the intervenors as "the Republicans," and section 101.151(3)(a) and its predecessor statutes as "Florida's Ballot Order Statute."   References to the pre-filed exhibits are identified by ECF number and pincite.

the ballot order statutes in 6 states,[2] and very similar to the ballot order statutes in 4 other states.[3]   Of these 10 states, 5 list Democrats first because a Democrat currently holds a particular office referenced in the statute.

The Democrats now claim that Florida's Ballot Order Statute gives the Republicans an unfair advantage.   Seeking relief under 42 U.S.C. § 1983, the Democrats allege that "[i]t has been well-established, and there is ample evidence, that the candidate listed first on a ballot attracts additional votes *solely* due to his or her position on the ballot."   ECF 1 at ¶ 1.   The Democrats claim this "position bias," also referred to as "primacy effect," "windfall vote," or "donkey vote," gives Republican candidates an advantage during partisan elections in Florida because Republican candidates have been listed first for the past 20 years.   ECF at ¶¶ 1 n. 1, 2.   The Democrats allege that the "windfall vote" effect places an undue burden on their right to vote, in violation of the First and Fourteenth Amendments, and violates the Fourteenth Amendment's Equal Protection Clause by treating Democrats differently than Republicans.   ECF 1 at ¶¶ 50-60.   Not so.

---

[2] Connecticut, Georgia, Nebraska, New York, Pennsylvania, and Texas require that the candidates of the party that received the highest number of votes for Governor in the last election in which a Governor was elected be listed first on the ballot. *See* ECF 111 at 1-19.

[3] Indiana, Michigan, Wisconsin, and Wyoming call for one party being listed first, but base ballot order on a different elected official, such as the Secretary of State. *See* ECF 111 at 20-27.

*First*, the Democrats fail to state a cognizable claim under any conceivable constitutional or statutory theory.

There is no undue burden or vote denial claim under the *Anderson-Burdick* test because there is no allegation that Florida's Ballot Order Statute creates a barrier to people exercising their right to vote.   Rather, the Democrats are concerned about "windfall votes," votes the Democrats deem as being less constitutionally meaningful, votes cast by those whom the Democrats deem uninformed, undecided, or disinterested because they are more likely to vote for whoever is first on the ballot.  But an emerging consensus among the federal courts makes clear that "access to a preferred position on the ballot so that one has an equal chance of attracting the windfall vote is not a constitutional concern."  *New Alliance Party v. N.Y. State Bd. of Elections*, 861 F. Supp. 282, 295 (S.D.N.Y. 1994).  Concluding otherwise puts the courts in the position of casting "aspersions upon citizens who expressed their civic right to participate in an election and made a choice of their own free will" albeit for reasons that might not appear rational to all.  *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 718 (4th Cir. 2016).  "Who are [the courts] to demean [the voters'] decision?"  *Id.*

The lack of any undue burden or vote denial claim under *Anderson-Burdick* becomes even starker when considering material adduced through discovery.   The Democrats' expert witnesses fail to quantify a precise "windfall vote" effect.  They

fail to account for significant variables in their analysis, such as gender, when arguing for the effect being *causally* related, as opposed to merely showing some statistically *in*significant *correlation*, between ballot order and election outcomes. They fail to explain away actual election results that contradict their theories. They refuse to specify any remedy to undo this suddenly unquantifiable "windfall vote" effect. The Democrats' corporate representatives also cannot specify a remedy. Depositions of the Democrats' witnesses, former Supervisor of Elections Sancho and Professor Krosnick, show that it is only the Democrats' lawyers who are responsible for defining the desired remedies; however, these remedies are either technologically infeasible or constitutionally suspect under their own "windfall vote" theory.

There is no standalone claim under the Equal Protection Clause either. While the *Anderson-Burdick* inquiry might not require a showing of intent, the traditional equal protection clause inquiry does. The Democrats neither plead nor can they prove intentional discrimination because at issue is a facially neutral statute enacted when the Florida Legislature had only three Republican members. ECF 111 at 2190.

Any vote dilution theory fails too. Vote dilution claims are ordinarily grounded in § 2 of the Voting Rights Act, which concerns itself with effects and not intent. But there is no mention of the Voting Rights Act in the Complaint. Nor

can there be.  The Act is intended to protect racial and language minorities whose votes are being diluted—not Democrats and Republicans engaged in their never-ending fight to seek electoral advantage that, as in this case, often confuses motion with progress.

*Second*, the Democrats have waited too long to pursue their claims.  The State's 4-year statute of limitations applies to this 1983 action.  The 4-year statute of limitations has long since passed.  The Florida Legislature enacted Florida's Ballot Order Statute in 1951.  The Democrats claim to have known about the "well-established" "windfall vote" effect since at least 1970.  ECF 1 at ¶ 1.  Their corporate representatives agree that the effect is not a new phenomenon to them.  But they waited decades to file a lawsuit.

*Third*, if this Court agrees with the Democrats that the "windfall vote" effect exists and confers an unconstitutional benefit on some, then the Democrats are still constitutionally estopped from pursuing their claims.  They have benefited more often than Republicans from Florida's Ballot Order Statute.  And they continue to benefit from similar ballot order statutes in 5 other states.  Allowing the Democrats (or the Republicans) to challenge the constitutionality of provisions from which they have and continue to benefit would be the constitutional equivalent to tossing a coin where the Democrats (or the Republicans) win when the coin lands on

5

heads, and everyone else loses when the coin lands on tails.  That should not be how constitutional law works.

This Court should grant the Secretary's Motion for Summary Judgment.

## II.   <u>RELEVANT LEGAL STANDARD</u>

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Material" facts are those that might affect the outcome of the case under the governing substantive law, not those that "are irrelevant or unnecessary."  *Id.* The nonmoving party also has an obligation to come forward with "specific facts showing there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "A mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party."  *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).  If the nonmoving party's evidence "is merely colorable, or is not significantly probative," then "summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50.  The moving party is entitled to summary judgment where the nonmoving party cannot prove an essential element of its case for which it has the burden of proof at

trial. *Celotex Corp.*, 477 U.S. at 323-24. These standards apply even in election-related cases such as this. *E.g., Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 187 (2008) ("After discovery, District Judge Barker prepared a comprehensive 70-page opinion explaining her decision to grant defendants' motion for summary judgment.").

The Secretary is entitled to summary judgment under these standards.

## III.   STATEMENT OF MATERIAL FACTS

Florida's Ballot Order Statute lists all candidates of the last successful gubernatorial candidate's party first. § 101.151(3)(a), Fla. Stat. Since 1951, Democrats have been listed first 20 times, and Republicans 14 times. *Infra* pg. 39-40. Ten other states have ballot order provisions nearly identical or very similar to Florida's Ballot Order Statute. ECF 111 at 1-27.

Florida, however, is the only state in which the Democrats have challenged this ballot order approach, which they allege leads to a phenomenon known as the "windfall vote." *E.g.*, ECF 111 at 1773. The "windfall vote," they contend, disadvantages and injures Democrats when Florida's Ballot Order Statute requires that they be listed second. ECF 1 at ¶ 1. The Democrats have been aware of or had available evidence to support this alleged concern since 1970 and, at the very least, since 1998. ECF 1 at ¶ 1.

