# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

NANCY CAROLA JACOBSON,
TERENCE FLEMING, SUSAN
BOTTCHER, PRIORITIES USA, DNC
SERVICES CORPORATION /
DEMOCRATIC NATIONAL
COMMITTEE, DSCC a/k/a
DEMOCRATIC SENATORIAL
CAMPAIGN COMMITTEE, DCCC a/k/a
DEMOCRATIC CONGRESSIONAL
CAMPAIGN COMMITTEE,
DEMOCRATIC GOVERNORS
ASSOCIATION, and DEMOCRATIC
LEGISLATIVE CAMPAIGN
COMMITTEE,

          Plaintiffs,

   v.

LAUREL M. LEE, in her official capacity
as the Florida Secretary of State,

          Defendant,

and

NATIONAL   REPUBLICAN   SENATE
COMMITTEE,   and   REPUBLICAN
GOVERNORS ASSOCIATION,

          Defendant-Intervenors.

No. 4:18-cv-00262-MW-CAS

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................... 1

STATEMENT OF FACTS ......................................................................... 3

      A.    The Ballot Order Statute ............................................... 3

      B.    Florida's History of Increasingly Close Elections .................... 3

      C.    Position Bias ................................................................ 5

      D.    State Interests in Preserving Ballot Order Statute ................ 8

PROCEDURAL HISTORY ......................................................................... 9

LEGAL STANDARD ................................................................................ 10

      A.    Summary Judgment Standard ..................................... 10

      B.    *Anderson-Burdick* Standard ...................................... 11

ARGUMENT .......................................................................................... 12

   I.    THE STATUTE TREATS SIMILARLY SITUATED MAJOR
       PARTIES DIFFERENTLY, BURDENING THE RIGHT TO
       VOTE ............................................................................. 13

      A.    Position Bias is Well-Established and Has Consistently
          Been Held Unconstitutional When It Discriminates
          Between Similarly Situated Parties in the Elections
          Context ....................................................................... 13

      B.    There Is No Material Dispute That Position Bias Exists in
          Florida ....................................................................... 18

   II.    NO LEGITIMATE STATE INTEREST JUSTIFIES THE
       STATUTE'S POLITICAL FAVORITISM ..................................... 21

      A.    The Statute Cannot be Justified by Claims of
          Administrative Burden ................................................. 22

      B.    The Statute Cannot be Justified by Claims of Voter
          Confusion .................................................................. 25

      C.    The Statute Cannot Be Justified by Defendants'
          Purported Concerns About Error .................................... 29

      D.    Intervenors Concede that Ballot Rotation Would Not
          Interfere with the Preparation of Sample Ballots or Other
          Party Electioneering .................................................... 31

**TABLE OF CONTENTS**
(continued)

**Page**

CONCLUSION ...................................................................................................33

# TABLE OF AUTHORITIES

**Page**

CASES

*Akins v. Secretary of State*,
 154 N.H. 67 (2006) ................................................................6, 19, 20

*Anderson v. Celebrezze*,
 460 U.S. 780 (1983) ..........................................................................12

*Burdick v. Takushi*,
 504 U.S. 428 (1992) ....................................................................12, 30

*Calvin v. Jefferson County Board of Commissioners*,
 172 F. Supp. 3d 1292 (N.D. Fla. 2016) ............................................11

*Celotex Corporation v. Catrett*,
 477 U.S. 317 (1986) ..........................................................................11

*Cordoba v. Dillard's, Inc.*,
 419 F.3d 1169 (11th Cir. 2005) ........................................................29

*Crawford v. Marion County Election Board*,
 553 U.S. 181 (2008) ..........................................................................12

*Elliott v. Secretary of State*,
 295 Mich. 245 (1940) ..........................................................................6

*Florida Democratic Party v. Detzner*,
 No. 4:16CV607-MW/CAS, 2016 WL 6090943 (N.D. Fla. Oct. 16,
 2016) ..................................................................................................23

*Florida Democratic Party v. Scott*,
 215 F. Supp. 3d 1250 (N.D. Fla. 2016) ............................................11

*Gould v. Grubb*,
 14 Cal. 3d 661 (1975) ..................................................................passim

*Graves v. McElderry*,
 946 F. Supp. 1569 (W.D. Okla. 1996).........................................passim

# TABLE OF AUTHORITIES
(continued)

**Page**

*Holtzman v. Power*,
62 Misc. 2d 1020 (N.Y. Sup. Ct. 1970), *aff'd*, 311 N.Y.S.2d 824
(1970) .................................................................................................5, 16, 21

*Josendis v. Wall to Wall Residence Repairs, Inc.*,
662 F.3d 1292 (11th Cir. 2011) .........................................................11

*Kautenburger v. Jackson*,
85 Ariz. 128 (1958)..............................................................................6

*Mann v. Powell*,
333 F. Supp. 1261 (N.D. Ill. 1969)...................................................15

*McLain v. Meier*,
637 F.2d 1159 (8th Cir. 1980) ...................................................passim

*Netsch v. Lewis*,
344 F. Supp. 1280 (N.D. Ill. 1972)..............................................11, 16

*Norman v. Reed*,
502 U.S. 279 (1992).......................................................................12, 13

*Obama for Am. v. Husted*,
697 F.3d 423 (6th Cir. 2012) .............................................................23

*Republican Party of Connecticut v. Tashjian*,
599 F. Supp. 1228 (D. Conn. 1984)...................................................30

*Reynolds v. Sims*,
377 U.S. 533 (1964)............................................................................16

*San Antonio School District v. Rodriguez*,
411 U.S. 1 (1973)................................................................................16

*Sangmeister v. Woodard*,
565 F.2d 460 (7th Cir. 1977) .....................................................passim

*State ex rel. Roof v. Board of Commissioners*,
39 Ohio St. 2d 130 (1974) ...................................................................6

iv

# TABLE OF AUTHORITIES
(continued)

**Page**

STATUTES

Fla. Stat. § 101.151(3)(a) ...................................................................passim

Fla. Stat. § 101.151(3)(b) ................................................................3, 25

N.J. Stat. Ann. § 19:14-12 (West 1999 & Supp. 2009) ...........................................28

RULES

Fed. R. Civ. P. 56(a)..............................................................................10

REGULATIONS

*Election by Lottery: Ballot Order, Equal Protection, and the*
  *Irrational Voter*, 13 N.Y.U. J. LEGIS. & PUB. POL'Y 373 (2010) ......................28