The Democrats offer expert witness testimony regarding the existence of the "windfall vote" effect in Florida, but are unable to quantify that effect, despite several widely-varying attempts. ECF 111 at 329-31; 424; 456-57; 866-76; 995; 1057. The Republicans offer expert witness testimony highlighting flaws in the Democrats' analysis including the failure to consider important variables, ECF 111 at 433-35, 507-08, 365-69, such as candidate quality and gender.

Even if the "windfall vote" effect can be reliably measured and shown to actually matter, the Democrats offer no remedy. ECF 31 at 58-62; ECF 111 at 385; 541-43; 866-76; 995; 1057; 1758-59; 1831-32; 2090-91; 2092; 1926-27; 1996-97; 2051-52. The Democrats probed county-by-county ballot rotation as a remedy, but that fails to remedy many down-ballot races alleged to be most affected by the effect. *E.g.*, ECF 111 at 1118-19; 1207-09. The Democrats probed precinct-by-precinct ballot rotation as a remedy but that option poses very serious practical problems for Florida's most populous county, Miami-Dade. *E.g.*, ECF 111 at 1279-80; 1277; 1318-22. The Democrats probed by-style rotation but that option suffers from the same infirmity as county-by-county rotation. *E.g.*, ECF111 at 1456; 1317-18. All three of these approaches also present varying degrees of technical and administrative concern and could cause voter confusion. ECF 111 at 1295-97; 1310; 719-20; 712-15; 763-64; 1437-39; 1652.

Any request for ballot rotation also implicates important state interests. First, the state has an interest in defending the constitutionality of Florida's Ballot Order Statute as an enactment of the people's duly elected representatives that has remained unchanged for 68 years.  *See infra* at pg. 23.  Second, the State has a compelling interest in ballot uniformity.  *See infra* at pg. 24.  Third, the State has a compelling state interest in ensuring the integrity of the elections process.  ECF 111 at 1295-97; 1310; 719-20; 712-15; 763-64; 1437-39; 1652.  Fourth, Florida's Ballot Order Statute, as currently drafted, avoids voter confusion and delays.  ECF 111 at 1295-97; 1310; 719-20; 712-15; 763-64; 1437-39; 1652.

## IV.   ARGUMENT

### A.   There is no conceivable constitutional or statutory claim.

#### 1.  There is no claim for undue burden or vote denial under the Anderson-Burdick test.

Count I of the Complaint alleges a claim under the *Anderson-Burdick* test. ECF 1 at ¶¶ 50-55.  The *Anderson-Burdick* test provides a flexible framework where this Court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,'" while "taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's

rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).  This framework only applies, however, when "evaluat[ing] a law respecting the *right to vote*—whether [the challenged law] governs voter qualifications, candidate selection, or the voting process." *Crawford*, 553 U.S. at 204 (Scalia, J., concurring) (emphasis added).  Undue burdens on the *right to vote* and outright *vote denial* are distinct from *vote dilution*. *See Johnson v. De Grandy*, 512 U.S. 997, 1007 (1994) (defining vote dilution under the Voting Rights Act as the "manipulation of district lines [to] dilute the voting strength of politically cohesive minority group members, whether by fragmenting the minority among several districts . . . or by packing them into one or a small number of districts").

### a.  There is no claim as a matter of law.

Florida's Ballot Order Statute is a facially neutral statute governing the order of candidates.  The statute neither imposes any burdens on the right to vote nor denies the ability to cast a vote.  The statute is unlike the restrictive ballot-access laws in *Anderson* and *Burdick* that would have denied supporters of certain candidates from voting for those candidates. *Anderson*, 460 U.S. at 782-83; *Burdick*, 504 U.S. at 430.  It is unlike the voter-id law in *Crawford* alleged to make it harder for certain people to vote.  531 U.S. at 185-86.  It is unlike other cases

before this Court where it is alleged that the State's early voting, vote-by-mail, and other standards make it harder to vote or deny the right to vote altogether.

Even the Democrats recognize the difference. They do not allege that Florida's Ballot Order Statute keeps a single Democrat from voting or makes it harder for a single Democrat to actually vote. They allege only that "[t]he weight and impact of their votes is consistently decreased . . . by the [lawfully cast] windfall votes accruing to the first-listed candidates." ECF 1 at ¶ 52.

But because "mere ballot order denies neither the right to vote, nor the right to appear on the ballot, nor the right to form or associate in a political organization," the Democrats cannot state an *Anderson-Burdick* claim. *Libertarian Party*, 826 F.3d at 717. This makes sense. Any lawsuit filed in pursuit of "windfall votes" asks this Court to cast "aspersions upon citizens who expressed their civic right to participate in an election and made a choice of their own free will." *Id.* at 718. Neither the Democrats nor the Republicans should ever ask this Court to "demean [a voter's] decision"—to tell voters that they are uninformed, undecided, or disinterested because they chose to vote for the first person on the ballot. *Id.* This is because neither the Democrats nor the Republicans have a right to a "rational election, based solely on a reasoned consideration of the issues and the candidates' positions, and free from [what the parties deem to be] other 'irrational considerations.'" *Id.* If in a free speech context the courts refuse to

11

serve as the "Ministry of Truth," *United States v. Alvarez*, 567 U.S. 709, 723 (2012), then in an elections context the courts should refuse to serve as the Ministry of Rationality responsible for considering the "weight and impact" of a lawfully cast but seemingly irrational "windfall vote" on a "meaningfully and thoughtfully cast vote for Democratic [or Republican or Libertarian or Reform] Party candidates." ECF 1 at ¶¶ 1 n.1, 1, 13, 15, 17, 52.

Thus, as a matter of law, there can be no undue burden or vote denial claim under the *Anderson-Burdick* test. "[A]ccess to a preferred position on the ballot so that one has an equal chance of attracting the windfall vote is [simply] not a constitutional concern." *Libertarian Party*, 826 F.3d at 719; *see also New Alliance Party*, 861 F. Supp. at 295 n.15 ("As the instant case indicates, however, there are election law regulations which do not burden constitutional rights and as such render the *Anderson*[-*Burdick*] test superfluous.") (citing *Eu v. San Francisco Cnty. Democratic Central Committee*, 489 U.S. 214, 222 (1989)).

        b.   *The undisputed material facts also show that there is no Anderson-Burdick claim.*

Even if the Democrats could state a claim as a matter of law, the undisputed and material facts show that the alleged burdens are minimal and the State's interests are compelling.

i.   Alleged Burden

Assuming that ballot order is a constitutional concern, the Democrats' claim relies first on establishing that there exists a "windfall vote" effect.   Next the Democrats must show that this "windfall vote" effect is enough to actually change the outcome of an election—that this effect disfavors them enough to cause some injury that a federal court has jurisdiction to remedy.   *See*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (requiring for Article III standing purposes (1) "an injury in fact . . . which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical," (2) "a causal connection between the injury and the conduct complained of," and (3) that "it must be 'likely', as opposed to merely 'speculative', that the injury will be redressed by a favorable decision").