## INTRODUCTION

This case concerns the constitutionality of a Florida law that puts its thumb on the scale in favor of all candidates of a single political party, for as long as their party maintains control of the Governor's mansion. Florida Statute § 101.151(3)(a) (2017) (the "Statute") mandates that candidates of the last-elected Governor's party appear first on the ballot in every partisan election. The result is state-sponsored—indeed, state-*mandated*—favoritism of a single political party in race after race, election after election, in a climate where Florida elections are decided by increasingly razor-thin margins. This follows from the well-demonstrated phenomenon of "position bias," or "primacy effect," whereby the candidate listed first receives an electoral advantage solely due to ballot position. As Defendants' own witnesses admit, this phenomenon has long been observed by those who make their living in politics, and the consensus among those who have studied and published on it is that position bias has a meaningful effect on elections.[1] In fact, if this matter proceeds to trial, *no one* will offer an opinion or evidence that could create a material issue of fact as to whether first-listed candidates enjoy the benefit of position bias.

For over twenty years, this artificial advantage has benefitted the Republican Party and its candidates, for no other reason than that four Republicans have won

---

[1] "Defendants" refers collectively to Florida's Secretary of State (the "Secretary") and the Republican Party Defendant-Intervenors ("Intervenors").

Governor's elections in Florida, and by increasingly vanishingly small margins. Thus, all Republican candidates enjoyed this state-conferred advantage in elections following Rick Scott's election in 2010, where he obtained a mere 1.2% of the vote more than his Democratic opponent. The same was true after Scott's 2014 reelection, which was decided by an even smaller margin—only 1% of the voters who cast ballots preferred Scott over the Democrat in the race. That gap narrowed substantially in 2018, when Republican Ron DeSantis prevailed over Democrat Andrew Gillum by a mere 0.4% of the vote. Because 49.6% of voters cast their ballots for DeSantis (as opposed to 49.2% who voted for Gillum), in every partisan race for the next four years, the Republican candidate will be listed first on every ballot in Florida.

Based on the undisputed evidence, the Court can and should find as a matter of law that the Statute violates the First and Fourteenth Amendments because it treats similarly situated major political parties and the candidates they support differently based solely on who won the last gubernatorial election and burdens the right to vote of those who support the political party that came in second in the last Governor's race. The burden that the Statue imposes on the Democratic Party, its candidates and voters, moreover, is not justified by even a legitimate state interest. Each of these conclusions is well established by the undisputed facts in this case.

## STATEMENT OF FACTS

### A.    The Ballot Order Statute

The Statute at issue mandates that all candidates associated with the party that won the last Governor's election be listed first in every partisan election in Florida that follows—unless and until another party's candidate wins a Governor's election. Specifically, the Statute provides:

> The names of the candidates of the party that received the highest number of votes for Governor in the last election in which a Governor was elected shall be placed first for each office on the general election ballot, together with an appropriate abbreviation of the party name; the names of the candidates of the party that received the second highest vote for Governor shall be placed second for each office, together with an appropriate abbreviation of the party name.

Fla. Stat. § 101.151(3)(a).[2]

### B.    Florida's History of Increasingly Close Elections

Since 1998, the Statute's effect has been to list Republicans first in every partisan race in Florida based on the electoral successes of only four candidates—Jeb Bush in 1998 and 2002, then-Republican Charlie Crist in 2006, Rick Scott in 2010 and 2014, and, in 2018, Governor DeSantis. For the next four years, absent Court intervention, Republican candidates will be consistently listed first on the ballot based on a 0.4% vote differential, where Governor DeSantis received 49.6%

---

[2] A separate provision, not at issue here, provides that major party candidates are followed on the general ballot by minor party candidates, who are followed by unaffiliated candidates, organized in the order in which they qualified. Fla. Stat. § 101.151(3)(b).

of the ballots cast and counted, and Gillum a nearly identical 49.2%.[3] The last eight years of mandated preference for the Republican Party on the ballot was also the result of elections decided by incredibly slim margins, with former Governor Scott winning by only 1% of the vote in 2014, and 1.2% in 2010.

Exceedingly close elections occur regularly in Florida up and down the ballot. In 2018 alone, at least 11 elections were won by a Republican within 2.7 percentage points, including the Governor's race, the U.S. Senate race (decided by 0.2 percentage points), and nine state-legislative races.[4] Two legislative races were decided by fewer than 100 votes.[5] Indeed, over the last roughly 40 years, at least 29 elections were decided within a single percentage point. *See* ECF No. 112-1, at 127-134.[6]

---

[3] All election results in this memorandum are available at the Florida Department of State's Election Reporting System, maintained by the Secretary. *See* Div. of Elections, Fla. Dep't of State, https://results.elections.myflorida.com/Index.asp? (last visited Apr. 7, 2019).

[4] Senate District ("SD") 8 (49.4% to 48.4%); House District ("HD") 15 (50.9% to 49.1%); HD 26 (50.05% to 49.95%); HD 28 (51.3% to 48.7%); HD 29 (51.0% to 49.0%); HD 89 (50.02% to 49.98%); HD 105 (50.4% to 49.6%); HD 115 (50.5% to 49.5%); HD 118 (51.2% to 48.8%).

[5] In HD 26, the Republican received 61 more votes than the Democrat, while in HD 89, the Republican received 32 more votes than the Democrat.

[6] At least 165 elections were decided within the 5.35 percentage point margin that Plaintiffs' expert Dr. Jonathan Krosnick calculates as the ballot order advantage conferred to Republicans in Florida. *See id.*

### C. Position Bias

It is a well-studied and consistently demonstrated phenomenon that people manifest bias toward selecting the first in a set of visually-presented options, as with candidates on ballots. As one court has recognized, this phenomenon is "so widespread and so universally accepted as to make it almost a matter of public knowledge." *Holtzman v. Power*, 62 Misc.2d 1020, 1023 (N.Y. Sup. Ct. 1970), *aff'd*, 311 N.Y.S.2d 824 (1970).