The Democrats rely on Professor Krosnick to establish that there is a "windfall vote" effect responsible for conferring an advantage on the first listed candidate.   But Krosnick cannot tell us what that advantage is or whether it even matters.   At the preliminary injunction stage, Krosnick boldly proclaimed that Republican candidates gained a 2.70% advantage when they were listed first and Democrats gained 1.96% when they were listed first.   ECF 31 at 3, 57.   Those numbers doubled in his 2019 expert report where he said that Republicans gained 5.35% and Democrats gained 4.57%.   ECF 111 at 30, 90-91, 110.   Yet the "windfall vote" effect is demonstrably less for both parties when one weights the

13

regression estimates based on county population or density so that Miami-Dade County is not treated the same as say Wakulla County. *Id*. at 143. Krosnick now says the effect of the "windfall vote" "is not . . . extremely important in this litigation," only that it exists. *See* ECF 111 at 329-31. But, accepting Krosnick's deposition testimony as true, if he cannot quantify the "windfall vote" effect, then for purposes of summary judgment and trial the Democrats cannot establish any cognizable injury. Without knowing the magnitude of any ballot order effects, this Court must conclude, like Dr. Krosnick did in his original ballot order study, that any observed effects "have probably done little to undermine the democratic process in [Florida]." ECF111 at 424; 456-57.

Krosnick's work is otherwise flawed in objective, material, and undeniable ways. As Professor Klick points out in his expert report, Krosnick's analysis of ballot order effect in the 2016 Presidential Election is careless and misleading because it relies on one-tailed statistical "p-value" tests to suggest statistical significance, rather than two-tailed tests, even though Krosnick himself admits that ballot order effects can theoretically go in either direction. ECF 111 at 424-25. Krosnick thus gives the impression that the results he cites are statistically significant when, in fact, they are not. *Id.* As Professor Barber explains, and there can be no dispute, Krosnick's discussion of his Ohio analysis also misleads by referring to the "largest" primacy effects observed and emphasizing that "the vast

14

majority" of observations were positive when, in fact, the most common outcome in the in the distribution is near zero. ECF 111 at 518. Moreover, by defining the unit of observation at the county level, Krosnick's analysis of Florida elections "gives significantly more weight to the many sparsely populated rural counties of Florida and underweights the densely populated coastal counties, where most of the population lives." *Id.* at 521. This fundamental analytical flaw—this dilution of the voting power in more populous urban counties—"casts doubt on the claims that the data, analysis and subsequent results are in fact representative of Florida overall." *Id.* at 521-22.

Krosnick also overstates how often ballot order has been "outcome determinative" in Florida. At the preliminary injunction stage, Krosnick claimed that the outcomes of at least 65 elections between 1978 and 2018 would have changed if the order of candidate names had been varied across voters. ECF 54 at 13. Now he proclaims that *308 elections* would have changed. ECF 111 at 111. But, in deposition, he admitted that his new analysis does not tell us what elections would have been affected if ballot order had varied across voters (as stated in his expert report); instead, if anything, it shows what elections would have been affected if ballot order had been *reversed* to make Democratic candidates first on all Florida ballots—a remedy even the Democrats do not seek in this case. ECF 111 at 378-79. That mischaracterization, along with his now doubled estimates of

15

ballot order effect, explains why Krosnick's new estimate of "outcome determinative" elections is almost 5 times greater than the one he previously presented to this Court.  Together with the flaws that Klick and Barber discuss, it shows that Krosnick's work is not the product of rigorous statistical analysis or precise language.  *Cf. id.* at 384-85.  It is an advocacy piece.

Importantly, it is beyond dispute that Krosnick now refuses to say what, if any, changes would remedy the "windfall vote" effect.   At the preliminary injunction stage, Krosnick advocated for ballot order rotation across geographical units, such as the precinct-by-precinct approach.   ECF 31 at 58-62.  But the Democrats' attorneys asked him to remove that discussion from his latest expert report.   ECF 111 at 385.  So assuming Korsnick establishes a cognizable injury through his work, he offers no remedy for this injury.  Like Krosnick, Ion Sancho recanted his proposal from the preliminary injunction stage of the proceedings by attributing his earlier flawed statements to lawyers.   ECF 111 at 541-43.

Professor Rodden, building on Krosnick's work, suggests that the "windfall vote" effect is more pronounced on down-ballot races.   Actual election results undercut this point.  Table 1 provided in the appendix shows that Democrats and Republicans, listed first and second, at the top and further down-ballot, have won close elections in Florida.  ECF 111 at 622-23.  Most recently, for example, Florida voters elected Nikki Fried, a Democrat, as Commissioner of Agriculture despite

that race receiving less attention than the U.S. Senate and Gubernatorial races where Democratic candidates lost.

This phenomenon—a woman winning a down-ballot election despite being listed second—is not new.   Democrat Alex Sink was elected Chief Financial Officer in 2006 and Republican Sandra Mortham was elected Secretary of State in 1994.   Both were listed behind their opponents.   Yet Rodden and Krosnick admitted to *not* considering gender or other omitted variables, like the overall quality of candidate, in their analyses.  ECF 67-2 at 6-7; ECF 111 at 433-34, 434-35; 507-08; at 365-69.

Ultimately, it is beyond dispute that Rodden too cannot quantify the "windfall vote" effect or propose a remedy.  ECF 111 at 866-76; 995; 1057.  In fact, Rodden's argument that the "windfall vote" effect is more pronounced on down-ballot races undercuts one of the remedies the Democrats' lawyers have seized upon: county-by-county rotation of only the Democratic and Republican candidates.  ECF 111 at 1118-19.  By Rodden's logic, county-by-county rotation would have absolutely no effect on any "windfall vote" in down-ballot races involving districts or jurisdictions located solely within a single county. In those counties, a candidate from one party would still be listed first on all ballots for such races, undoubtedly prompting litigation by second-listed candidates seeking to secure their share of the "windfall vote."  There are currently 4 congressional

districts, 15 state senate districts, and 85 state house districts located wholly within one county.  ECF 111 at 1207-09.  That means as many as 104 lawsuits for a share of the "windfall vote."[4]

While county-by-county rotation is constitutionally infeasible under the Democrats' own theory, other potential remedies are technologically infeasible.

In particular, Supervisor White of Miami-Dade testified in deposition that precinct-by-precinct rotation would be "very problematic" for Florida's most populous county.  ECF 111 at 1277.  While most counties in Florida design and print their ballots on a precinct-by-precinct basis, Miami-Dade designs and prints its ballots on a by-style basis.  *Id.* at 1279-80.  A by-style ballot is defined by electoral race or ballot questions presented, as opposed to being specific to each precinct.  *Id.* at 1233-34.  This means that each by-style ballot design can serve multiple precincts.  *Id.*  As a result, Miami-Dade can administer its elections with approximately 100 by-style ballot designs serving approximately 900 precincts.  *Id.* at 1223.  Miami-Dade must employ the by-style design approach because a precinct-by-precinct basis is infeasible.  *Id.* at 1277.  Requiring candidate rotation by precinct would force Miami-Dade to go from approximately 100 different ballot

---

[4] The Democrats' experts also offer no analysis showing how county-by-county rotation would affect the share of "windfall vote" in other races involving multiple counties.  This Court is simply left to guess what, if any, effect county-by-county rotation would have on any "windfall vote" in such multi-county races.

styles to approximately 900, "exponentially" increasing the burden and time required for ballot preparation and printing. *Id.* at 1318-22. Miami-Dade would be unable to meet the deadline for vote-by-mail ballot distribution or print ballots in time for the election. *Id.*

To overcome the most populous Florida County's inability to implement precinct-by-precinct rotation, the Democrats' lawyers seized on a new approach: by-style ballot rotation. But by-style rotation is equally unable to equitably rotate candidates.