Plaintiffs' expert Dr. Krosnick, who Defendants' expert recognizes as the "best known" and "most cited" authority on position bias, ECF No. 112-2, at 68:22-69:6; *see also* ECF No. 112-3, at 167:11-169:21, examines the "overwhelming evidence that primacy effects have occurred in nearly all of the thousands of elections that have been studied" during the last 70 years. ECF No. 112-1 at 3. As Defendants' expert Dr. Jonathan Klick admits, the consensus among those who have studied and published on position bias is that it is real and impacts elections. ECF No. 112-3, at 176:4-8, 180:1-17.[7] Federal and state courts alike have repeatedly come to the same conclusion. *See, e.g.*, *McLain v. Meier*, 637 F.2d 1159, 1166 (8th Cir. 1980) (affirming "finding of ballot advantage in the first position"); *Sangmeister v. Woodard*, 565 F.2d 460, 465 (7th Cir. 1977) ("[T]he

---

[7] Defendants' other expert, Dr. Michael Jay Barber, similarly acknowledges that "[t]he research suggests that [position bias] occurred in some cases." ECF No. 112-2 at 72:18-19.

trial court's conclusion that 'top placement on the ballot would be an advantage to the plaintiff' is supported by substantial evidence[.]"); *Graves v. McElderry*, 946 F. Supp. 1569, 1576 (W.D. Okla. 1996) (finding "some measure of position bias exists in Oklahoma's" elections); *Akins v. Sec'y of State*, 154 N.H. 67, 71 (2006) (affirming finding that "the primacy effect confers an advantage in elections"); *Gould v. Grubb*, 14 Cal. 3d 661, 664 (1975) (describing finding of position bias as "consistent with parallel findings rendered in similar litigation throughout the country"); *State ex rel. Roof v. Bd. of Comm'rs*, 39 Ohio St. 2d 130, 136 (1974) (recognizing "it is generally agreed" that "candidates whose names appear at the beginning of the list receive some votes attributable solely to the positioning of their names"); *Kautenburger v. Jackson*, 85 Ariz. 128, 130-131 (1958) ("[I]t is a commonly known and accepted fact that where there are a number of candidates for the same office, the names appearing at the head of the list have a distinct advantage."); *Elliott v. Sec'y of State*, 295 Mich. 245, 249 (1940) (same).

Defendants cannot seriously dispute that position bias exists in elections generally, or in Florida specifically. Their own witnesses acknowledge as much. For example, Michael Barnett—Chairman of the Palm Beach County Republican Party and a declarant for Intervenors during the preliminary injunction proceeding—testified it is "common knowledge among everybody involved in politics" that first-listed candidates receive an advantage from their position. ECF

No. 112-4, at 122:1-21; *see also id.* at 99:17-19. Altering the ballot order law, he acknowledged, would deprive Republican candidates of this benefit. *Id.* at 116:20-117:6. Similarly, Oskaloosa County Supervisor of Elections ("SOE") Paul Lux testified, on behalf of Defendants, that it is "absolutely" common for voters to simply vote for the first candidate listed. ECF No. 55-2, at 33.

Defendants' expert witnesses likewise do not dispute the existence of position bias. Dr. Klick provides no opinion as to whether primacy effect occurs in elections generally or in Florida, or whether it has undermined the democratic process. ECF No. 112-3, at 23:13-20, 38:3-43:5, 44:6-9, 182:15-19. Dr. Klick admittedly has no prior experience in studying primacy effect, voter behavior, or election-related statistical modeling. *Id.* at 38:11-39:1, 41:7-42:14. Nevertheless, he admits that, even before his work in this case, he was aware that "there's a conventional wisdom that . . . a systematic benefit" inures to the first-listed candidate on a ballot simply because of position. *Id.* at 42:15-43:5. He further admits that the general consensus among those who have studied and published on ballot order is that primacy effect has a real impact on elections. *Id.* at 176:4-8, 172:12-15.[8] Finally, Dr. Klick's own report concludes that, when he adds in

---

[8] At the same time, Dr. Klick acknowledges that he has not reviewed all of the literature on the topic, or even the vast majority of it. *Id.* at 169:13-176:3 (admitting he relied upon Dr. Krosnick's presentation of the literature as his "starting point," but that, of the over 100 studies discussed by Dr. Krosnick in his report, Dr. Klick only examined eight of them).

various additional variables that he suggests a researcher could "imagine" *might* be relevant to the inquiry, position bias favoring Republicans in Florida remains evident, albeit to a lesser degree than Dr. Krosnick finds. ECF No. 112-5, at 9; *see also* ECF No. 112-3, at 246:20-247:16 (explaining "we can come up with stories as to why those differences *could* be relevant," but admitting he has no basis for believing they actually *are* relevant); *id.* at 272:15-273:16, 371:12-372:17.

Defendants' expert Dr. Barber similarly does not dispute either that position bias exists or the conclusions of the multitude of peer-reviewed studies finding position bias. ECF No. 112-2, at 72:18-20, 69:10-14, 139:17-19; *compare also* Barber et al., *Status Quo in Ballot Wording*, J. of Experimental Poli. Sci. 4, at 152 (2017) (noting "past research has found that small changes in the presentation (or frame) of a ballot question can change the expressed opinion of voters," and "[t]hese biases can depend on . . . the graphic design and presentation of ballots"), *with* ECF No. 112-2, at 49:2-8 (admitting "the graphic design and presentation of a ballot include the order in which candidates are listed").[9]

### D.    State Interests in Preserving Ballot Order Statute

Plaintiffs have deposed seven witnesses offered by Defendants in support of the interests they argue justify the burdens imposed by the Statute. None could logically explain why or how voters would be confused by a change in Florida's

---

[9] Dr. Barber acknowledges that he has only reviewed around 10 studies on position bias in total. ECF No. 112-2 at 65:19-21, 66:3-5.

ballot order, *see, e.g.*, ECF No. 112-4, at 120:17-20, and several affirmatively testified they have no evidence that voters are even aware of ballot order, or are confused when the order of major party candidates flips after a change in the Governor's party. *See, e.g.*, ECF No. 112-6, at 79:3-19, 97:4-22; ECF No. 32, at 5. Several also confirmed that even if there were some risk of confusion, there are multiple ways to educate voters about what to expect on their ballots. *See* ECF No. 112-6, at 96:5-20; ECF No. 112-7, at 170:10-14; ECF No. 112-8, at 98:10-13; ECF No. 112-9, at 104:6-9. SOEs from Miami-Dade, Leon, and Oskaloosa Counties, moreover, admit that should the Statute be found unconstitutional, at least one remedy that the Court might consider—specifically, switching the order of major party candidates on all ballots in half of the counties ("county-by-county rotation")—would impose no additional administrative burdens on the counties. *See* ECF No. 112-6, at 68:4-9; ECF No. 112-8, at 67:13-69:11; ECF No. 112-9, at 119:21-120:18.