> When you go to a by-style rotation that you are proposing or presuming could be done in Miami, I will agree with your presumption that it would imitate or be similar in nature to the programming for a precinct-by-precinct for a county that is already doing it. But you are definitely not going to be achieving any form of equity or equanimity for the number of voters reached by-style versus as by-precinct.

ECF 111 at 1456; 1317-18.

Every approach to rotation—by precinct, county, or style—also presents technical and administrative issues:

- *Certification of election management systems:* State certification of election management systems will likely be required for rotation by precinct or by style "even if the software written by [election management system vendors] and used in other states has the potential to [rotate

candidates].” ECF 111 at 1354; 1353-55 (precinct-by-precinct); ECF 111 at 700-013; 1292-93 (by-style); ECF 111 at 1556.  Certification is a difficult process that tends to “blow up because the devil is in the details and the details get very tricky.” ECF 111 at 677-78.

- *Proofing ballots:*  The introduction of precinct or by-style rotation would result in “a much bigger proofing process” by “add[ing] a layer of proofing where you [sic] actually having to validate the rotation of races of candidates within a contest is as expected.”  ECF 111 at 706 (precinct-by-precinct); 1326 (by-style); 1365 (precinct-by-precinct).

- *Logic and accuracy testing:*  Rotating candidates would mean that for the logic and accuracy testing required prior to every election the “test deck design gets much more complicated.”  ECF 111 at 702 (precinct-by-precinct); *see* ECF 111 at 1380-83 (precinct-by-precinct).

- *Sample ballots:*  Candidate rotation could “add a layer of complexity to [the sample ballot] process” by requiring “the sample ballot booklet . . . to be unique for each household in each precinct, which would change drastically that process . . . as far as preparation and getting the files to the printer, making sure the files that are being generated are correct.”  ECF 111 at 1431 (precinct-by-precinct); 719-20.

- *Tabulation and state-level aggregation and reporting:* As Supervisor White from Miami-Dade testified: "[M]y biggest concern [with by-style ballot rotation] is how we are going to code and ensure the tabulation of that is accurate." ECF 111 at 1294. As Supervisor Earley from Leon testified, state-level aggregation and reporting is also a concern for other approaches:

> **Q:** One of the issues you identified, I believe, with respect to county-by-county rotation would be the uploading of county results to the State, is that correct?
>
> **A:** Correct. And I think there would have to be -- and the aggregation of those results and making sure that was all mapped out properly and tested and all the little details with that, yes; and with the election night reporting results with our various vendors.

ECF 111 at 762; 675 (concern with uploading results if different forms of rotation are used in different counties).

- *Recounts:* "[V]ariations of the ballot order complicates recount processes," already subject to tight statutory and constitutional deadlines. *Id.* at 680.

Beyond technical and administrative issues, ballot rotation would undercut the State's concerted effort to promote uniformity. As Supervisor White testified this could result in more voter confusion because ballots would "not [be] uniform throughout the County; and that on some people's ballot, it would be [sic] one way and on others, another way." ECF 111 at 1297; 1295-97; 1310. With respect to

by-county and by-precinct rotation, Supervisors Earley and Lux testified to similar concerns.  ECF 111 at 719-20; 712-15;763-64;1437-49.

In short, accepting the Democrats' expert witness testimony as true for purposes of summary judgment, the Democrats still cannot define the alleged burdens or identify a workable remedy.  This undercuts any *Anderson-Burdick* claim, tests the Democrats' ability to establish Article III standing, and entitles the Secretary to summary judgment.

## ii.   Compelling State Interests

Regardless, the State's compelling interests outweigh whatever burdens the Democrats might establish.

First and foremost, the State has a compelling interest in defending the constitutionality of Florida's Ballot Order Statute.  Enacted by the people's duly elected representatives, and unchanged over 68-years, this statute reflects the State's policy choices concerning the time, place, and manner of elections.  Second-guessing these choices is a job for the people through their elected representatives, not any one political party that feels slighted.  *See* U.S. Const. art. I, § 4, cl. 1; *id.* art. II, § 1, cl. 2; *Bush v. Gore*, 531 U.S. 98, 113-15 (2000) (Rehnquist, C.J., concurring); *Summit Cnty. v. Blackwell*, 388 F.3d 547, 551 (6th Cir. 2004) (State's interest in the "smooth and effective administration of the voting laws" under "legitimate statutory processes"); *Sarvis v. Judd*, 80 F.Supp. 3d

692, 709 (E.D. Va. 2015) ("If Virginia has articulated a sufficiently weighty reason for its ballot design and employed reasonable regulations in its service, then the Commonwealth has acted within constitutional bounds and this Court may not stand in judgment of that discretion properly exercised by the legislative body.").

Second, the State has a compelling interest in upholding its policy of ballot uniformity.  After the 2000 Presidential Election and the U.S. Supreme Court's decision in *Bush v. Gore*, the State undertook a series of reforms.  Among other things, these reforms sought to blunt criticism of the State's lack of ballot uniformity through the enactment of an elections reform package and a later adopted "uniform ballot" rule.  2001 Laws of Fla. ch. 2001-40 (2001); 1S-2.032, Fla. Admin. Code.  Suddenly randomizing ballot order by precinct, by-style, or even county would undermine this goal of promoting statewide uniformity whenever possible.  ECF 111 at 1649; 1655; 1651; 1668-71; 1462-63.

Third, on a related note, changing ballot order by precinct, by-style, or even county would undermine the integrity of the elections process.  Any kind of ballot rotation, without adequate voter education, and right before a presidential election year, would inject uncertainty and confusion into the process.  *See* ECF 111 at 1295-97; 1310; 719-20; 712-15; 763-64; 1437-39; 1652.  Voters might, for example, find it more difficult to use their sample ballots as reference guides when casting votes or raise concerns about high-profile races on the ballot appearing in a

different order.   *See* ECF 111 at 712-20; 1438-39.  Voters residing in multi-county metro-areas such as Orlando might raise concerns about election irregularities if their neighbors have different ballots, thereby undermining trust and confidence in the State's elections.  *See* ECF 111 at 1438-39 (discussing problems with use of sample ballots in county-by-county rotation hypothetical).

"The state's interest is in making sure that we are able to hold elections and not be held hostage to changes that make the process more complicated, less transparent, less easy for voters, and that may cloud or undermine the integrity of the election results being reported."   ECF 111 at pg. 1649; 1655; *see also Crawford*, 553 U.S. at 197 ("public confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process.").