## PROCEDURAL HISTORY

On May 24, 2018, Plaintiffs filed a complaint alleging that the Statute is unconstitutional. ECF No. 1. Within a few weeks, two Republican entities intervened on the basis that Republican candidates and organizations "stand to be most directly harmed by a change" in ballot order. ECF No. 23, at 16. Plaintiffs moved for a preliminary injunction, while the Secretary and Intervenors filed

motions to dismiss. ECF Nos. 29, 21, 37. At a hearing held on July 24, the Court denied all pending motions. *See* ECF Nos. 69-71. While the Court declined to grant relief on "the eve of an election," ECF No. 72, at 111:4, it observed that its ruling "in no way minimize[s] the importance of the primacy effect or position bias," *id.* at 110:5-14.

Given Defendants' assertion that implementing a potential remedy would take time, the Court recognized the need to set an "abbreviated schedule" for resolving the case. *Id.* at 53:8. After the November election, trial was scheduled for June 3, 2019, ECF No. 88, and the parties commenced discovery. On March 21, the Court issued an order removing this case from the trial calendar, indicating it would select a new trial date after ruling on dispositive motions. *See* ECF No. 106.[10]

## LEGAL STANDARD

### A.    Summary Judgment Standard

A court must grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.

---

[10] Plaintiffs filed a motion for reconsideration on March 22, requesting that the Court reinstate the June trial because of the time-sensitive nature of the dispute and the difficulty of rescheduling. *See* ECF No. 107. That motion is now fully-briefed.

56(a). The moving party "bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then "shifts to the non-moving party to rebut that showing by producing affidavits or other relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011).

Summary judgment is appropriate when the undisputed facts show that a voting system or procedure violates the Constitution. *See Calvin v. Jefferson Cty. Bd. of Comm'rs*, 172 F. Supp. 3d 1292, 1326 (N.D. Fla. 2016) (Walker, J.) (granting summary judgment for plaintiffs in vote dilution case); *Netsch v. Lewis*, 344 F. Supp. 1280, 1280 (N.D. Ill. 1972) (granting summary judgment for plaintiffs and enjoining statute that granted incumbents favorable ballot placement in violation of the Fourteenth Amendment).

### B.    Anderson-Burdick Standard

When a state election law is challenged on First or Fourteenth Amendment grounds, courts apply the "*Anderson-Burdick*" standard. *See Graves*, 946 F. Supp. at 1578-79 (applying test to ballot order statute that favored Democrats and finding it unconstitutional); *see also Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1256 (N.D. Fla. 2016). That standard requires the Court to "weigh 'the character and magnitude of the asserted injury to the rights . . . the plaintiff seeks to

vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). It is a "flexible" sliding scale, where "the rigorousness of [the court's] inquiry . . . depends upon the extent to which [the challenged law] burdens [voting rights]." *Id.* Thus, when a law subjects voting rights to a "severe" restriction, it "must be narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed*, 502 U.S. 279, 280 (1992). Less severe burdens remain subject to balancing: "[h]owever slight" the burden on voting rights "may appear," "it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (controlling op.) (quoting *Norman*, 502 U.S. at 288-89).

## ARGUMENT

This Court should grant summary judgment and hold the Statute unconstitutional, because: (1) it treats similarly situated major political parties, their candidates, and the voters who support them differently and burdens the voting rights of voters who support the party that received the second highest number of votes in the last gubernatorial election; and (2) it cannot be justified by any legitimate state interest. Numerous courts have found that similar statutes

unconstitutionally burden the right to vote, and there is no dispute among the parties here that position bias exists in Florida—indeed, Defendants' experts offer no opinion on that question at all. Even assuming for purposes of summary judgment that these facts trigger only *Anderson-Burdick's* most lenient standard of review, the Secretary still must proffer some legitimate state interest to justify the law, but she has offered none. Instead, throughout this litigation, the Secretary has only offered purported interests that either fail as a matter of law or are contradicted by undisputed facts, address potential remedies rather than justifications for the Statute itself, or are pure speculation with no factual underpinning. None justifies the political favoritism mandated by the Statute, and the Court should grant summary judgment to Plaintiffs.

## I.    THE STATUTE TREATS SIMILARLY SITUATED MAJOR PARTIES DIFFERENTLY, BURDENING THE RIGHT TO VOTE

### A.    Position Bias is Well-Established and Has Consistently Been Held Unconstitutional When It Discriminates Between Similarly Situated Parties in the Elections Context

On its face, the Statute treats "the candidates of the party that received the highest number of votes for the Governor in the last election" differently than the similarly situated "candidates of the party that received the second highest vote for Governor," Fla. Stat. § 101.151(3)(a), to the systemic disadvantage of the latter. Because, over the last 21 years, the candidates who have obtained the highest number of votes for Governor (by increasingly infinitesimal amounts) have all run

as Republicans, for over two decades that statutory advantage has consistently accrued in favor of the Republican Party, its candidates, and the voters who support it—and to the detriment of the Democratic Party, its candidates, and its voters. *See* Fla. Sec'y of State, http://dos.myflorida.com/elections/candidates-committees/political-parties/ (last visited Apr. 7, 2019) (classifying Republican and Democratic parties as the two "major political parties" in Florida); *Graves*, 946 F. Supp. at 1572 (finding Republican Party candidates similarly situated to Democratic Party candidates).

Courts that have considered challenges to similar schemes have easily found them in violation of the Fourteenth Amendment. For example, in *Graves*, the court applied *Anderson-Burdick* to strike down an Oklahoma law that mandated that Democrats be listed first in each race on every general election ballot, holding it violated the Equal Protection Clause. 946 F. Supp. 1569. In doing so, the court found that "*no* legitimate State interest . . . can possibly be served by the selection of one particular party's candidates for priority position on every General Election ballot." *Id.* at 1580 (emphasis added).

In *McLain*, the Eighth Circuit found that a system that consistently listed first the candidates of the party that received the most votes in the last North Dakota congressional election "burden[ed] the fundamental right to vote possessed

by supporters of the last-listed candidates, in violation of the fourteenth amendment." 637 F.2d at 1167.