Fourth, as a practical matter, Florida's Ballot Order Statute, as currently drafted, serves "the important state interest" of "reducing voter confusion and speeding the voting process."  *Libertarian Party*, 826 F.3d at 719.  It allows "voters to more quickly find their preferred choice for a given office, especially when party loyalties influence many voters' decisions."  *Id.*  Randomizing order by precinct or by-style, or even by county, could inject complexity, confusion, and delay into the process by undermining the State's and local supervisors of elections' efforts to make the voting process simple and easy.  ECF 111 at 712-20.

"For each extra minute that a voter spends deciphering his ballot in the voting booth, dozens or more voters may spend another minute in line." *Libertarian Party*, 826 F.3d at 720. "This all adds up." *Id.* "Long election lines may frustrate voters attempting to exercise their right to vote." *Id.*; *see also* § 101.015, Fla. Stat. (requiring "maximum degree of correctness, impartiality, and efficiency of the procedures of voting, including write-in voting, and of counting, tabulating, and recording votes by votes systems used in this [S]tate").

The State's interests are both legally and factually compelling. Even if the Democrats had anything on their side of the *Anderson-Burdick* balance, the balance still tilts decidedly in the State's favor.

### c. *Cases the Democrats have previously cited do not require a contrary result.*

Cases cited by the Democrats do not require a contrary result. These cases are distinguishable, predate the *Anderson-Burdick* test, and are otherwise inconsistent with a growing consensus on the issue.

The district court's decisions in *Mann v. Powell*, 314 F. Supp. 677 (N.D. Ill. 1969) (*Mann I*), and 333 F. Supp. 1261 (N.D. Ill. 1969) (*Mann II*) feature prominently in the Democrats' papers. There, the district court enjoined the Illinois Secretary of State from applying a "first-in-line" ballot order statute in a manner where "personal favoritism or [a] systematic bias in favor of incumbents

[was used] in breaking ties." *Mann II*, 333 F. Supp. at 1264.  But Florida's Ballot Order Statute leaves no room for the exercise of discretion; it creates a bright-line rule that lists *all* candidates of the winning gubernatorial candidate's party first regardless of incumbency or the Secretary's preferences.

The Seventh Circuit's decision in *Sangmeister v. Woodard*, 565 F.2d 460 (7th Cir. 1977) is distinguishable for the same reason.  *Sangmeister* involved evidence of discriminatory application of Illinois's ballot order statute by election boards that had always placed candidates from *their* party at the top of the ballot. *Id*. at 464.  Again, this cannot happen under Florida's Ballot Order Statute.

Other cases the Democrats cite are distinguishable because, unlike this case, they involved statutes that expressly favored incumbents or candidates from a particular political party.[5]  Florida's Ballot Order Statute does neither.

Rather, Florida's Ballot Order Statute is like New York's statute upheld in *New Alliance Party*.  In upholding New York's statute, the district court expressly disagreed with the Eighth Circuit's analysis of a similar North Dakota law in

---

[5] *See Graves v. McElderry*, 946 F. Supp. 1569 (W.D. Okla. 1996) (law passed by Democratic-controlled legislature that expressly required Democratic candidates to be listed first); *Netsch v. Lewis*, 344 F. Supp. 1280 (N.D. Ill. 1972) (law requiring listing of incumbents first); *Gould v. Grubb*, 536 P.2d 1331 (Cal. 1975) (incumbents first); *Holtzman v. Power*, 313 N.Y.S 2d 904 (N.Y. Sup. Ct. 1970), *aff'd*, 311 N.Y.S. 2d 824 (1970) (incumbents first).  *See also Williamson v. Fortson*, 376 F. Supp. 1300, 1302 (N.D. Ga. 1974) ("[T]he published opinion in *Netsch* is devoid of reasoning and its citations refer the researcher to cases which are not even arguably in point.").

*McLain v. Meier*, 637 F.2d. 1159 (8th Cir. 1980), because *McLain* failed to recognize that the North Dakota law did *not* impose an "incumbent-first" ballot order and "simply overlooked" that "prevention of voter confusion is not merely a legitimate, but a compelling state interest, which need not be supported by particularized evidence." *New Alliance Party,* 861 F. Supp. at 298

*New Alliance Party* is also significant because, unlike *Mann, Sangmeister,* and *McLain*, it was decided after the U.S. Supreme Court established the *Anderson-Burdick* test.   And with only one exception involving a blatantly discriminatory law,[6] every federal court that has addressed the constitutionality of a ballot order statute since *New Alliance Party* has held that any alleged burdens due to "position bias" are outweighed by the state's important regulatory interests. *See Green Party v. Hargett*, 2016 U.S. Dist. LEXIS 109161 (M.D. Tenn. Aug. 17, 2016), *aff'd Green Party of Tenn. v. Hagrett*, 2017 U.S. App. LEXIS 18270 (6th Cir. May 11, 2017) (upholding Tennessee statute requiring the candidate of the party in the majority in the combined houses of the general assembly to be listed first); *Sarvis*, 80 F. Supp. at 692 (upholding Virginia's three-tiered ballot order

---

[6] As noted above, in *Graves*, the court found a law unconstitutional because it expressly required Democratic candidates—and only Democratic candidates—to be listed first.   The district court reasoned that the only conceivable interest in always listing Democrats first was "entirely political" and such "political patronage" was not a legitimate state interest.   946 F. Supp. at 1580-81.   By contrast, Florida's Ballot Order Statute does not forever entrench any one political party in a particular position on the election ballot.

statute); *Meyer v. Texas*, 2011 U.S. Dist. LEXIS 50325 (S.D. Tex. May 11, 2011) (upholding Texas statute which arranges party candidates in descending order beginning with party whose last gubernatorial candidate received the most votes).

The Democrats attempt to side-step this growing body of precedent by arguing that these recent cases "are distinguishable because they involve differential treatment of minor party or independent candidates, rather than major political parties, who are not similarly situated." ECF 30 at 26. Yet the Democrats offer nothing to suggest that their party or its members have any more or less of an interest in "windfall votes" than minor parties or independent candidates. They *cannot* because no such interest exists. To repeat, "access to a preferred position on the ballot so that one has an equal chance of attracting the windfall vote is not a constitutional concern" for any party. *Libertarian Party*, 826 F.3d at 718-19.

Thus, as a matter of law or fact, there is no *Anderson-Burdick* claim.

## 2. There is no standalone equal protection claim.

Count II of the Complaint alleges a standalone claim under the Equal Protection Clause. ECF 1 at ¶¶ 56-60. But the Democrats fail to state a claim because they do not allege any discriminatory intent—they allege no direct or circumstantial evidence of intent stemming from the enactment of Florida's Ballot Order Statute by a *Democratic-controlled* Florida Legislature or its consistent application by *Democratic and Republican* Gubernatorial Administrations over 68

years.  At best, the Democrats allege some disparate impact on Democratic voters whenever a Democrat fails to win the gubernatorial race.  ECF 1 at ¶ 58.  Even if true, these allegations are not enough for purposes of the Equal Protection Clause.