In *Gould*, the California Supreme Court similarly struck down as unconstitutional a procedure that automatically afforded "an incumbent, seeking reelection, a top position on the election ballot." 14 Cal. 3d at 664. As is the case here, the California scheme "establishe[d] two classifications of candidates for public office," which imposed "a very 'real and appreciable impact' on the equality, fairness and integrity of the electoral process." *Id.* at 669-70. Based on the court's finding "that any procedure which allocates such advantageous positions to a particular class of candidates inevitably discriminates against voters supporting all other candidates," it applied strict scrutiny and found the statute wanting. *Id.* at 664.

All of these cases are consistent with *Mann v. Powell*, the only opportunity the Supreme Court has had to consider the constitutionality of a ballot-ordering system that gives one category of candidates a systemic advantage. After the district court issued a preliminary injunction requiring that ballot order in the upcoming election be determined by "nondiscriminatory means" providing each candidate "an equal opportunity to be placed first on the ballot," 314 F. Supp. 677,

679 (N.D. Ill. 1969), the Supreme Court summarily affirmed that ruling. *Mann*, 398 U.S. 955 (1970).[11]

The cases discussed above present just a few examples of courts that have found similar ballot order statutes unconstitutional on Fourteenth Amendment grounds. *See, e.g.*, *Sangmeister*, 565 F.2d at 468 ("This court will not accept a procedure that invariably awards the first position on the ballot to . . . the incumbent's party.") (citation omitted); *Netsch*, 344 F. Supp. at 1280 (holding statute prescribing ballot order by past electoral success violated equal protection); *Holtzman*, 62 Misc.2d at 1025 (holding system requiring incumbent at top of ballot unconstitutional).

Further, many of these cases specifically find that position bias imposes a significant burden on the voting rights of voters whose preferred candidates consistently appear later on the ballot. *See McLain*, 637 F.2d at 1167; *Gould*, 14 Cal.3d at 672 (relying on Supreme Court precedent to find that incumbent-first statute "substantially dilutes the weight of votes of those supporting nonincumbent candidates"); *Graves*, 946 F. Supp. at 1579 ("[T]he existence of position bias arising from ballot configuration . . . infringes upon the careful and thoughtful

---

[11] The lower court later issued a permanent injunction. *Mann v. Powell*, 333 F. Supp. 1261, 1267 (N.D. Ill. 1969) ("*Mann II*") (rejecting argument that "favoring certain candidates on the basis of 'incumbency' or 'seniority' is constitutionally permissible").

voters' rights of free speech and association by negating the weight or impact of those citizens' votes for candidates for public office.").

These authorities are consistent with long-standing Supreme Court authority recognizing that voters have the right, "implicit in our constitutional system, to participate in state elections on an equal basis with other qualified voters." *San Antonio Sch. Dist. v. Rodriguez,* 411 U.S. 1, 35 n.78 (1973); *see also Reynolds v. Sims*, 377 U.S. 533, 568 (1964) ("[A]n individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of [other] citizens[.]"). The practical effect of the Statute is to directly infringe upon that right: because more Democratic voters must turn out and support their candidates to counteract the advantage the Statute confers on Republicans, one Republican voter has effectively more voting power than one Democratic voter. *See Gould*, 14 Cal. 3d at 670 ("[A] statute, ordinance or election practice which reserves such an advantage for a particular class of candidates inevitably dilutes the weight of the vote of all those electors who cast their ballots for a candidate who is not included within the favored class.").

Defendants do not dispute that some statutes automatically elevating certain candidates to the top of the ballot are unconstitutional. For instance, the Secretary agrees that the statute at issue in *Graves*, which required that Democratic candidates be listed first in all races, is "blatantly discriminatory." ECF No. 44, at

11. But this view only makes sense if there is some meaningful benefit that inures to the first-listed candidate. Otherwise, why is a statute requiring that Democrats be listed first anything other than a predictable and convenient ordering system that a state may use in administering elections? Indeed, the Statute *only makes sense* if the legislature believed that being listed first conferred some advantage for candidates of the governor's party. *See Gould*, 14 Cal.3d at 668 n.8 ("The legislature must have deemed [ballot] position of real advantage[.]").

Intervenors similarly recognize the inherent unfairness created by incumbent-first statutes, in which "incumbents are automatically favored on the ballot for no other reason other than that they are incumbents." ECF No. 51, at 5; *see also id.* at 6-7 (attempting to distinguish "incumbent first cases"). But to the extent that there are any meaningful differences between incumbent-first statutes and the Florida Statute, they only illuminate the *more significant burden* imposed here. While incumbency-first statutes give ballot order preference to specific candidates for whom voters have already expressed a preference, the Florida Statute puts a thumb on the scale, consistently and without exception, for *all* candidates associated with the Governor's political party based entirely on the results of the last Governor's election, no matter how unrelated the seat, that it has been years since that election, or that the candidate who won it may be no longer eligible to serve as Governor. That advantage persists into the next Governor's

election, giving the entrenched party an advantage yet again. In short, by conceding a burden caused by Democrat-first and incumbent-first statutes, Defendants have conceded the burden here.

### B.    There Is No Material Dispute That Position Bias Exists in Florida

Florida presents no exception to the rule that first-listed candidates receive a meaningful electoral advantage. Indeed, the Chairman of the Palm Beach County Republican Party testified that it is "common knowledge among everybody involved in politics" that the candidate listed first on the ballot receives an advantage from that position. ECF No. 112-4, at 122:1-21; *see also id.* at 99:17-19.

To the extent there is a dispute among the parties here, it involves only the numerical extent of the primacy effect in Florida. Dr. Krosnick's statistical analysis demonstrates that "Republican candidates have gained 5.35 percentage points on average by being listed first on the ballot, and Florida Democratic candidates have gained 4.57 percentage points on average by being listed first." ECF No. 112-1, at 3. Neither of Defendants' experts offers an opinion that position bias does not exist and influence elections, in Florida or elsewhere. *See* ECF No. 112-2, at 72:18-20; ECF No. 112-3, at 23:13-20, 44:6-9, 182:15-19, 371:12-372:17. Indeed, Dr. Klick's own report, which posits that different variables (that Dr. Klick "pulled out of [his] head") might have been used by Dr. Krosnick, ECF No. 112-3, at 273:14-16, still concludes that Republicans in Florida receive a ballot order advantage of

slightly under a percentage point. ECF No. 112-5, at 9. As Florida's most recent Governor's election aptly illustrates, that percentage point is dispositive for some incredibly crucial Florida elections.