As Justice Ginsburg explained, "[t]he Equal Protection Clause . . . prohibits only intentional discrimination; it does not have a disparate-impact component." *Ricci v. DeStefano*, 557 U.S. 557, 627 (2009) (Ginsburg, J., dissenting) (citing *Pers. Adm. of Mass. v. Feeney*, 442 U.S. 256, 272 (1979) and *Washington v. Davis*, 426 U.S. 229, 239 (1976)); *see also Coleman v. Ct. of Appeals of Maryland*, 566 U.S. 30, 42 (2012) ("Although disparate impact may be relevant evidence  . . . such evidence alone is insufficient [to prove a constitutional violation] even where the Fourteenth Amendment subjects state action to strict scrutiny."); *Bd. of Election v. Libertarian Party of Ill.*, 591 F.2d 22, 24-25 (7th Cir. 1979) (explaining that ballot placement claim under the equal protection clause requires a showing of "an intentional or purposeful discrimination"); *Republican Party of N.C. v. Martin*, 980 F.2d 943, 955 (4th Cir. 1992) (explaining that equal protection claim involving voting rights requires allegation of "intentional discrimination against an identifiable political group and an actual discriminatory effect on that group").

Thus, as a matter of law, the Democrats fail to state a standalone claim under the Equal Protection Clause.

### 3.  There is no vote dilution claim.

Although not a separate count, the Democrats' Complaint is replete with allegations of vote dilution.  ECF 1 at ¶¶ 5, 13, 14, 15, 17, 52.  While it is axiomatic that one should not assume that litigants can prove facts they have not pled and so this Court should deny such half-pled claims, *Bell. Atl. Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007), the Secretary responds to concerns regarding vote dilution for the sake of completeness.

Vote dilution claims may arise in a redistricting context where the drawing of district lines diminishes the voting power of a certain segment of the electorate. *See Johnson*, 512 U.S. at 1007.  The U.S. Supreme Court's decision in *Reynolds v. Sims*, 377 U.S. 533, 568 (1964), is the classic example where, under the Equal Protection Clause, the U.S. Supreme Court held that "the seats in both houses of a bicameral legislature must be apportioned on a population basis." *Reynolds* and its progeny thus ended the ability of rural, less populated counties to use redistricting as a means to dominate urban, more populated counties.  *Reynolds* replaced this dilution of urban votes with the "overriding objective" of "substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State." *Id.* at 579.

Vote dilution claims may also arise under § 2 of the Voting Rights Act.  52 U.S.C. § 10301.  The Act makes it unlawful for states and political subdivisions to

impose or apply any redistricting plans on *racial or language* minorities, *id.* §§ 10301(a), 10303(f)(2), that have the effect of denying the minorities an equal opportunity "to elect representatives of their choice." *Id.* § 10301(b). The U.S. Supreme Court's decision in *Thornburg v. Gingles*, 478 U.S. 30, 47-52 (1986), establishes a detailed framework for evaluating claims when a state or political subdivision's use of at-large or multimember redistricting plans dilute minority votes and thereby diminish the ability of racial or language minorities to elect representatives of their choice.

But the Democrats cannot state a vote dilution claim for three reasons. First, this is not a redistricting case where lines have been drawn to diminish the voting power of Democrats or anyone else. This makes the dilution framework impossible to apply here. Second, if like *Reynolds*, the Democrats wish to establish an equal protection claim for vote dilution, they must plead and prove intent. *Supra.* They do neither. Third, while § 2 of the Voting Rights Act does not require a showing of intent, the Democrats still cannot plead such a claim because § 2 of the Act is intended to protect the rights of racial and language minorities—not Democrats or Republicans or Libertarians or independents.

Thus, the Democrats have no vote dilution claim. In fact, the Democrats do not have a valid claim to pursue under any constitutional or statutory theory, making summary judgment appropriate.

**B.**    <u>The 4-year state of limitation has run.</u>

Even if the Democrats had a valid claim under any of the aforementioned theories, it is now too late to pursue it.  "All constitutional claims brought under § 1983 are tort claims and, thus, are subject to the statute of limitations governing personal injury actions in the state where the § 1983 action has been brought."[7] *Boyd v. Warden, Holman Corr. Facility*, 856 F.3d 853, 872 (11th Cir. 2017) (citing *Wallace v. Kato*, 549 U.S. 384, 387 (2007)).  Florida has a 4-year statute of limitations.  § 95.11, Fla. Stat.; *Burton v. Cty of Belle Glade*, 178 F.3d 1175, 1188 (11th Cir. 1999).  Where "the harm occurs immediately upon, and because of, the statute's enactment," that 4-year statute of limitations begins to run from the date of the enactment.  *Hillcrest Prop., LLC v. Pasco Cnty.,* 754 F.3d 1279, 1282 (11th Cir. 2014).  As a "general principle," however, "a federal claim accrues [and Florida's 4-year statute of limitations begins to run] when the prospective plaintiff knows or has reason to know of the injury which is the basis of the action."  *Boyd,* 856 F.3d at 872.  There is a reason to know of the injury when "the facts which

---

[7] While not specifically pled as an affirmative defense in the Secretary's Answer, the Secretary may still raise statute of limitations as an issue on summary judgment.  *See Grant v. Preferred Research, Inc.*, 885 F.2d 795, 797-98 (11th Cir. 1989).  There is also no prejudice to the Democrats because timeliness has been a defense throughout these proceedings.  The Secretary raised laches as a basis to dismiss the case and as a defense in her Answer.  ECF 21 at 8-10; ECF 77 at 11.  And this Court denied the Motion for Preliminary Injunction on timeliness grounds.  ECF 70 at 2.

would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for [one's] rights." *Mullinax v. McElhenney,* 817 F.2d 711, 716 (11th Cir. 1987).

Regardless of whether the 4-year statute of limitations began to run from enactment or when the Democrats knew or should have known about the "windfall vote" effect, the statute of limitations has run.

If "[a]t its most basic, the Ballot Order Statute injures the Democratic Party and its candidates, as well as voters and organizations that support them," ECF 1 at ¶ 5, then, like a statute affecting property rights, the "harm occur[ed] immediately upon, and because of, the [Ballot Order] [S]tatute's enactment" in 1951. *Hillcrest Prop.*, 754 F.3d at 1282. It was immediately upon its enactment in 1951 that the Democrats became subject to a framework that they knew or should have known would result in them being listed second on the partisan ballots. Like the property owner charged with challenging a framework that applies to his property within 4 years of its enactment, *id. at* 1282-83, the Democrats too had 4 years to challenge this new ballot ordering framework. But 1955 has long since passed.

The statute of limitations ran long ago even if one begins to run the 4-year clock from when the Democrats first learned of the "windfall vote" effect. The first two paragraphs of the Complaint tell us when that was:

1. It has been **well-established**, and there is **ample evidence**, that the candidate listed first on the ballot attracts votes *solely* due to his or her position on the ballot. *See, e.g.,* . . . *Holtzman v. Power,* 62 Misc. 2d 1020, 1023 (**N.Y. Sup. Ct. 1970**) (noting the belief "that there is a distinct advantage to the candidate whose name appears first on a ballot . . . appears to be so widespread and so universally accepted as to make it almost a matter of public knowledge"). This phenomenon is known as "position bias."