In any event, Plaintiffs need not show that the percentage point impact of position bias meets a certain threshold to be unconstitutional. After all, "even a small degree of influence carries the potential to change the result of an election." *Akins*, 154 N.H. at 72–73. Courts routinely invalidate ballot-order statutes similar to the one at issue here without determining the precise magnitude of the effect. *See, e.g.*, *id.* (striking down statute on finding "that the primacy effect influences, even to a small degree, the outcome of New Hampshire elections"); *Gould*, 14 Cal. 3d at 668 (finding "significant," but unquantified, advantage accrued to candidates even in high-visibility elections); *Graves*, 946 F. Supp. at 1576 (finding effect of position bias "may be slight" but concluding "some measure of position bias exists in" Oklahoma elections). So too here, the Court can and should conclude on summary judgment that, even if the primacy effect here is "slight," the Statute impermissibly burdens Plaintiffs.[12]

---

[12] The Court may also conclude that the Statute imposes a burden based on the undisputed conclusions in the veritable mountain of previous peer-reviewed studies finding position bias, as, like in *Gould*, "nothing in the record suggests that [Florida] voters differ significantly from the voters who participated in the numerous elections that were studied." 14 Cal. 3d at 667-68, n. 7 (finding position bias exists in Santa Monica elections, based on studies examining elections outside of Santa Monica); *see also McLain*, 637 F.2d at 1166 (finding position bias exists

Without a ruling from the Court (either on summary judgment or following a trial), a difference of 0.4% of the vote share in the 2018 gubernatorial race will result in a systematic disadvantage to the Democratic Party and its candidates in every single race for partisan office in Florida, perpetuating and compounding the disadvantage resulting from the (all too slim) electoral victories for Republican governors over the last two decades. The Statute undisputedly creates an unlevel playing field, under which Plaintiffs have suffered and (absent an injunction) will continue to suffer a meaningful disadvantage from the outset. *See McLain*, 637 F.2d at 1166 ("[V]ictory may in fact turn on the windfall vote which accompanies an advantageous ballot position.").

## II.   NO LEGITIMATE STATE INTEREST JUSTIFIES THE STATUTE'S POLITICAL FAVORITISM

The Statute cannot be justified by a legitimate, much less compelling, state interest. Given the severity of the burden that it imposes, the Statute must be narrowly tailored to advance a compelling state interest. *See Gould*, 14 Cal. 3d at 675. But even if the Court were to assume for purposes of this motion that the least stringent level of scrutiny applies, the Statute still fails constitutional muster because there is no legitimate basis for favoring one major political party over the

---

based on studies "not perfectly suited to the facts of th[e] case"); *Sangmeister*, 565 F.2d at 466 (rejecting defendants' "attempt to discount the effect of [position bias] studies by arguing that none of them deals with an Illinois general election"); *see also* ECF No. 112-2 at 75:10-12; ECF No. 112-3 at 173:10-13.

other. *See, e.g.*, *McLain*, 637 F.2d at 1167 (finding state's "favoritism" of the political party that received the most votes in the last congressional election failed rational basis test); *Graves*, 946 F. Supp. 1569 (finding no legitimate state interest in always listing one major political party first); *Holtzman*, 62 Misc.2d at 1024 (holding no rational basis for "favoritism to a candidate merely on the basis of his having been successful at a prior election").

Since the inception of this case, Defendants have offered a number of interests that they argue justify maintaining Florida's ballot ordering scheme, all of which fail as a matter of law. Specifically, Defendants have articulated a purported state interest in (1) avoiding administrative burden, *see* ECF No. 112-10, at 2; (2) "developing comprehensible ballots to avoid voter confusion," ECF No. 21, at 19; and (3) avoiding error on behalf of elections administrators, ECF No. 112-7, at 194:10-19, 210:4-25. Intervenors also asserted an interest in effective electioneering. *See* ECF No. 23-1; *see also* ECF No. 112-11, at 4-5. But as explained further below, none of these justifications explains why the State must maintain its existing system of political favoritism, as opposed to a constitutional system that would ensure a more level playing field. Tellingly, Defendants have never suggested that the State has a legitimate interest in favoring the political

party of the last-elected governor.[13] Nor could they, as "[p]olitical patronage is not a legitimate state interest which may be served by a state's decision to classify or discriminate in the manner in which election ballots are configured as to the position of candidates on the ballot." *Graves*, 946 F. Supp. at 1580-81.

## A. The Statute Cannot be Justified by Claims of Administrative Burden

Defendants' administrative burden argument fails as a matter of law. "[N]umerous cases have refused to permit the state to justify discriminatory legislation on the basis of similar 'administrative efficiency' interests." *Gould*, 14 Cal. 3d at 675; *see also Obama for Am. v. Husted*, 697 F.3d 423, 434 (6th Cir. 2012) (finding state interest in "smooth election administration" insufficient to justify disparate burden on voters); *Fla. Democratic Party v. Detzner*, No. 4:16CV607-MW/CAS, 2016 WL 6090943, at *7 (N.D. Fla. Oct. 16, 2016) (finding administrative inconvenience in allowing voters to cure vote-by-mail ballots insufficient to justify burden on voters).

Moreover, Defendants' asserted administrative burdens are directed at just one of a host of potential *remedies* to the constitutional burden, not the burden itself. Specifically, Defendants contend that rotating candidates on the ballot *could* raise issues with "election administration, including voter education, staff training,

---

[13] In fact, the Secretary has admitted that the State does not have such an interest. *See* ECF No. 112-7 at 162:11-19.