2. Florida law mandates that candidates of the political party of the Governor be listed first on the ballot . . . Because a Republican has held the position of Florida Governor for twenty years, this advantage has continued, unabated, for **two decades.**

ECF 1 at ¶¶ 1, 2 (emphasis added in bold). These allegations show that the Democrats knew of the supposed unconstitutionality of Florida's Ballot Order Statute as early as 1970 and seek to undo a supposed disadvantage that has existed for two decades since the election of Governor Bush. The statute of limitations bars claims accruing in 1970 or even 1998.

The individual named plaintiffs fare no better. All have been registered to vote since 1998 or earlier. ECF 1 at ¶¶ 13-15. All claim to be heavily engaged in promoting Democratic candidates and causes and have "meaningfully and thoughtfully cast vote[s] for Democratic Party candidates." ECF 1 at ¶¶ 13-15. But despite seeing their preferred candidates win close elections (Governor Chiles over Governor Bush in 1994) and lose close elections (Governor Scott over CFO Sink in 2010) they still did not challenge the Florida's Ballot Order Statute until

May 24, 2018.  These politically engaged voters either knew or should have known about what they now claim is the allegedly "well-established" harm, supported by "ample evidence," caused by Florida's Ballot Order Statute well before then.   ECF 1 at ¶ 1.  Yet they did nothing until it was too late.

Corporate representative depositions further establish that the Democrats sat on their claims.  The Democrats' corporate representatives have been aware of the "windfall effect" for as long as they have been in politics.  ECF 111 at pg. 1758-59;  1831-32;  2090-91;  2092-93;  1926-27;  1996-97;  2051-52.   They also understand that Florida's approach to determining candidate order has been in place for decades.  ECF 111 at 1762-63; 1837; 2094; 1923; 1999; 2019.  And, with the exception of two corporate representatives who would not answer, all testified that their alleged injuries from the "windfall effect" have persisted since a Republican first became Governor of Florida.  ECF 111 at 1765-66; 1767; 1838-39;  2100-01;  1938-39 (instructed not to answer); 2000-01 (instructed not to answer); 2058-59.

The testimony of these corporate representatives corroborates the only conclusion one must draw from the Democrats' Complaint: the statute of limitations has run.

No continuing violation theory offers the Democrats a reprieve either.  "A continuing violation is occasioned by continual unlawful acts, not by continual ill

effects from an original violation." *Ward v. Caulk,* 650 F.2d 1144, 1147 (9th Cir. 1982).  Statutory changes to parole frequency, for example, are "a one time act with continued consequences" and so the continuing violation theory does not apply to extend the statute of limitations. *Lovett v. Ray,* 327 F.3d 1181, 1183 (11th Cir. 2003).  Statutory registration requirements for sexual offenders are one-time violations that "have effects on [offender] into the future" but no continuing violation theory applies to extend the statute of limitations.  *Meggison v. Bailey,* 575 Fed. App'x 865, 867 (11th Cir. 2014).  Violations of the Clean Air Act's preconstruction permitting process are one-time unlawful acts despite the alleged ongoing effects from running the powerplant.  *Nat'l Parks & Conservation Ass'n v. Tenn. Valley Auth.,* 502 F.3d 1316, 1322-23 (11th Cir. 2007).  Likewise the enactment of Florida's Ballot Order Statute is a one-time alleged violation—not some continual unlawful act.  It is from this one enactment that the allegedly unlawful "windfall vote" effect flows election after election.  The continuing violation theory, therefore, cannot apply to extend the statute of limitations.

Thus, the State's 4-year statute of limitations applies and bars any claim concerning the constitutionality of Florida's Ballot Order Statute.

### C.    <u>Constitutional estoppel applies.</u>

If this Court accepts the Democrats' argument that there is indeed a "windfall vote" and they have a constitutional right to that vote, then the

Democrats are still constitutionally estopped from challenging the constitutionality of a provision from which they have benefited here in Florida, and continue to benefit elsewhere in the country.   As in *Robertson v. Federal Election Commission,* 45 F.3d 486, 490 (D.C. Cir. 1995) and *Wilkinson v. Legal Services Corporation,* 80 F.3d 535, 538 (D.C. Cir. 1996) the doctrine of constitutional estoppel bars such claims.

In *Robertson*, a presidential candidate accepted matching campaign funds from the Federal Elections Commission.  45 F.3d at 488.  When the Commission required that the candidate repay some of the funds because of certain improprieties, the candidate claimed that the Commission had been unconstitutionally constituted.  *Id.* at 489-90.  The D.C. Circuit disagreed:

> It is hardly open to [the candidate] now, after having taken the money, to claim that the very statutory instrumentality by which the funds are dispensed may not seek reimbursement because its composition is unconstitutional . . .
>
> It would seem that a party wishing to make such a challenge must do so before it accepts and spends federal funds—not after, as a ploy to avoid its part of the bargain.

*Id.* at 490.  Simply put, according to the D.C. Circuit, the doctrine of constitutional estoppel precluded a candidate from accepting benefits under a statutory scheme and then challenging the constitutionality of that scheme to avoid the burdens.  *Id.*

In *Wilkinson*, the D.C. Circuit reiterated these principles when reversing a district court's determination that the Legal Services Corporation's Board had been unconstitutionally composed and had, therefore, improperly discharged the Corporation's Inspector General.  80 F.3d at 536-39.  The inspector general had argued that board could not "discharge" him because the board was composed of recess appointees who had not been confirmed by the U.S. Senate consistent as required by Article II, § 2, clause 2 of the U.S. Constitution.  *Id.* at 536.   The D.C. Circuit held that the doctrine of constitutional estoppel precluded the inspector general from challenging the constitutionality of the recess appointments because he had "been employed and *compensated* by a recess appointments [b]oard for nearly two years," *id.* at 538, for "19 of his 24 months" on the job to be more precise.  *Id.* at 536 (citing and quoting *Robertson,* 45 F.3d at 490).   The D.C. Circuit explained that one simply could not "ignore the fact that the [inspector general] was employed and compensated for much of the time by the same allegedly illegal constituted [b]oard."  *Id.* at 538.[8]

---

[8] The only reported case concerning constitutional estoppel from the Eleventh Circuit appears to be *S.J. Groves & Sons Company v. Fulton County*, 920 F.2d 752, 768 (11th Cir. 1991), where the Eleventh Circuit said that "[u]nder the doctrine of constitutional estoppel, one may not 'retain the benefits of a statute or regulation while attacking the constitutionality of one of its provisions.'"  (Quoting *U.S. v. San Francisco*, 310 U.S. 16, 29 (1940)).  But in *S.J. Groves & Sons*, the plaintiffs "ha[d] received no benefits under the [statute being challenged] and so the doctrine did not apply."  *Id.*