[] preparation and testing of voting equipment," and tabulating election results, ECF No. 112-7, at 197:21-25. But regardless of whether these administrative burdens are as problematic as Defendants proclaim, they fall away if the Court were to order county-by-county rotation as a remedy to the constitutional violation.[14] Indeed, each of the county SOEs who have testified thus far in this case agrees that county-by-county rotation could be implemented without imposing administrative burdens. *See* ECF No. 112-6, at 68:4-9 (Miami-Dade SOE describing "no [administrative] impact" from changing order of candidates by county); *see also id.* at 60:6-61:20, 74:7-21, 82:9-19; ECF No. 112-8, at 51:3-10, 67:13-69:11, 71:9-74:8 (Leon County SOE concluding "we could probably do" county-by-county rotation and describing "fairly straightforward" change to county-level processes requiring no software change or additional certification); ECF No. 112-9, at 119:21-120:18 (Okaloosa County SOE explaining current system is capable of county-by-county rotation and would require no software certification); ECF No. 55-2, at 130-32 (Florida counties could change ballot order right now, because current software would allow county-by-county rotation and would accurately tabulate results); ECF No. 56, at 4 (former Leon County SOE

---

[14] Under a county-by-county rotation system, the Division of Elections would create a list of Florida's 67 counties ranked, for example, by number of registered voters, and ballot order of Republicans and Democrats would be assigned on an alternating county-by-county basis progressing down the list. All ballots in any one county would list either Republicans or Democrats first for all partisan races in that county.

stating "[a]ll of the concerns about administrative burden . . . would be addressed as long as all of the ballots in each county (under the direction of each county SOE) had one uniform ballot order"). Similarly, representatives from Election Systems & Software and Dominion Voting Systems—the two voting-systems vendors in Florida—testified that their voting technology can easily accommodate county-by-county rotation. *See* ECF No. 112-12, at 37:10-39:15; 42:4-45:7; ECF No. 112-13, at 48:2-54:19.

Plaintiffs' burden in this case is to establish a constitutional violation, not to fend off attacks on every conceivable remedy to that violation. Should the Court find a constitutional violation, it is not tied to any one remedial option. Defendants' proffered state interest in avoiding a specific remedy, meanwhile, fails to justify the burdens imposed by the Statute in the first place.

### B.   The Statute Cannot be Justified by Claims of Voter Confusion

Defendants claim an interest in avoiding voter confusion, but they fail to explain why a constitutional system would be any more confusing than the current system. Whether the first candidate on the ballot secured that favorable position through political favoritism or through some more equitable method of selection should make no difference to the voter. *See Sangmeister*, 565 F.2d at 467 (finding it "difficult to understand" how the practice of County Clerks placing their own political party in the first ballot position avoids confusion or maintains ballot

predictability "any more efficiently than would a neutral system of ballot placement").

Claims of voter confusion might make some sense if Plaintiffs, for example, were challenging the ballot order of *all* candidates—major party, minor party, and non-party candidates alike. *See* Fla. Stat. § 101.151(3)(b). In that instance, voters searching for the major party candidates (which, under the Secretary's definition of "major" political party, is the vast majority of voters) may encounter some difficulty locating their preferred choice. But Plaintiffs do not make any such challenge. Instead, Plaintiffs' focus is entirely on the treatment of the parties in the top tier of Florida's tiered system, within which the Statute automatically elevates the candidates of one major party over those of another. For the same reason, the State's asserted interest in facilitating "straight party voting" or partisan "symmetry," *see* ECF No. 21, at 19; ECF No. 37, at 16, or in allowing "voters to more quickly find their preferred choice for a given office," *see* ECF No. 112-10, at 2, is in no way implicated by Plaintiffs' challenge. While a state's differential treatment of candidates who are *not* similarly situated might be justified by an interest in avoiding voter confusion, the same cannot be said where the two major political parties, clearly similarly situated, are subject to disparate treatment that systematically prejudices the unfavored party and the voters who support it. If

anything, that favoritism operates to *capitalize and enhance* voter confusion to the sole advantage of the favored political party.

It is thus not surprising that Defendants' witnesses cannot provide factual support for their voter confusion claim. The Miami-Dade SOE testified that she could not recall any instance in which a voter questioned or was confused by the order of candidates on a ballot; nor could she recall any situation in which voters were confused when Democrats and Republicans traded places after an election pursuant to the Statute. ECF No. 112-6, at 79:3-19, 97:4-22. Similarly, Palm Beach County Republican Party Chairman Barnett testified that he had no facts to support his earlier claim (made through an affidavit submitted at the preliminary injunction stage) that voters would be confused if the ballot order changed. ECF No. 112-4, at 120:17-20. This is consistent with the experience of former long-time Leon County SOE Sancho, who does not recall any voter confusion resulting from the change in ballot order after Jeb Bush was first elected Governor of Florida in 1999. ECF No. 32, ¶ 11.

To the extent that Defendants argue that voter confusion would inure from a potential mismatch between sample ballots published by the SOEs and the actual ballots some voters receive, *see* ECF No. 112-7, at 201:7-202:9, that argument also fails based on the undisputable facts. While SOEs typically create multiple different ballot styles for individual precincts within their counties, the SOEs

27

testified that each county mails a single, composite sample ballot that does not list all the races voters may see on their ballot. *See* ECF No. 112-6, at 94:19-95:13; ECF No. 112-8, at 90:11-14, 95:9-16; ECF No. 112-9, at 92:9-93:17. Thus, the present system already entails such a mismatch.

Moreover, any concern about voter confusion could be alleviated by notifying voters about the mismatch, just as some counties currently notify voters that not all races appearing on the composite sample ballot will appear on each actual ballot, ECF No. 112-6, at 96:5-14; by the State's voter hotline, which already addresses concerns of voter confusion, ECF No. 112-7, at 170:10-14; or by sending individual sample ballots that mirror the voters' ballot, *see* ECF No. 112-8, at 98:10-13; ECF No. 112-9, at 104:6-9.

It is also undisputed that, "twelve states [as of 2010] use some form of rotation, either in practice or by statute." Laura Miller, *Election by Lottery: Ballot Order, Equal Protection, and the Irrational Voter*, 13 N.Y.U. J. LEGIS. & PUB. POL'Y 373, 380 (2010).[15] Defendants are not expected to offer any evidence that voters in those states are any more confused by their ballots than voters in Florida. Nor are they likely to be able to offer any evidence that would contradict the testimony of Jessica Burns, the Executive Director of the nonpartisan League of Women Voters in New Jersey, who has never heard of any voter confusion

---

[15] As of 2010, an additional 17 states assign ballot order alphabetically or by lottery. *See id.* at 382.

resulting from New Jersey's ballot order system, *see* ECF 112-14 at 13:20-17:2, which uses a lottery to determine the ballot order for each county, N.J. Stat. Ann. § 19:14-12 (West 1999 & Supp. 2009).