Like *Robertson* and *Wilkinson* there is a convergence of constitutional law and common sense in this case.  Chart 1 below shows Florida elections held since the enactment of Florida's Ballot Order Statute.[9]

| CHART 1:  FLORIDA BALLOT ORDER 1952-2018 | | |
|---|---|---|
| **YEAR** | **GOVERNOR** | **PARTY** |
| 1952 | Fuller Warren | Democrat |
| 1954 | Charley E. Johns | Democrat |
| 1956 | Thomas L. Collins | Democrat |
| 1958 | Thomas L. Collins | Democrat |
| 1960 | Thomas L. Collins | Democrat |
| 1962 | Cecil F. Bryant | Democrat |
| 1964 | Cecil F. Bryant | Democrat |
| 1966 | Haydon Burns | Democrat |
| 1968 | Claude R. Kirk | Republican |
| 1970 | Claude R. Kirk | Republican |
| 1972 | Reubin O. Askew | Democrat |
| 1974 | Reubin O. Askew | Democrat |
| 1976 | Reubin O. Askew | Democrat |
| 1978 | Reubin O. Askew | Democrat |
| 1980 | Bob Graham | Democrat |
| 1982 | Bob Graham | Democrat |
| 1984 | Bob Graham | Democrat |
| 1986 | Bob Graham | Democrat |
| 1988 | Robert Martinez | Republican |
| 1990 | Robert Martinez | Republican |

---

[9]  Federal Rule of Evidence 201(b) allows this Court to take judicial notice of facts "not subject to reasonable dispute" because they are "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  This Court can thus take judicial notice of who the names and party affiliations of Florida's Governors from when Florida's Ballot Order Statute was adopted by the 1951 Florida Legislature, Ch. 26870, s. 5, Laws of Fla. (1951), and since 1952 the list of individuals above has served as Governors of Florida.

| 1992 | Lawton Chiles | Democrat |
| 1994 | Lawton Chiles | Democrat |
| 1996 | Lawton Chiles | Democrat |
| 1998 | Kenneth McKay | Democrat |
| 2000 | Jeb Bush | Republican |
| 2002 | Jeb Bush | Republican |
| 2004 | Jeb Bush | Republican |
| 2006 | Jeb Bush | Republican |
| 2008 | Charlie Crist | Republican |
| 2010 | Charlie Crist | Republican |
| 2012 | Rick Scott | Republican |
| 2014 | Rick Scott | Republican |
| 2016 | Rick Scott | Republican |
| 2018 | Rick Scott | Republican |

As the chart makes clear, the Democrats have been listed first in 20 elections to the Republicans 14 elections—thus benefitting more often from any potential advantage. Constitutional estoppel precludes the Democrats from enjoying the benefits of favorable ballot order and then challenging the very statute that conferred those benefits because, though unchanged, it now imposes a burden.

Chart 2 further undermines the Democrats' claim. This chart compiles a list of states with provisions like the statute at issue here and shows that Democrats continue to benefit from ballot order in states other than Florida.[10]

---

[10] The Secretary compiles as exhibits each of these statutes for this Court's convenience. This Court may take judicial notice of these state statutes and the electoral outcomes that determine and correspond to the party that would have been listed first under these statutes since enactment. *See Chaker v. Crogan*, 428 F.3d 1215, 1223 n.8 (9th Cir. 2005); *Demos v. City of Indianapolis*, 302 F.3d 698, 706 (7th Cir. 2002) (district court properly took judicial notice of previously

| CHART 2:  BALLOT ORDER IN OTHER STATES | | |
|---|---|---|
| STATE | OFFICER (as of Jan. 1, 2019) | PARTY |
| Connecticut | Governor-Edward Lamont | Democrat |
| Georgia | Governor-Brian Kemp | Republican |
| Nebraska | Governor-John P. Ricketts | Republican |
| New York | Governor-Andrew Cuomo | Democrat |
| Pennsylvania | Governor-Thomas W. Wolf | Democrat |
| Texas | Governor-Gregory W. Abbott | Republican |
| Indiana | Secretary of State-Connie Lawson | Republican |
| Wisconsin | Governor-Tony Evers | Democrat |
| Michigan | Secretary of State-Jocelyn Benson | Democrat |
| Wyoming | Congressperson-Liz Cheney | Republican |

The Democrats have not challenged or sought to change the ballot order approach in any of these other states.  ECF 111 at 1773; 1852-54; 2104-05; 1931-33; 2008-09; 2046-47, 2063-64.  Apparently, only in Florida does the scheme make for bad public policy.  Elsewhere the Democrats are content with accruing the alleged benefits of their favorable ballot placement.

---

unmentioned state statutes as "matters of public record such as state statutes, city charters, and city ordinances fall within the category of 'common knowledge' and therefore are proper subjects for judicial notice); *see also,* n. 9, *supra.*

As in *Robertson* and *Wilkinson*, the Democrats cannot take with one hand (money from the FEC, recess appointments, or "windfall votes"), only to sue with the other.  Constitutional estoppel applies and bars the Democrats from challenging a statute from which they have benefited in Florida and continue to benefit elsewhere.

### V.   Conclusion

The Democrats would have us believe that the "windfall vote" effect exists but cannot be quantified; that the effect denies no one the right to vote but still harms the Democrats; that there is no intentional discrimination but there is still an equal protection claim; that there is vote dilution under some unidentifiable theory; that it is never too late to pursue a claim against a statute enacted in 1951 even though its alleged flaws had been "well-established" since at least 1970; and that it is okay to challenge a statute *after* it has benefited them and only *where* it does not continue to benefit them.  This is nonsense.  The Democrats and the Republicans have a right to vote, but neither has a right to votes, "windfall" or otherwise.  This Court should grant the Secretary's Motion for Summary Judgment so that she, as the Chief Election Officer, can tackle real issues, implement lessons learned from the 2018 General Election, and focus on planning for Florida's Presidential Preference, Primary, and General Elections in 2020.

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this memorandum complies with the size and font requirements in the local rules. While at 9,931 words this memorandum exceeds the word limit, a request to exceed that limit has also been filed. Intervenors consent to that request.  Plaintiffs take no position on that request.

Respectfully submitted by:

BRADLEY R. MCVAY (FBN 79034)
 *General Counsel*
brad.mcvay@dos.myflorida.com
ASHLEY E. DAVIS (FBN 48032)
 *Deputy General Counsel*
ashley.davis@dos.myflorida.com
FLORIDA DEPARTMENT OF STATE
R.A. Gray Building Suite, 100
500 South Bronough Street
Tallahassee, Florida 32399-0250
(850) 245-6536 / (850) 245-6127 (fax)

*/s/ Mohammad O. Jazil*
MOHAMMAD O. JAZIL (FBN 72556)
mjazil@hgslaw.com
GARY V. PERKO (FBN 855898)
gperko@hgslaw.com
JOSEPH A. BROWN (FBN 25765)
jbrown@hgslaw.com
HOPPING GREEN & SAMS, P.A.
119 South Monroe Street, Suite 300
Tallahassee, Florida 32301
Phone: (850) 222-7500
Fax:  (850) 224-8551

***Counsel for the Florida Secretary of State,
Laurel M. Lee***

Dated:  April 8, 2019

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served through the Court's CM/ECF system to all counsel of record on this 8th day of April 2019.


*/s/ Mohammad O. Jazil*

Attorney