Courts considering schemes similar to the system of political favoritism at issue here have rejected arguments that purported concerns about voter confusion justify their disparate and burdensome impacts. *See, e.g.*, *McLain*, 637 F.2d at 1167 (finding "making the ballot as convenient and intelligible as possible for the great majority of voters" is not a legitimate state interest that can justify uniform first-listing of candidates of party receiving most votes in last congressional election); *Gould*, 14 Cal. 3d at 672 (rejecting argument that interest in promoting "efficient, unconfused voting" justified incumbent-first ballot order system); *Sangmeister*, 565 F.2d at 467 (ordering names on ballot based on past electoral success not justified by "the administrative need to avoid confusion and to have a consistent practice so that voters will know in advance where the parties will be on the ballot"). The Court should reach the same result here.

## C.    The Statute Cannot Be Justified by Defendants' Purported Concerns About Error

Defendants also raise the specter of potential errors if Florida adopted a ballot ordering system other than the one currently in place. Again, however, the risk of error (if any) depends on the type of system adopted at the *remedy* stage. Miami-Dade County SOE White testified, for example, that there would be no

change in her office's processes or systems if the order of major party candidates were rotated on a county-by-county basis, which means that the risk of error in such a system would be the same as it is now. ECF No. 112-6, at 82:9-83:5; *see also* ECF No. 112-8, at 67:13-69:11, 71:9-74:8 (implementing county-by-county rotation be "straightforward" at the county level); ECF No. 112-9, at 131:1-12 (no software certification would be required to list Democrats first on every ballot in the county).

In any event, Defendants' concerns are purely speculative and, as such, cannot give rise to a material dispute of fact. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.") (quoting *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 931–32 (7th Cir. 1995)) (internal quotation marks omitted). Palm Beach County Republican Party Chairman Barnett testified, for example, that the election mishaps he listed in his affidavit submitted at the preliminary injunction stage were isolated incidents that had nothing to do with the order in which candidates appeared on the ballot. ECF No. 112-4, at 50:11-73:19, 76:13-17; *compare* ECF No. 42-5, at ¶ 9.

*    *    *

Ultimately, Defendants' asserted state interests attempt only to justify maintaining the status quo, whatever that may be. Under Defendants' logic, these same interests would justify a ballot ordering scheme mandating that all Democrats be listed first on the ballot, *see Graves*, 946 F. Supp. 1569, as long as that had long been the rule. Defendants' mere resistance to change, however, cannot justify maintaining an unconstitutional system that uniformly advantages one party over another to the consistent detriment of the disfavored party, its candidates, and its voters. *See, e.g.*, *Burdick*, 504 U.S. at 434; *Republican Party of Conn. v. Tashjian*, 599 F. Supp. 1228, 1241 (D. Conn. 1984) ("There is nothing legitimate or reasonable, much less compelling, about an asserted state interest in freezing the parties in *status quo*."). Accordingly, based on the undisputed facts and as a matter of law, none of Defendants' justifications withstand scrutiny.

### D. Intervenors Concede that Ballot Rotation Would Not Interfere with the Preparation of Sample Ballots or Other Party Electioneering

During the preliminary injunction phase, Intervenors asserted that changing Florida's ballot ordering scheme would cause them harm, *see* ECF No. 42, at 30, and offered the affidavit of Palm Beach County Republican Party Chairman Barnett, stating that adopting a new system would complicate the Republican Party's production and distribution of sample ballots, *see* ECF No. 42-5, at 4. When Plaintiffs requested that Intervenors describe their anticipated injuries in

interrogatories, Intervenors responded that varying ballot order "by any criterion" would hinder "the creation, administration, and distribution of sample ballots" and necessitate "extensive voter education efforts" that would diminish their "ability to undertake their traditional candidate and issue advocacy." ECF No. 112-11, at 4.

Less than six weeks later, during Chairman Barnett's deposition, it was revealed that the "sample ballots" issued by the Republican Party are simply lists of favored Republican candidates—no Democrats appear on these lists, so ballot order is a non-issue. ECF No. 112-4, at 93:4-94:9; *id.* at 111:3-17; *see also id.* at 78:22-82:12, 84:2-11, 86:5-87:22, 89:4-22, 91:1-93:20, 95:1-96:6, 97:9-98:17, 103:3-11. In fact, Barnett testified that he could not think of *any* action the Republican Party would take if the ballot-order system were to change. *Id.* at 119:6-15. He feared only that Republicans would no longer enjoy the benefit of appearing first on the ballot. *See id.* at 99:1-19, 116:20-117:11. Subsequently, Intervenors amended their interrogatory response, conceding that "how states places [sic] candidates on their ballots do *not* impact [Intervenors'] election day operations, get-out-the-vote efforts, or policies." ECF No. 112-15, at 3 (emphasis added).

Intervenors' shifting position on this point is telling. When they first sought intervention, they asserted that Republican organizations "stand to be most directly harmed by a change" to the current ballot ordering regime. ECF No. 23, at 16.

When pressed on their alleged injury in discovery, they provided a fulsome description of the impact any change would have on their Election Day campaign efforts. ECF No. 112-11, at 4. Now that the facts have unfolded, those alleged harms have undisputedly fallen away, exposing the one and only reason Intervenors have injected themselves into this case: Ballot order matters and has a real impact on electoral outcomes in Florida.

Plaintiffs agree that Intervenors have the most to lose by a court order leveling the playing field. But Intervenors' naked desire to retain the advantage of position bias not only fails to justify the constitutional burden imposed on Plaintiffs, it brings it into sharper relief.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment should be granted.

## LOCAL RULE 7.1(F) CERTIFICATION

Counsel for Plaintiffs, Fritz Wermuth, Esquire, certifies that this motion contains 7,828 words, excluding the case style, table of contents, table of authorities, and certificate of service.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 8, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

Respectfully submitted,

/s/ Frederick S. Wermuth
Frederick S. Wermuth
Florida Bar No.: 0184111
KING, BLACKWELL, ZEHNDER
     & WERMUTH, P.A.
P.O. Box 1631
Orlando, FL 32802-1631
Telephone: (407) 422-2472
Facsimile: (407) 648-0161
fwermuth@kbzwlaw.com

Marc E. Elias
Elisabeth C. Frost*
Jacki L. Anderson*
John M. Geise*
PERKINS COIE LLP
700 Thirteenth St., N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-9959
melias@perkinscoie.com
efrost@perkinscoie.com
jackianderson@perkinscoie.com
jgeise@perkinscoie.com

Abha Khanna*
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: (206) 359-8000
Facsimile: (206) 359-9000
akhanna@perkinscoie.com

*Counsel for the Plaintiffs*
*Admitted Pro Hac Vice*

34

35