## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

NANCY CAROLA JACOBSON,
TERENCE FLEMING, SUSAN
BOTTCHER, PRIORITIES USA, DNC
SERVICES CORPORATION /
DEMOCRATIC NATIONAL
COMMITTEE, DSCC a/k/a
DEMOCRATIC SENATORIAL
CAMPAIGN COMMITTEE, DCCC a/k/a
DEMOCRATIC CONGRESSIONAL
CAMPAIGN COMMITTEE,
DEMOCRATIC GOVERNORS
ASSOCIATION, and DEMOCRATIC
LEGISLATIVE CAMPAIGN
COMMITTEE,

            Plaintiffs,

    v.

LAUREL M. LEE, in her official capacity
as the Florida Secretary of State,

            Defendant,

and

NATIONAL REPUBLICAN SENATE
COMMITTEE, and REPUBLICAN
GOVERNORS ASSOCIATION,

            Defendant-Intervenors.

No. 4:18-cv-00262-MW-CAS

## [PLAINTIFFS' PROPOSED] ORDER

Every year the University of Florida and Florida State go head-to-head in one of college football's most anticipated rivalry games of the season. Imagine a rule that granted the winner of last year's game a five-yard advantage on each possession in next year's game. Imagine further that a similar advantage accrued to every other sports team affiliated with the winning school when competing against its rival college—basketball, volleyball, track & field, etc. Under this system, a single win in a single game reaps an arbitrary advantage in *both* the next decisive game *and* a host of other athletic contests between the two schools, to the singular advantage of one institution, its athletes and students, and to the detriment of the other institution and *its* athletes and students.

This is a case about the constitutionality of a Florida law that has this same effect; the playing fields at issue, however, are Florida's elections. Plaintiffs allege that Fla. Stat. § 101.151(3)(a) (the "Statute") grants, to the political party whose candidate won the last Governor's election, an artificial and unfair advantage in every single partisan general election thereafter, until another party's candidate wins a subsequent Governor's race. The Statute mandates that, "[t]he names of the candidates of the party that received the highest number of votes for Governor in the last election in which a Governor was elected shall be placed first for each office on the general election ballot . . . [and] the names of the candidates of the party that received the second highest vote for Governor shall be placed second for each office[.]" Fla. Stat. § 101.151(3)(a). The advantage conferred by that mandate is the result of a phenomenon known as "position bias," or "primacy effect," whereby the candidate listed first receives an electoral advantage solely due to

ballot position.[1] In this case, the evidence demonstrates that, on average, first-listed candidates have gained approximately five percentage points more of the vote share, simply due to ballot order.

In a state where elections are decided by razor-thin margins, the advantage conferred by the Statute is not just significant, in many cases it has likely been decisive. The losers are not only the candidates who must run, election after election, against both their opponent *and* a state-mandated edge that favors that opponent simply because of the political party with which they affiliate, but also Florida voters, nearly half of whom have cast ballots whose power is directly diluted by the operation of the Statute.

For over twenty years, this artificial advantage has operated to the substantial benefit of the Republican Party and its candidates and voters—including Intervenor Defendants the National Republican Senatorial Committee and the Republican Governors Association (together, "Republican Party Intervenors" or "Intervenors")—for no other reason than that four Republicans have won Governor's elections in Florida, and by increasingly small margins. In 2010, Rick Scott was elected within only 1.2 percentage points more of the vote share than his Democratic opponent. In 2014, Scott won by an even smaller margin. And last November, Republican Ron DeSantis prevailed over Democrat Andrew Gillum in the Governor's race by a mere 0.4 percentage points. Because 49.6% of voters cast their ballots for DeSantis (as opposed to 49.2% who voted for

---

[1] Other terms for this phenomenon include "ballot order effect" and "candidate name order effect."

Gillum), the Statute now mandates that, in every partisan race for the next four years, the Republican candidate will be listed first on every ballot in Florida.

Plaintiffs, a collection of Democratic Party committees, non-profit organizations, and voters, filed this lawsuit against Florida's Secretary of State ("Secretary") in her official capacity.[2] Plaintiffs allege that this perpetual (and self-perpetuating) thumb on the scale in favor of every candidate who shares their political party with the last-elected governor violates the First and Fourteenth Amendments to the U.S. Constitution. They seek a declaratory judgment to that effect, and an order requiring Florida to implement a "nondiscriminatory means of determining the order of candidates' names on the ballot," ECF No. 1, at 35. Put differently, Plaintiffs seek implementation of a name ordering system that does not relegate one similarly situated party and all of its candidates to second position in election after election, while its counterpart consistently benefits from the tailwind that results from the first position.

For the reasons that follow, this Court agrees with Plaintiffs.

# I

Plaintiffs filed a complaint challenging the Statute's constitutionality on May 24, 2018. ECF No. 1. Within a few weeks, Republican Party Intervenors sought intervention on the basis that Republican candidates and organizations "stand to be most directly harmed by a change" in name order. ECF No. 23, at 16. Plaintiffs moved for a preliminary injunction, while Defendants filed motions to

---

[2] The Secretary and Intervenors are referred to collectively as "Defendants."

dismiss. ECF Nos. 29, 21, 30, 37. At a hearing held on July 24, this Court denied all pending motions. *See* ECF Nos. 69-71. While the Court declined to grant relief on "the eve of an election," ECF No. 72, at 111:4, it observed that its ruling "in no way minimize[d] the importance of the primacy effect or position bias," *id.* at 110:6-7.

Given the Secretary's assertion that implementing a potential remedy would take time, the Court recognized the need to set an "abbreviated schedule" for resolving the case. *Id.* at 53:8. After the November election, trial was scheduled for the summer of 2019, ECF No. 88, and the parties commenced discovery. The parties filed cross motions for summary judgment on April 8, 2019. ECF Nos. 115-117. The Court denied those motions in a subsequent order, in which it concluded that Defendants' "arguments regarding justiciability, laches, standing, and the applicable statute of limitations [were] unpersuasive." ECF No. 158, at 1. "As for the merits," the Court found that "the *Anderson-Burdick* balancing test applie[d]." *Id.* Summary judgment was not appropriate, however, because there were "material issues of disputed fact regarding 'position bias' and its purported effects on Florida elections as well as the viability of alternatives to the current scheme." *Id.*

This Court held a three-day bench trial beginning on July 15, 2019. Plaintiffs presented the testimony of three expert witnesses regarding the effects of ballot order. They also presented the testimony of several lay witnesses, including political operatives from both the Democratic and Republican parties, elections officials from Florida as well as states that rotate name order, and representatives from the voting systems companies that serve Florida's 67 counties. Defendants

collectively offered the testimony of one expert witness and three lay witnesses, including the Director of the Florida Divisions of Elections and two county supervisors of elections. During trial, the Court admitted (generally without objection) various exhibits and legislative materials, including the expert witnesses' reports and supporting materials. *See* ECF No. 192-1.

## II

Before turning to the merits, this Court must address some threshold issues. The first is whether this case is justiciable. Next, this Court determines whether Plaintiffs have standing. Last, this Court addresses Defendants' affirmative defenses that Plaintiffs' claims are barred.

## A

Intervenors contend that the Supreme Court's recent decision in *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019), renders this case nonjusticiable. *See* ECF No. 182. It does not. *Rucho* held that partisan gerrymandering claims present political questions beyond the reach of federal courts. 139 S. Ct. at 2491, 2508. Contrary to Intervenors' suggestion, *Rucho* did not hold that *all* elections-related claims that have political ramifications are similarly—and suddenly—out of bounds. The Supreme Court's failure to announce such a sweeping and transformative rule was hardly an oversight. The opinion clearly explains why, in the Supreme Court's view, partisan-gerrymandering claims, in contrast to other claims regarding the electoral process, are uniquely difficult to adjudicate.

First, a fundamental problem with partisan gerrymandering claims is that, under federal law, "a jurisdiction may engage in constitutional political

gerrymandering." *Id.* at 2497 (quoting *Hunt v. Cromartie*, 526 U.S. 541, 551 (1999)); *see also Gaffney v. Cummings*, 412 U.S. 735, 753 (1973) ("Politics and political considerations are inseparable from districting and apportionment."). Accordingly, the "'central problem' is not determining whether a jurisdiction has engaged in partisan gerrymandering. It is 'determining when political gerrymandering has gone too far.'" *Rucho*, 139 S. Ct. at 2497 (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 296 (2004)).

The present case presents no such problem. None of the parties to this litigation contends that the design of the ballot (or any aspect of the voting interface) is or should be an inherently partisan activity. *See, e.g.*, 52 U.S.C. § 20981 ("Help America Vote Act") (requiring Election Assistance Commission to study election administration issues "with the goal of promoting methods of voting and administering elections which . . . [are] nondiscriminatory and afford each registered and eligible voter an equal opportunity to vote and to have that vote counted"); *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 363 (1997) ("Ballots serve primarily to elect candidates, not as forums for political expression."); *New Progressive Party (Partido Nuevo Progresista) v. Hernandez Colon*, 779 F. Supp. 646, 660 (D.P.R. 1991) ("Every election conducted under the aegis of a democratic government has necessarily the imprimatur of the state and therefore must be balanced, impartial and neutral to the contestants."). Indeed, outside the unique context of redistricting, it is well established that states are generally forbidden from discriminating based on political views. *See, e.g.*, *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 203 (2008) ("If [partisan]

considerations had provided the only justification for a photo identification requirement, we may also assume that [the voter-identification law] would suffer the same fate as the poll tax at issue in *Harper*."); *Carrington v. Rash*, 380 U.S. 89, 94 (1965) ("'Fencing out' from the franchise a sector of the population because of the way they may vote is constitutionally impermissible."). Intervenors' suggestion that *Rucho* silently authorized any and all election laws that disadvantage lawmakers' political opponents finds no support in either the opinion itself nor the preceding decades of Supreme Court precedent.

Intervenors' position on this point is so nonsensical, even they appear confused by its implications. During trial, this Court questioned whether, under Intervenors' theory of *Rucho*, a state's decision to put a "thumbs up" next to all candidates of a favored political party on the ballot would be nonjusticiable question. Transcript of Trial ("Tr.") 42:2-43:2. Intervenors assured the Court it would not, noting that "the Supreme Court has already directly addressed" that issue in *Cook v. Gralike*, 531 U.S. 510 (2001). Tr. 43:8-15, 70:10-16. This Court agrees. In *Cook*, the Supreme Court struck down an initiative that would provide a notation on the ballot next to the names of candidates who declined to support certain term limits, explaining that the Elections Clause is not a source of power "to favor or disfavor a class of candidates." 531 U.S. at 523-24 (quotation marks omitted). The "adverse labels" would "handicap candidates at the most crucial stage in the election process—the instant before the vote is cast," and place the marked targets at "a political disadvantage." *Id.* at 525 (quotation marks omitted).

Moreover, Defendants have repeatedly acknowledged that a statute providing Democrats the top spot on the ballot would be "blatantly discriminatory," ECF No. 44, at 11, noting that "'political patronage' [is] not a legitimate state interest" sufficient to justify a state's name ordering scheme, ECF No. 138, at 8 n.5 (quoting *Graves v. McElderry*, 946 F. Supp. 1569, 1580-81 (W.D. Okla. 1996)); *see also* ECF No. 138, at 7-8 ("Unlike Florida's facially neutral statute, the ballot order regime[] in *Graves* . . . specifically discriminated in favor of a specific political party[.]"); ECF No. 51, at 5 ("Surely [a ballot ordering statute that entrenches a political party by name] would be one example of a facially discriminatory statute."). Thus, even Defendants appropriately recognize that certain election laws that favor certain candidates or parties are not only justiciable, but unconstitutional. There is no way to reconcile Intervenors' reliance on *Cook* and *Graves* with their position that this Court is without the appropriate tools to adjudicate this case.

Second, while *Rucho* discusses a constitutional claim in search of a judicially manageable standard, *see* 139 S. Ct. at 2499 (federal courts "must be armed with a standard that can reliably differentiate unconstitutional from 'constitutional political gerrymandering'") (citation omitted), it acknowledged that adjudicating questions involving "matters of degree" is perfectly permissible so long as there are "constitutional . . . provisions" or "common law" decisions "confining and guiding the exercise of judicial discretion." *Id.* at 2505; *see also Mahan v. Howell*, 410 U.S. 315, 329 (1973) (adjudicating one-person, one-vote claim even though "[n]either courts nor legislatures are furnished any specialized

calipers" that enable them to determine "what range of percentage deviations is permissible, and what is not"). Here, the balancing test set forth in *Anderson-Burdick* supplies the appropriate framework for evaluating Plaintiffs' claims under the First and Fourteenth Amendments. *See* ECF No. 158. The Court has long recognized that *Anderson-Burdick* rejects bright-line "litmus test[s]" and requires courts to make "hard judgment[s]" in light of the facts of each case, *Crawford*, 553 U.S. at 190. Since the test was developed nearly 30 years ago, courts have evaluated challenges to voting laws of all stripes under its flexible standard.[3] In fact, courts have adjudicated name order claims without difficulty for decades, more recently using the familiar *Anderson-Burdick* standard to differentiate constitutional ballot order statutes from unconstitutional ones. *See, e.g.*, *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 716 (4th Cir. 2016); *Graves*, 946 F. Supp. at 1578; *see also Akins v. Sec'y of State*, 154 N.H. 67, 72 (2006). In short,

---

[3] *See, e.g.*, *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 200 (1999) (applying *Anderson-Burdick* in holding unconstitutional a Colorado statute requiring initiative-petition circulators to wear identification badges because it "discourage[d] participation in the petition circulation process by forcing name identification without sufficient cause"); *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1319 (11th Cir. 2019) (applying *Anderson-Burdick* in evaluating Florida's signature-match scheme); *Obama for Am. v. Husted*, 697 F.3d 423, 432 (6th Cir. 2012) (applying *Anderson-Burdick* in affirming district court order enjoining the State of Ohio from enforcing election law related to in-person early voting); *Wexler v. Anderson*, 452 F.3d 1226, 1231-32 (11th Cir. 2006) (applying *Anderson-Burdick* in considering challenge to Florida's practice of employing different manual recount procedures according to the type of voting system employed in each county); *Fulani v. Krivanek*, 973 F.2d 1539 (11th Cir. 1992) (applying *Anderson-Burdick* in holding that provision of Florida election statute denying candidates option of waiving signature verification fee burdened fundamental First and Fourteenth Amendment right to associate politically).

contrary to Intervenor's assertion, there is no hint in *Rucho* that the Court overruled the *Anderson-Burdick* standard *sub silentio*, suddenly closing the courthouse doors to all of these previously justiciable cases.

Finally, *Rucho*'s discussion about the challenge of "predict[ing] how a particular districting map will perform in future elections," 139 S. Ct. at 2503, has no bearing here. In *Rucho*, the Court rejected a proposed test that would require partisan gerrymandering plaintiffs to show that vote dilution would be "'likely to persist' to such a degree that the elected representative [would] feel free to ignore the concerns of the supporters of the minority party." *Id.* at 2503. That inquiry would require judges to "forecast with unspecified certainty whether a prospective winner w[ould] have a margin of victory sufficient to permit him to ignore the supporters of his defeated opponent." *Id.* "Judges [would] not only have to pick the winner—they [would] have to beat the point spread." *Id.* Plaintiffs here, by contrast, are not asking the Court to predict the outcome of any election, much less the margin of victory or the winner's staying power. They simply seek the chance to compete—win or lose—on a level playing field. To be sure, the fact that past Florida elections have been exceedingly close helps illustrate the magnitude of the burden the Statute imposes, *see infra* at 43-45, but Plaintiffs are not required to show that the name order effect has been or will be outcome determinative in any particular election. *See McLain v. Meier*, 637 F.2d 1159, 1162 (8th Cir. 1980) (holding ballot order system unconstitutional where plaintiff candidate received only 1.5% of the vote); *Graves*, 946 F. Supp. at 1579 ("[A]lthough the impact may be slight, citizens' rights under the First and Fourteenth Amendments are directly

infringed."). Whether an election was or will be decided by two points or ten, it is sufficient that Plaintiffs have shown that the Statute bestows an artificial advantage upon one of the major political parties at the other's expense.

In the end, *Rucho* makes clear that non-justiciability is the exception to the rule:

> No one can accuse this Court of having a crabbed view of the reach of its competence. But we have no commission to allocate political power and influence in the absence of a constitutional directive or legal standards to guide us in the exercise of such authority. "It is emphatically the province and duty of the judicial department to say what the law is." *In this rare circumstance*, that means our duty is to say "this is not law."

139 S. Ct. at 2508 (citation omitted) (emphasis added). The present challenge, by contrast, falls squarely within the law, and is properly adjudicated under the legal standard adopted and repeatedly utilized by the Supreme Court itself. This Court therefore declines to extend *Rucho*'s reach beyond the partisan gerrymandering context to which it is limited.

**B**

Defendants next contend Plaintiffs lack standing. This Court already found Defendants' challenge to Plaintiffs' standing "unpersuasive," ECF No. 158, at 1, and the evidence presented at trial only reinforces this conclusion. Plaintiffs satisfy each of the elements to invoke federal jurisdiction under Article III of the Constitution. Plaintiffs have: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be

redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

The injury-in-fact element "is 'very generous' to claimants, demanding only that the claimant 'allege[] some specific, identifiable trifle of injury.'" *Cottrell v. Alcon Labs*., 874 F.3d 154, 162 (3d Cir. 2017) (quoting *Bowman v. Wilson*, 672 F.2d 1145, 1151 (3d Cir. 1982)) (citations omitted). "It is not Mount Everest." *Id*. (citation and quotation marks omitted). Plaintiffs easily clear this bar. Nancy Carola Jacobson is a registered Democrat and Party activist who has consistently voted for Democrats in Florida. *See* Tr. 45-52. Ms. Jacobson's votes have been diluted relative to Republican voters because the Statute has artificially inflated the Republican vote share. *See* ECF No. 1, ⁋ 13; Tr. 54:17-22; *see also McLain*, 637 F.2d at 1167 (finding ballot order statute operated at "expense of . . . voters" who supported candidates disadvantaged by statute); *Graves*, 946 F. Supp. at 1579 (finding ballot order statute's vote-dilution effect injured voters); *see also Gould v. Grubb*, 14 Cal. 3d 661, 670 (1975) (finding statute conferring top position to "a particular class of candidates inevitably dilutes the weight of the vote of all those electors who cast their ballots for a candidate" not in that class). The Statute also burdens Ms. Jacobson's efforts to elect Democratic candidates by putting a thumb on the scale; she must invest significantly more time, effort, and resources to elect Democrats than if elections were on a level playing field. *See* ECF No. 1, ⁋ 13; Tr. 54:17-55:11. The expenditure of resources to respond to laws adverse to a party's interests constitutes an injury-in-fact. *See Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1166 (11th Cir. 2008).

The organizational Plaintiffs suffer similar injuries. The Statute frustrates their mission by making it more difficult to elect Democrats in Florida, requiring the diversion of resources to counteract position bias, and diluting the votes of the Party's members. *See* Tr. 72:22-73:6, 74:16-75:20; ECF No. 195-1, at 13:3-22, 17:8-25, 29:24-30:21; ECF No. 195-2, at 18:4-19:11; ECF No. 195-3, at 12:6-10, 12:20-25, 14:13-16, 16:15-17:11, 24:6-9; ECF No. 195-4, at 16:6-18:4; ECF No. 195-5, at 7:25-9:2, 14:8-18, 21:4-20. Organizations plainly have standing to sue for these sorts of injuries. *See, e.g.*, *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) ("[T]he new law injures the Democratic Party by compelling the party to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote."); *Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1336-38 (N.D. Ga. 2018) (finding state Democratic Party and organization supporting Party's gubernatorial candidate had standing to challenge voting laws requiring diversion of resources that would likely affect at least one party member).

Intervenors' arguments to the contrary are meritless. Relying on *Gill v. Whitford*, 138 S. Ct. 1916 (2018), they argue that Plaintiffs must demonstrate that the Statute has injured each voter individually. *See* Tr. 37:1-15. But *Gill*, a partisan gerrymandering case, is entirely inapposite. In partisan gerrymandering, vote dilution "arises from the particular composition of the voter's own district." *Gill*, 138 S. Ct. at 1931. Thus, a voter must show that *his* district has been gerrymandered; allegations about *other* districts are insufficient. *See id.* at 1930-31. The focus on district-specific harm has no application here, where Plaintiffs' votes

are diluted by *ballot order* (not district manipulation), irrespective of district. *See id.* at 1939 ("[W]hen the harm alleged is not district specific, the proof needed for standing should not be district specific either."). In any event, because Plaintiffs have shown that the name order effect has diluted Plaintiffs' votes in election after election*, see, e.g.*, Tr. 47:25-52:9, 54:23-55:11—including most recently in 2018— the Statute *has* harmed each individually.

Further, Plaintiffs here include Democratic Party entities, in addition to voters, and assert harms in addition to vote dilution—specifically, that the Statute subjects them to differential treatment. "[B]urden[ing] the ability of like-minded people across the State to affiliate in a political party and carry out that organization's activities and objects" is an associational harm that afflicts individual party members and the party itself. *Gill*, 138 S. Ct. at 1938-39 (Kagan, J. concurring).[4] Similarly, disadvantaging one political party in favor of a similarly-situated party clearly harms the disadvantaged party and its supporters. *See, e.g.*, *Green Party of Tenn. v. Hargett*, 791 F.3d 684, 695 (6th Cir. 2015); *Nat. Law Party of U.S. v. Fed. Election Comm'n*, 111 F. Supp. 2d 33, 44, 47 (D.D.C. 2000).[5]

---

[4] In *Gill* itself, plaintiffs resolved the standing issue by filing a new action with a state political entity as a plaintiff. *See* Compl., *The Wis. Assembly Democratic Campaign Comm. v. Gill*, No. 3:18-cv-763-jpd (W.D. Wis. Sept. 14, 2018).

[5] That Democrats have served as Governor and might do so again does not undermine the injury Plaintiffs presently suffer. *See Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1275 (11th Cir. 2003) ("Article III standing must be determined as of the time at which the plaintiff's complaint is filed.") (collecting cases). Nor does the large number of Democrats in Florida render those injuries a "generalized grievance." *See Spokeo*, 136 S. Ct. at 1548 n.7

Plaintiffs also more than demonstrate that their asserted injuries are traceable to the Secretary's enforcement of the Statute's state-mandated advantage that inures to a single political party in every partisan election on every ballot, particularly in a state where less than a single percentage point regularly decides elections. *See McLain v. Meier*, 851 F.2d 1045, 1048 (8th Cir. 1988) (finding voter plaintiff had standing based on injury that was fairly traceable to ballot access law).

Finally, Plaintiffs' injuries are redressable. Intervenors have conceded in prior briefing that the Court has "the power to declare [the] Statute unconstitutional, and to enjoin its enforcement." ECF No. 117, at 10. That is all that is required to satisfy Article III's redressability element. *See, e.g.*, *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2663 (2015); *LaRoque v. Holder*, 650 F.3d 777, 791 (D.C. Cir. 2011); *Richey v. Tyson*, 120 F. Supp. 2d 1298, 1306 (S.D. Ala. 2000). Contrary to Intervenors' suggestion, Plaintiffs' standing does not hinge on the details of the Court's ultimate remedy.

Moreover, as explained further below, *see infra* at 56-57, Intervenors are incorrect to argue that the Court lacks authority to grant specific relief. "[O]nce a plaintiff has established the violation of a constitutional . . . right . . . [,] courts have broad and flexible equitable powers to fashion a remedy that will fully correct past wrongs." *N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 239 (4th Cir. 2016) (quotation marks and alterations omitted). This Court's hands are not

---

("The fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance.").

tied. Where, as here, the Court is capable of affording some relief to Plaintiffs, Plaintiffs' claims are redressable for purposes of standing.[6]

C

Defendants launch a series of affirmative defenses to assert that Plaintiffs' claims are barred. This Court addresses—and rejects—each in turn.

1

Intervenors (and not the Secretary) argue that the equitable doctrine of laches bars relief in this case.[7] In denying Defendants' motion to dismiss, this Court already held that laches "does not apply where, as here, Plaintiffs seek prospective relief." ECF No. 71, at 1. It also found the laches argument "unpersuasive" at the summary judgment stage. ECF No. 158, at 1. Intervenors

---

[6] Intervenors also miss the mark in asserting that ordering rotation of candidate names is impracticable because it would require implementation by third parties. The Secretary is Florida's "chief election officer." Fla. Stat. § 97.012. "This statutory job description is not window dressing." *Madera v. Detzner*, 325 F. Supp. 3d 1269, 1276 (N.D. Fla. 2018). The Secretary must "[o]btain and maintain uniformity in the interpretation and implementation of" and promulgate rules for the "proper and equitable interpretation and implementation" of election laws. Fla. Stat. § 97.012(1). The Secretary is "vested with the power to issue orders directing compliance with the election code or prohibiting violations thereof," *Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1255 (N.D. Fla. 2016), which county officials must implement. *See Lacasa v. Townsley*, No. 12-22432-CIV-ZLOCH, 2012 WL 13069990, at *2 (S.D. Fla. July 13, 2012). The Secretary thus has not only the authority, but the obligation, to direct whatever is necessary to comply with the Court's order.

[7] Laches was first raised by the Secretary in a motion to dismiss. *See* ECF No. 21, at 2, 8-10. Although the Secretary lists laches as an affirmative defense in her answer, ECF No. 77, at 11, her counsel indicated during the preliminary injunction hearing that laches does not bar Plaintiffs' claim, *see* ECF No. 72, at 46:7-14, and the Secretary declined to advance laches in her motion for summary judgment, *see* ECF No. 115. Intervenors now take up the mantle.

- 16 -

nevertheless raise the laches argument again in their proposed order, and the Court rejects it a third time.

Plaintiffs seek prospective injunctive relief to protect their rights in *future* elections, and it is well-established, including by binding Eleventh Circuit authority, that laches cannot bar such an action. *See Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters.*, 533 F.3d 1287, 1321 (11th Cir. 2008) (laches "bar[s] only . . . the recovery of retrospective damages," not "prospective relief"); *see also Envt'l. Def. Fund v. Marsh*, 651 F.2d 983, 1005, n.32 (5th Cir. 1981); *Lyons P'ship v. Morris Costumes, Inc.*, 243 F.3d 789 (4th Cir. 2001). Thus, courts have not applied laches in voting rights cases where plaintiffs seek prospective relief to address "ongoing" injury. *See, e.g.*, *Garza v. Cty. of L.A.*, 918 F.2d 763, 772 (9th Cir. 1990); *Smith v. Clinton*, 687 F. Supp. 1310, 1312-13 (E.D. Ark. 1988); *Hershcopf v. Lomenzo*, 350 F. Supp. 156, 159 (S.D.N.Y. 1972) (holding "the right to vote is too fundamental in the democratic process to be denied" on basis of laches).

Even if laches could apply, Intervenors have not established the requisite elements. Laches is only available as a defense when the party seeking to avoid liability can show: (1) a delay in asserting a right or claim, which (2) was not excusable, and (3) caused undue prejudice to the party against whom the claim is asserted. *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1546 (11th Cir. 1986). The burden of establishing each essential requirement is on Intervenors, and they fail to carry it. *See Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1516 (11th Cir. 1984).

First, Intervenors have failed to establish that Plaintiffs inexcusably delayed. Ms. Jacobson testified that she was unaware of studies establishing the existence and magnitude of the primacy effect until recently. Tr. 53:18-54:6. The Court must assess the extent and reasonableness of each plaintiff's purported delay in bringing suit and may not impute knowledge of voting rights violations from one plaintiff to another. *See Nader 2000 Primary Comm., Inc. v. Hechler*, 112 F. Supp. 2d 575, 579 n.2 (S.D.W.Va. 2000) (holding a candidate's and political party's delay in asserting First Amendment challenge to ballot access laws did not apply to registered-voter co-plaintiffs, who "should not be forced to anticipate and predict possible constitutional violations").

Nor have Intervenors established that the organizational plaintiffs have inexcusably delayed. Heather Williams, the 30(b)(6) witness for Plaintiff Democratic Legislative Campaign Committee ("DLCC"), testified that while her organization has long been familiar with the notion that there is *some* benefit to being listed first on the ballot, Tr. 73:15-18, it only became aware of the magnitude of the name order effect in Florida after it commissioned a study by Dr. Krosnick approximately two years ago, *id.* 76:1-19; *see also* ECF No. 195-1 at 37:3-17; ECF No. 195-2 at 72:12-19; ECF No. 195-3 at 19:15-17; ECF No. 195-4 at 61:19-23; ECF No. 195-5 at 16:8-20. Plaintiffs filed suit shortly thereafter based on the research amassed and evidence adduced by Dr. Krosnick. Tr. 76:6-8. This Court finds Ms. Williams testimony to be credible. But in addition, Intervenors ignore that the DLCC represents the interests of Democratic candidates and voters alike, including candidates who only recently opted to run for election and newly-

registered voters, Tr. 94:25-95:9, none of whom could have filed this lawsuit on the timeline Intervenors apparently would deem appropriate.

The Eleventh Circuit has repeatedly rejected broad interpretations of laches that would require plaintiffs to "sue first and ask questions later." *Kason Indus., Inc. v. Component Hardware Grp., Inc.*, 120 F.3d 1199, 1206 (11th Cir. 1997). Here, an accumulating body of research has played a critical role in creating an evidentiary record, establishing the impact that position bias has on elections, and the specific and substantial irreparable harms inflicted by the Statute in particular. Plaintiffs' asserted injuries, moreover, have significantly worsened in recent years by a streak of close elections. With only one exception, the margin of victory enjoyed by the winners in Florida gubernatorial elections between 1978 to 2002 was never less than 9.2 percentage points (and reached as high as 29.4 in 1982). *See* ECF No. 162, at 9. By contrast, the 2014 and 2018 races were decided by 1.0 and 0.4 percentage points, respectively. ECF No. 198-1, at 237, 259. Under the circumstances, it cannot fairly be concluded that any of the Plaintiffs inexcusably delayed in bringing this suit.

Second, Intervenors fail to establish prejudice. "Laches depends on more than inexcusable delay in asserting a claim; it depends on inexcusable delay causing undue prejudice to the party against whom the claim is asserted." *Law v. Royal Palm Beach Colony, Inc.*, 578 F.2d 98, 101 (5th Cir. 1978). Here, the party against whom Plaintiffs' claims are asserted is the Secretary, not Intervenors, who provide no argument for why they may argue prejudice on the Secretary's behalf. *Cf. SEC v. Quest Energy Mgmt. Grp.*, 768 F.3d 1106, 1109 (11th Cir. 2014). But

even if they could properly do so, "the mere passage of time does not constitute laches unless the passage of time is shown to have lulled Defendant into actions in reliance thereon." *Gen. Conference Corp. of Seventh-Day Adventists v. Perez*, 97 F. Supp. 2d 1154, 1162 (S.D. Fla. 2000). Thus, laches is traditionally only appropriate "when witnesses have died or evidence has gone stale." *Trustees for Alaska Laborers Constr. Indus. Health & Sec. Fund v. Ferrell*, 812 F.2d 512, 518 (9th Cir. 1987). But legislators' memories are entirely irrelevant here, as none of Plaintiffs' claims turn on legislative intent. And with respect to evidence that *is* relevant—the existence and magnitude of position bias—the passage of time has allowed for a more robust evidentiary record and the development of a body of scholarship that will only aid in understanding and adjudicating the merits.

Any costs incurred by the State in remedying the Statute, moreover, would be the routine consequence of an adverse merits ruling, insufficient to establish laches. *See Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1286 (11th Cir. 2015) (prejudice "must stem specifically from [] delay in bringing suit, rather than from the consequences of an adverse decision on the merits"). Intervenors cannot credibly contend that changing the method by which Florida counties list candidates on the ballot will be more costly (if at all) because of the amount of time that has passed since the Statute's enactment, nor have they provided any evidence to that effect.

Therefore, this Court concludes that laches does not bar the Plaintiffs' request for an injunction.

**2**

The Secretary (and not Intervenors) asserts that the 4-year statute of limitations applicable to Plaintiffs' claims bars this action. The Secretary's failure to assert this affirmative defense in her motion to dismiss, preliminary injunction opposition, or answer plainly waives the argument. *See Am. Nat'l Bank of Jacksonville v. Fed. Deposit Ins. Corp.*, 710 F.2d 1528, 1537 (11th Cir. 1983). Indeed, the fact that the Secretary did not bother to timely raise the statute of limitations evinces the utter baselessness of this newfound claim.

The Secretary relies on *Hillcrest Property, LLC v. Pasco County*, 754 F.3d 1279, 1282 (11th Cir. 2014), for the proposition that the statute of limitations for challenging a statute begins to run upon its enactment. *Hillcrest*, however was a facial takings claim, and in that context "the harm occurs immediately upon, and because of, the statute's enactment." *Id.* "In other contexts, the harm inflicted by the statute is continuing, or does not occur until the statute is enforced—in other words, until it is applied." *Id.*

Here, whether due to recurrent or continuing harms inflicted by the Statute, Plaintiffs' claims easily come within the statute of limitations. Each time the Statute is enforced to arrange candidate name order in an allegedly unlawful manner, the limitations period begins anew. *See Palmer v. Bd. of Educ.*, 46 F.3d 682 (7th Cir. 1995) ("Every fall the school board decides which buildings to use and which children shall be assigned to which schools. If, as plaintiffs believe, the school board's explanation for closing [the school] is a pretext for discrimination, then each year's decision to leave the building shuttered is a new violation."). And

while the harm from enforcing the Statute in previous elections cannot be undone, Plaintiffs seek to ensure that it does not inflict harm in future elections. *Cf. Moore v. Ogilvie*, 394 U.S. 814, 816 (1969) ("But while the 1968 election is over, the burden . . . placed on the nomination of candidates for statewide offices remains and controls future elections, as long as Illinois maintains her present system as she has done since 1935.").

In seeking to cast aside the continuing violations doctrine here, the Secretary effectively asks this Court to undo nearly seventy years of civil rights law and find that the continued enforcement of an allegedly unconstitutional statute can be insulated from review by the statute of limitations. *But see Brown v. Bd. of Educ. of Topeka, Kan.*, 347 U.S. 483, 486–88 (1954) (permitting plaintiffs to challenge ongoing violation of equal protection rights under state laws that had existed for decades); *Va. Hosp. Ass'n v. Baliles*, 868 F.2d 653, 663 (4th Cir. 1989) (citations omitted) (holding where an unconstitutional law causes ongoing harm, "continu[ous] enforcement of [the] unconstitutional statute cannot be insulated by the statute of limitations"). This Court declines the Secretary's invitation.

In short, the statute of limitations does not bar Plaintiffs' claim.

**3**

The Secretary also argues that Plaintiffs' suit is barred by constitutional estoppel, apparently on the theory that Plaintiffs have benefitted from Florida's Statute and similar statutes in other states. This Court rejects the argument. Suffice it to say, the fundamental rights that Plaintiffs seek to vindicate are not a function

of the Statute, nor do Plaintiffs seek to maintain any advantage they may receive from the Statute while avoiding its disadvantages.

The Secretary's repeated assertions that Democrats in general may benefit from similar statutes in other states, *see* ECF No. 115, at 5-6, 40-42; Tr. 33:12-17, 99:15-100:23, are not relevant to the doctrine of constitutional estoppel, the constitutionality of the Statute, or, indeed, any aspect of this case. The suggestion that to obtain a judgment in a case challenging the constitutionality of a specific state statute, a plaintiff must also simultaneously mount a judicial challenge against all similar laws from which persons with whom the plaintiff shares a political affinity gain some benefit, is beyond absurd. Indeed, as counsel for Intervenors was quick to note during the preliminary injunction hearing, *see* ECF No. 72, at 53:18-54::2, Plaintiffs and their political allies would almost certainly lack standing to challenge laws from which they suffer no harm.

### III

This Court proceeds to evaluate the merits of Plaintiffs' claims under the *Anderson-Burdick* standard. *See* ECF No. 158. *Anderson-Burdick* requires courts to "weigh 'the character and magnitude of the asserted injury to the rights . . . the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). The *Anderson-Burdick* test is a "flexible" sliding scale, where "the rigorousness of [the court's] inquiry . . . depends upon the extent to

which [the challenged law] burdens [voting rights]." *Id.* Thus, when a law subjects voting rights to a "severe" restriction, it "must be narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed*, 502 U.S. 279, 280 (1992). Less severe burdens remain subject to balancing: "[h]owever slight" the burden on voting rights "may appear," "it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford*, 553 U.S. at 191 (quoting *Norman*, 502 U.S. at 288-89).

The premise of *Anderson-Burdick* is that all "[e]lection laws will invariably impose some burden upon individual voters." *Burdick*, 504 U.S. at 433. "Each provision of a code, 'whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the *voting process itself*, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends.'" *Id.* (quoting *Anderson*, 460 U.S. at 788) (emphasis added). There is no "litmus test" immunizing certain types of laws from scrutiny, nor are there certain recitations of interests that automatically make them immune. *Crawford*, 553 U.S. at 190. Rather, the court must balance these factors and "make the 'hard judgment' that our adversary system demands." *Id.* at 190-91.

Applying this framework here, this Court finds, as explained below, that the Statute imposes a severe burden on Plaintiffs' rights, and Defendants have provided no legitimate—much less compelling—reason to justify it.

## A

The Court evaluates the "character and magnitude" of Plaintiffs' asserted injury by examining the nature of the burden in context of legal precedent, expert analysis, and election results. All of these factors—and in particular the facts as set forth in the record—support a finding that the Statute imposes a severe burden on Plaintiffs.

## 1

Ballot order matters. How do we know? From the testimony offered at trial to the very identity of the litigants, the evidence abounds.

It is a well-studied and consistently demonstrated phenomenon that people manifest bias toward selecting the first in a set of visually-presented options, as with candidates on ballots. As one court has recognized, this phenomenon is "so widespread and so universally accepted as to make it almost a matter of public knowledge." *Holtzman v. Power*, 62 Misc.2d 1020, 1023 (N.Y. Sup. Ct. 1970). And, in fact, there is a long line of cases finding that position bias can and does influence elections. *See, e.g.*, *McLain*, 637 F.2d at 1166 (affirming "finding of ballot advantage in the first position"); *Sangmeister v. Woodard*, 565 F.2d 460, 465 (7th Cir. 1977) ("[T]he trial court's conclusion that 'top placement on the ballot would be an advantage to the plaintiff' is supported by substantial evidence[.]"); *Graves*, 946 F. Supp. at 1576 (finding "some measure of position bias exists in Oklahoma's" elections); *Akins*, 154 N.H. at 71 (affirming finding that "the primacy effect confers an advantage in elections"); *Gould*, 14 Cal. 3d at 664 (describing finding of position bias as "consistent with parallel findings rendered in similar

litigation throughout the country"); *State ex rel. Roof v. Bd. of Comm'rs*, 39 Ohio St. 2d 130, 136 (1974) (recognizing "it is generally agreed" that "candidates whose names appear at the beginning of the list receive some votes attributable solely to the positioning of their names"); *Kautenburger v. Jackson*, 85 Ariz. 128, 130-131 (1958) ("[I]t is a commonly known and accepted fact that where there are a number of candidates for the same office, the names appearing at the head of the list have a distinct advantage."); *Elliott v. Sec'y of State*, 295 Mich. 245, 249 (1940) (same).

As witnesses at trial repeatedly affirmed, this phenomenon has long been observed by those involved in politics. Representatives from Democratic and Republican organizations alike testified that it is "common knowledge among everybody involved in politics that a person listed first on the ballot may get a benefit from that in an election." Tr. 128:25-129:3; *see also id.* 73:13-18, 102:17-103:9.

Indeed, political actors across the country have drafted legislation in recognition of the name order effect. At least 27 states employ ballot ordering systems that rotate,[8] alphabetize,[9] or randomize[10] the order of candidate names on

---

[8] *See* Alaska Stat. § 15.15.030(6); Ark. Code Ann. § 7-5-207(c)(1); Cal. Elec. Code § 13111; Idaho Code Ann. §§ 34-903(4) & 34-2419; Kan. Stat. Ann. § 25-610; Ky. Rev. Stat. Ann. § 118.225; Mont. Code Ann. § 13-12-205(2); N.H. Rev. Stat. Ann. § 656:5(II); N.J. Stat. Ann. § 19:14-12; N.D. Cent. Code §§ 16.1-11-27 & 16.1-06-05; Ohio Rev. Code Ann. § 3505.03.

[9] *See* Ala. Code § 17-6-25; Haw. Rev. Stat. § 11-115; La. Rev. Stat. Ann. § 18:551(C); Me. Rev. Stat. Ann. tit. 21-A, § 601; Miss. Code Ann. § 23-15-367(2); Nev. Rev. Stat. § 293.267; Vt. Stat. Ann. tit. 17, § 2472; Utah Code Ann. § 20A-6-302(1)(b).

general election ballots, in an apparent effort to neutralize the effects of position bias. *See, e.g.*, *Roof*, 39 Ohio St. 2d at 136 (explaining that Ohio's Constitution requires that ballots give each candidate's name reasonably equal position "[i]n an attempt to neutralize" "group-position bias").

On the flip side, lawmakers have also attempted to use ballot order to benefit themselves or members of their party. In North Carolina, for instance, after a Democrat won the governor's race in 2016, the Republican legislature abolished that State's name ordering scheme which, like Florida's, favored the party of the governor. *See* Pls.' Exs. FF, II, KK. This amendment eliminated the across-the-board advantage that would have accrued to Democrats after capturing the governor's mansion. But North Carolina did not stop there. Before the bill reached the Senate, the Board of Elections conducted a drawing determining that primary election candidates would be ordered alphabetically beginning with "F." Pls.' Ex. NN. The Senate then amended the bill to provide that general election candidates would be ordered using the same "random selection process," Pls.' Ex. II, thereby ensuring that the Democratic candidate for the North Carolina Supreme Court, Anita Earls, would appear last on the ballot. *See* Pls.' Ex. UU.

In fact, this Court need look no further than its own courtroom to determine whether the first position on the ballot confers an advantage worth fighting for. The very presence of Republican Intervenors in this case confirms as much. When

---

[10] *See* Colo. Rev. Stat. § 1-5-404; N.M. Stat. § 1-10-8.1; N.C. Gen. Stat. Ann. § 163A-1114; Okla. Stat. Ann. tit. 26, § 6-106; Or. Rev. Stat. § 254.155; S.D. Codified Laws § 12-16-3.1; R.I. Gen. Laws § 17-19-9.1; Va. Code Ann. § 24.2-613.

Intervenors first sought intervention, they asserted that Republican organizations "stand to be most directly harmed by a change" to the current ballot ordering regime. ECF No. 23, at 16. In defining their alleged injury during the preliminary injunction phase and in discovery, they provided a fulsome description of the alleged impact any change would have on their Election Day campaign efforts. *See* Pls.' Ex. 74, at 4. Now that the facts have unfolded, however, those alleged harms have undisputedly fallen away. Pls.' Ex. 75, at 3 (amending interrogatory response to concede that "how states places [sic] candidates on their ballots do *not* impact [Intervenors'] election day operations, get-out-the-vote efforts, or policies") (emphasis added); *see also* Tr. 129:4-9 (Palm Beach County Republican Party Chairman agreeing that "switching the order of candidates on the ballot would not change how Republican parties campaign" in his county). The reason Intervenors have injected themselves into this case is obvious: Ballot order has a real impact on electoral outcomes in Florida.

In the end, in the course of defending this action, both the Secretary and Intervenors have essentially conceded that first position on the ballot confers a meaningful electoral advantage. The Secretary agrees that the statute at issue in *Graves*, which required that Democratic candidates be listed first in all races, is "blatantly discriminatory." ECF No. 44, at 11 n.4. The Secretary and Intervenors similarly recognize the inherent unfairness created by incumbent-first statutes, in which "incumbents are automatically favored on the ballot for no other reason other than that they are incumbents." ECF No. 51, at 5; ECF No. 115, at 26 & n.5; ECF No. 138, at 7-8. And they agree that statutes allowing election officials

discretion to award the top ballot position to candidates from their own party are also discriminatory. *See* ECF No. 115, at 26; ECF No. 138, at 8 n.4; ECF No. 141, at 28. Defendants' arguments on this score only make sense if there is some meaningful benefit that inures to first-listed candidates. Otherwise, it would not matter whether Democrats are always listed first, or incumbents are always listed first, or if the Secretary gets to choose who is listed first. There would be no discrimination in favor or against a given class of candidates under any of these schemes unless the first position on the ballot translates into a real advantage.

It is thus beyond dispute that being listed first confers an electoral advantage. The existence of position bias in elections, however, is the beginning, not the end, of the constitutional inquiry.

## 2

The next inquiry under *Anderson-Burdick* concerns the magnitude of the ballot order effect in Florida elections. Here, Plaintiffs' experts presented highly credible testimony that first-listed candidates enjoy a significant percentage point advantage in Florida, one that is amplified in down-ballot races.

Plaintiffs presented the expert testimony of Dr. Jon A. Krosnick, a widely respected political scientist and the preeminent scholar on candidate name order effects. *See* Pls.' Ex. 1, at 5-8; Tr. 279:10-293:17. Dr. Krosnick explained that people exhibit a psychological tendency to select the first-listed option—whether selecting answers on a multiple choice test or candidates on a ballot—largely due

to lack of information or ambivalence. Pls.' Ex. 1, at 41-47; Tr. 320:15-321:2; *see also* Tr. 296:18 (primacy effect "is a reflection of human nature").

Dr. Krosnick provided a comprehensive review of the scholarship on position bias, concluding that primacy effects are evident in the vast majority of the thousands of elections that have been studied over the past 70 years. *See* Pls.' Ex. 1, at 15-39; Tr. 295:17-296:14, 302:4-325:14. Dr. Krosnick's meta-analysis of the 1,086 unique tests of name order effects reported in the literature demonstrated that 84% manifested differences in the direction of primacy. *See* Pls.' Ex.1, at 35. The probability that such a result would appear by chance is less than one percent (p<.000001). Tr. 304:12-23. Indeed, the extensive literature on position bias is not limited to U.S. elections. Name order effects have also been documented in elections in Australia, the United Kingdom, Ireland, Colombia, Denmark, Belgium, Germany, Greece, Chile, Japan, Ireland, Malta, the Czech Republic, Poland, Slovakia, Spain, the Netherlands, Switzerland, and Canada. Pls.' Ex. 1, at 29-31. Only one study of a foreign election, conducted in Afghanistan, failed to find evidence of a primacy effect. *Id.* at 29-32.

Dr. Krosnick also studied the effect of candidate name order in Florida elections specifically. His regression analysis of general election returns in Florida from 1978 to 2018 showed that first-listed candidates in Florida have gained an average electoral advantage of five percentage points due to their position on the ballot. Tr. 299:12-20, 301:4-17; Pls.' Ex. 1, at 3, 63-64, 83. The probability that this result would appear by chance is "miniscule," less than one percent. Tr. 343:9-17; Pls.' Ex. 1, at 110.

The sole expert proffered by Intervenors, Dr. Michael Barber, offered no credible reason to doubt these findings.[11] Dr. Barber did not dispute the central findings of the literature, acknowledging that he had no reason to question the results of Dr. Krosnick's peer-reviewed studies on name order effects. Tr. 711:10-13. Nor did he dispute that studies have shown name order effects in partisan races, races with an incumbent, and high-profile races, and even *greater* effects in open and low-profile races. Tr. 729:1-24. Indeed, he offered no opinion on whether position bias affects elections in Florida. Tr. 761:7-12.

Instead, Dr. Barber's expert testimony was largely limited to critiques of Dr. Krosnick's regression analysis, leading him to "question the persistence and validity" of Dr. Krosnick's five-percentage-point estimate. Tr. 618:7-11. None of Dr. Barber's critiques, however, undermines the significant magnitude of the name order effect Dr. Krosnick observes. For instance, Dr. Barber suggested that demographic differences between Florida and states like Ohio and California, in which researchers have documented the effects of name order through rotation of candidate names, make it difficult to draw conclusions about how estimated name ordering effects in those other states would apply to Florida. Intervenors' Ex. 11, at 11. According to Dr. Barber, where one has a "theoretical reason to believe" that these types of differences are meaningful, a proper regression analysis should control for those variables. Tr. 624:24-625:2. At trial, however, Dr. Barber admitted he had *no* reason to believe that any of those demographic differences

---

[11] The Secretary did not offer any expert witnesses to rebut Plaintiffs' experts' conclusions.

have any relevance to a voter's susceptibility to position bias. *See* Tr. at 714:3-718:24.[12]

Moreover, Dr. Krosnick effectively demonstrated that even when Dr. Barber's speculative critiques are indulged, they do not change the ultimate, compelling conclusions of Dr. Krosnick's analysis. For instance, when Dr. Krosnick included the demographic variables Dr. Barber insisted were necessary, his analysis showed that "the primacy effect in Florida is statistically significant even among the most Hispanic voters and among the most metropolitan voters." Pls.' Ex. 11, at 4-5; *see also* Pls.' Ex. 1, at 78-80; Tr. 740:1-42:12.[13] Similarly, when Dr. Krosnick weighted counties by size, as Dr. Barber suggested, he still found statistically significant evidence of a primacy effect greater than three percentage points. *See* Pls.' Ex. 1, at 73-74; Pls.' Ex. 11, at 10; Tr. 730:14-731:12. In fact, after Dr. Krosnick replaced his variable for Ohio elections with a variable specifically suggested by Dr. Barber, he found even *larger* effects. *See* Tr. 727:19-728:19; Pls.' Ex. 1, at 69. And, after clustering standard errors as Dr. Barber proposed, Dr. Krosnick still found sizeable effects at a level of statistical

---

[12] Dr. Barber cited several sources for the proposition that certain demographic differences can affect candidate and policy preferences, but admitted that none of those sources study whether different groups of people along those demographic dimensions have different psychological reactions to seeing a sequential list of options, including candidates listed on a ballot. *See* Tr. 718:21-719:16.

[13] With one exception (a 2.92 percentage-point boost for Democrats in counties with the highest population density), the size of the primacy effect was greater than three points in all of Dr. Krosnick's estimates. *See* Pls.' Ex. 1, at 78-80.

significance that Dr. Barber deemed sufficient in his own work. *See* Tr. 732:5-738:19.

In short, Dr. Krosnick's regression analyses controlled for a variety of variables to isolate the causal effect of candidate name order, and in all events his estimates remained robust and statistically significant. This Court finds Dr. Krosnick's testimony helpful and credible in all respects. This Court further finds that Dr. Barber's testimony was neither helpful nor undermined the credible evidence relied upon by the Court, including Dr. Krosnick's conclusion regarding the average electoral advantage for first-listed candidates in Florida elections.

Plaintiffs' expert testimony not only demonstrated the magnitude of position bias in Florida elections, it demonstrated the added disadvantage experienced by second-listed candidates in "down-ballot" races, about which voters generally have less information. Dr. Jonathan Rodden—a highly-regarded professor of political science at Stanford University who focuses on political geography and election administration, *see* Pls.' Ex. 5, at 7-9; Tr. 137:9-140:10—investigated name order effects in Florida by examining whether candidates in down-ballot races suffer a *greater* disadvantage from being listed second on the ballot as compared to their co-partisans in higher-profile races. *See* Pls.' Ex. 5, at 2-5. According to Dr. Rodden's study, down-ballot candidates of the second-listed party in Florida's statewide elections—Republicans and Democrats alike—suffered an average disadvantage between 3.1 and 5.6 percentage points compared to their top-of-ballot co-partisans. Tr. 161:3-17; Pls.' Ex. 5, at 4-5, 22. Even more striking, down-ballot candidates of the first-listed party—regardless of which party it was—consistently

outperform that same party's candidates for president, governor, and U.S. Senate in Florida elections. Tr. 152:8-19, 158:16-160:2, 160:23-161:22, 170:2-9; Pls.' Ex. 5, at 17-41. Dr. Rodden could conceive of no political science theory that would account for this phenomenon other than ballot order. Tr. 162:22-163:22. Notably, neither could Intervenor's expert Dr. Barber. *See* Tr. 748:11-749:11, 751:15-753:8.

Dr. Rodden further analyzed whether changing a ballot ordering scheme like Florida's might meaningfully impact election results. Tr. 175:14-179:18; Pls.' Ex. 5, at 41-48. To do so, Dr. Rodden made use of the "natural experiment" created by the 2018 amendment to North Carolina's ballot order law. *See supra* at 26-27; *see also* Tr. 177:15-198:18. Comparing the same precincts in 2016, when Republicans were listed first in all precincts, and in 2018, when Republicans were listed first in only half of the precincts, Dr. Rodden found that the increase in Democratic vote share from 2016 to 2018 was larger by 1.5 percentage points in the precincts in which Republicans no longer held the top spot on the ballot. *See* Pls.' Ex. 5, at 6, 45-46. The effect was even larger in "open" seats where no incumbent was running (8 percentage points), and in races where the exact same pair of candidates was running in both 2016 and 2018 (4 percentage points). *Id.* at 6, 47-48. These results provided a "clear sense of causality associated with reform and ballot order practices." Tr. 179:11-18; *see also* Tr. 186:14-18. Dr. Barber offered no critique whatsoever of Dr. Rodden's North Carolina analysis, *see* Intervenors' Ex. 11, at 3; Pls.' Ex. 13, at 36, and in fact, in the course of his expert testimony in a North Carolina elections law case, Dr. Barber himself has drawn on Florida studies to

bolster his conclusions in that state, Tr. 707:25-708:17. This Court finds Dr. Rodden's testimony credible, and his methodology and conclusions reliable.[14]

Ultimately, even Dr. Barber does not contend that there is no ballot order effect in Florida elections. Tr. 669:3-5. Instead, while he agrees the magnitude of the effect is more than zero, in his view it is "very hard to determine what the actual amount is." Tr. 670:11-13. That may well be so. But this Court need not throw up its hands in the absence of the "ideal" study, Tr. 744:14-745:6, which the experts agree is not available in states like Florida that do not rotate the order of candidate names. *See* Tr. 754:2-18; Pls.' Ex. 1, at 57; Pls.' Ex. 5, at 2-3, 49-50. The evidence presented at trial is as thorough and robust as it could be given the nature of Florida's Statute. Defendants offered no evidence that would support a finding that Floridians are immune from a psychological bias evident in human

---

[14] Dr. Paul S. Herrnson—a respected professor of political science at the University of Connecticut, *see* Pls.' Ex. 4-7, Tr. 405:14-411:8—provided an explanation for the existence of ballot order effects in addition to the psychological explanations Dr. Krosnick provided in his report and testimony. *See* Pls.' Ex. 8, at 2-3. Dr. Herrnson discussed "proximity error," which occurs "when a voter inadvertently selects a candidate listed immediately above or below the candidate the voter intended to vote for." *Id.* at 2. Dr. Herrnson credibly testified, based on both his observations in the course of his field work and empirical data, that voters make fewer proximity errors when intending to vote for first-listed candidates, who have no candidates listed above them, than when intending to vote for second-listed candidates, whose ballot position allows for proximity errors in either direction. *Id.* at 11-12; Tr. 418:22-421:1. Dr. Barber described a large-scale study that Dr. Herrnson oversaw on this issue as "excellent" and "well-executed," Intervenors' Ex. 11, at 21, but opined that his study failed to address ballot order effects, Tr. 698:10-13.

populations across the globe, or that credibly undermines the careful, methodical, and reliable testimony of Plaintiffs' experts.

Though the Court finds, as a matter of fact, that first-listed candidates in Florida have gained an average electoral advantage of five percentage points due to their position on the ballot, it need not pinpoint the precise percentage point advantage conferred by ballot order in each and every election in order to find a constitutional violation. Courts have consistently found ballot order statutes unconstitutional without defining the exact numerical magnitude of the primacy effect. *See, e.g.*, *Graves*, 946 F. Supp. at 1576 (finding "some measure of position bias exists in Oklahoma's General Elections"); *Akins*, 154 N.H. at 73 (2006) (finding "even a small degree of influence carries the potential to change the result of an election"). Courts have also found that position bias impacts elections in their jurisdictions based on studies conducted in other jurisdictions. *See Sangmeister*, 565 F.2d at 466; *Gould*, 14 Cal. 3d at 668. In sum, this Court finds that Plaintiffs' experts credibly testified that their analyses provided reasonable, reliable estimates of the ballot order effect in Florida, and that the magnitude of that effect is significant.

### 3

The magnitude of the ballot order effect in Florida elections is not equivalent to the magnitude of Plaintiffs' asserted injury. It is the *way* in which the advantages (and commensurate disadvantages) of the ballot order effect are distributed between the two major political parties that is the crux of the constitutional burden

here. In short, the Statute treats similarly situated major parties differently, thereby burdening Plaintiffs' voting rights.

On its face, the Statute treats "the candidates of the party that received the highest number of votes for the Governor in the last election" differently than similarly situated "candidates of the party that received the second highest vote for Governor," Fla. Stat. § 101.151(3)(a), to the systemic and severe disadvantage of the latter. Because, over the last 21 years, the candidates who have obtained the highest number of votes for Governor have all run as Republicans, for over two decades that statutory advantage has consistently accrued in favor of the Republican Party, its candidates, and the voters who support it—and to the detriment of the Democratic Party, its candidates, and its voters. *See* ECF No. 162, at 8 ¶¶ 4-6 (parties stipulating that Republican and Democratic Parties "are the only two parties ever to have been listed first or second" in partisan general elections pursuant to the Statute); Fla. Sec'y of State, https://dos.myflorida.com/elections/candidates-committees/political-parties/ (last visited July 31, 2019) (classifying Republican and Democratic parties as the two "major political parties" in Florida); *Graves*, 946 F. Supp. at 1572 (finding Republican Party candidates similarly situated to Democratic Party candidates).

Courts that have considered challenges to similar schemes have consistently found them in violation of the Fourteenth Amendment. For example, in *Graves*, the court applied *Anderson-Burdick* to strike down an Oklahoma law—challenged by Republican candidates—that mandated that Democrats be listed first in each race on every general election ballot, holding it violated the Equal Protection Clause.

946 F. Supp. 1569. Contrary to Defendants' suggestion, *Graves* does not suggest that a statute is only unconstitutional if it expressly entrenches a party *by name*. Rather, the court held that "no legitimate State interest . . . can possibly be served by the selection of *one particular party's* candidates for priority position on every General Election ballot." *Id.* at 1590 (emphasis added).

In *McLain*, the Eighth Circuit invalidated a statute that was strikingly similar to Florida's. The only difference was that it reserved the first position on the ballot for the party that received the most votes in the last congressional election, rather than the gubernatorial. 637 F.2d at 1166. The Secretary rightly admits that *McLain* is not "clearly distinguishable," ECF No. 138, at 7-8.[15]

Nor are *Graves* and *McLain* outliers; they are consistent with every single decision that has considered an analogous challenge. *Sangmeister*, 565 F.2d at 468 ("This court will not accept a procedure that invariably awards the first position on the ballot to . . . the incumbent's party.") (citation omitted); *Netsch v. Lewis*, 344 F. Supp. 1280, 1281 (N.D. Ill. 1972) (holding unconstitutional statute prescribing ballot order by past electoral success); *Gould*, 14 Cal. 3d at 664, 669-70 (finding unconstitutional procedure that automatically afforded "an incumbent, seeking

---

[15] Defendants' argument that *McLain* should be disregarded because the court did not find the state's asserted interest in avoiding voter confusion "compelling," demonstrates not that *McLain* was wrongly decided, but that it is consistent with a long line of cases concluding that speculative concerns about voter confusion and "election integrity" cannot justify disparate treatment implicating voting rights. *See Soltysik v. Padilla*, 910 F.3d 438, 448-49 (9th Cir. 2018); *Boustani v. Blackwell*, 460 F. Supp. 2d 822, 826 (N.D. Ohio 2006); *Green Party of N.Y. State v. N.Y. State Bd. of Elections*, 267 F. Supp. 2d 342, 359 (E.D.N.Y. 2003).

reelection, a top position" on ballot "establishe[d] two classifications of candidates for public office," imposing "a very 'real and appreciable impact' on the equality, fairness and integrity of the electoral process"); *Holtzman*, 62 Misc. 2d at 1024 (holding unconstitutional system requiring incumbent in first position, finding such favoritism over all other candidates "so disparate as to raise the possibility of invalidity on this basis alone").

All of these cases are consistent with *Mann v. Powell*, the only opportunity the Supreme Court has had to consider the constitutionality of a ballot-ordering system that gives one category of candidates a systemic advantage. After the district court issued a preliminary injunction requiring that name order in the upcoming election be determined by "nondiscriminatory means" providing each candidate "an equal opportunity to be placed first on the ballot," 314 F. Supp. 677, 679 (N.D. Ill. 1969), the Supreme Court summarily affirmed that ruling. *Mann*, 398 U.S. 955 (1970).[16] The reason those statutes were invalidated applies equally here: they granted top ballot placement, and thus electoral advantage, to one class of candidates, burdening the candidates and supporters of another similarly situated class.

*All* of the cases Defendants cite to the contrary were brought by plaintiffs *not* similarly situated to the candidates or parties with whom they sought parity of treatment. This is true of *Alcorn*, where a third-party candidate challenged

---

[16] The lower court later issued a permanent injunction. *Mann v. Powell*, 333 F. Supp. 1261, 1267 (N.D. Ill. 1969) ("*Mann II*") (rejecting argument that "favoring certain candidates on the basis of 'incumbency' or 'seniority' is constitutionally permissible").

Virginia's tiered ballot order system, which—like Florida's Statute—places the major political parties (*i.e.*, Democrats and Republicans) in the first tier, but—unlike Florida's Statute—does not "automatically elevate" any one party "to the top of the ballot." *Alcorn*, 826 F.3d at 720 ("Within the first two ballot tiers, party order is determined by lot.").[17] Similarly, the plaintiff in *New Alliance Party v. New York State Board of Elections* was a minor political party that "tendered no empirical evidence in support of its claims," but still sought to be placed in the "first tier" of candidates on ballots, a position reserved for political parties that could obtain over 50,000 votes in a gubernatorial election (equivalent to 1% of the State's registered voters). 861 F. Supp. 282, 287, 295 (S.D.N.Y. 1994). The court relied upon the state's interest in orderly elections administration to justify the differential treatment between minor and major party candidates, *id.* at 298, and also noted the low bar to attain "first tier" status, *id.* at 297 (examining burden imposed in light of "lenient" 50,000 vote threshold to become a major party, which five political parties had been able to surmount).[18]

---

[17] Even in the third-party candidate context, the court in *Alcorn* still found that the statute imposed a "modest burden" on the plaintiff's rights and weighed that burden based on the precise nature of the claims and evidence before it, as appropriate under *Anderson-Burdick*, finding that the state's interests justified organizing parties on the ballot in tiers. *Id.* at 719. Plaintiffs here do not challenge Florida's tiered ballot-order system or the order in which minor-party or non-partisan candidates are listed. *See* ECF No. 1, at 25 n.2.

[18] *See also Meyer v. Texas*, No. H–10–3860, 2011 WL 1806524, at *6 (S.D. Tex. May 11, 2011) (dismissing write-in candidate's challenge to tiered ballot order system, finding write-in candidate "not similarly situated to party candidates"); *Democratic-Republican Org. of N.J. v. Guadagno*, 900 F. Supp. 2d 447, 458 (D.N.J. 2012) (rejecting unaffiliated candidates' challenge to statute placing major party candidates in first two columns, noting "it is well established that states may

When the case law is viewed as a whole, it becomes clear that courts are less likely to grant relief to minor party-affiliated or write-in candidates who seek to be treated as major party candidates, and for good reason: they are not similarly situated. Furthermore, because such candidates generally have significantly less support than major party candidates, they are often unable to demonstrate that they are injured directly and severely because of ballot position. Thus, the burden that such plaintiffs can show (if any) is generally quite slight and may be outweighed by state interests in election administration and avoiding voter confusion that are present and legitimate *precisely because* of the difference between major and minor party candidates. *See, e.g.*, *Sarvis v. Judd*, 80 F. Supp. 3d 692, 706 (E.D. Va. 2015); *Meyer*, No. H-10-3860, 2011 WL 1806524, at *18. The Supreme Court has explicitly found that states may constitutionally "enact reasonable election regulations that may, in practice, favor the traditional two-party system," *Timmons*, 520 U.S. at 367; it has not, however, reached the same conclusion about regulations that favor one similarly-situated major political party over another, much less systemically and repeatedly, in race after race, election after election.

Defendants' attempts to find support in the case law are so tortured, they only serve to further demonstrate that the only reasonable result is to find the

---

treat candidates affiliated with political parties differently than unaffiliated candidates"); *Green Party of Tenn. v. Hargett*, No. 3:11-CV-692, 2016 WL 4379150, at *3, *38-40 (M.D. Tenn. Aug. 17, 2016) (rejecting minor parties' claim after trial in which they "presented no competent statistical evidence or expert testimony demonstrating that a party's position on the ballot affects its performance in an election, much less the extent of any such effects").

Statute unconstitutional. For instance, the Secretary concedes that ballot order systems that discriminate in favor of "a particular class of candidate," such as "incumbents or candidates from a specific political party," are unconstitutional. ECF No. 138, at 7-8. Yet, on its face, the Statute favors "a particular class of candidates"—*i.e.*, all who affiliate with the specific political party of the incumbent Governor. Defendants also agree that systems that give election officials the authority to "list[] candidates from their party first" are unconstitutional. *Id.* at 8 n.4; *see also* ECF No. 141, at 28. By arguing that this case is meaningfully different, the Secretary ignores that she was appointed to her position "by the Governor" and "serve[s] at [his] pleasure." Fla. Stat. Ann. § 20.10(1). Thus, the Statute not only allows but *mandates* that the Secretary list candidates from her party first.

Intervenors similarly recognize the inherent unfairness created by incumbent-first statutes, in which "incumbents are automatically favored on the ballot for no other reason other than that they are incumbents." ECF No. 51, at 5; *see also id.* at 6-7 (attempting to distinguish "incumbent first cases"). But to the extent that there are any meaningful differences between incumbent-first statutes and Florida's incumbent-*party* Statute, they only illuminate the more significant burden imposed here. While incumbency-first statutes give name order preference to specific candidates for whom voters have already expressed a preference, the Florida Statute puts a thumb on the scale, consistently and without exception, for all candidates associated with the Governor's political party based entirely on the results of the last Governor's election, no matter how unrelated the seat, how many

years since that election, or that the candidate who won the election may be no longer eligible to serve as Governor. That advantage persists into the next Governor's election, giving the entrenched party an advantage yet again.

### 4

Finally, Florida's recent history of elections with razor-thin margins of victory compounds the severity of the burden. The evidence demonstrates that the Statute has consistently operated to the detriment of Plaintiffs for the past 20 years, likely deciding several elections, including the last four governor races from which the Republican advantage under the Statute flows.

Since 1998, the effect of the Statute has been to list Republicans first in every partisan race in Florida based on the electoral successes of only four candidates—Jeb Bush in 1998 and 2002, then-Republican Charlie Crist in 2006, Rick Scott in 2010 and 2014, and, in 2018, Governor DeSantis. *See* ECF No. 162, at 9. Thus, under the operation of the Statute, for the next four years, Republican candidates will be consistently listed first on the ballot in all partisan elections based on a 0.4 percentage-point vote differential, where Governor DeSantis received 49.6% of the ballots cast and counted, and Gillum a nearly identical 49.2%. *See* ECF No. 198-1, at 259. Over the prior eight years, Republicans were listed first as the result of elections that were also decided by incredibly slim margins, with former Governor Scott winning by only 1 percentage point in 2014, and 1.2 percentage points in 2010. *See id.* at 219, 237.

Exceedingly close elections occur regularly in Florida up and down the ballot and have increased significantly in recent years. In 2018 alone, at least 16

elections were won by a Republican within 5.0 percentage points, including the Governor's race (decided by 0.4 percentage points), the U.S. Senate race (decided by less than 0.2 percentage points), the race for Chief Financial Officer (decided by 3.4 percentage points), and thirteen state legislative races.[19] *See* ECF No. 198-1, at 257-70. Two of those legislative races were decided by fewer than 100 votes.[20]

In light of this election history, Florida is widely considered a "competitive" "swing state." Tr. 87:13-18. In such a hotly-contested electoral environment, every tenth of a percentage point counts. The thumb on the scale in favor of first-listed candidates, therefore, has real consequences for the major parties and Florida voters. For instance, DLCC representative Ms. Williams testified that, in 2018 alone, 11 Florida House of Representatives districts were won by Republican candidates by less than Dr. Krosnick's estimated average, and an additional seven districts were won by Republicans within that margin since 2012. Tr. 83:5-84:12; *see also* Tr. 79:11-21 (name order effect is greater in Florida House and other down-ballot elections): Pls.' Ex. 5, at 2-5, 17-24. Ms. Williams credibly demonstrated that, but for the benefits of name order effect conferred on the

---

[19] Senate District ("SD") 8 (49.4% to 48.4%); SD 16 (52.2% to 47.8%); House District ("HD") 15 (50.9% to 49.1%); HD 21 (51.4% to 48.6%); HD 26 (50.05% to 49.95%); HD 28 (51.3% to 48.7%); HD 29 (51.0% to 49.0%); HD 60 (52.3% to 47.7%); HD 83 (52.1% to 47.9%); HD 89 (50.02% to 49.98%); HD 105 (50.4% to 49.6%); HD 115 (50.5% to 49.5%); HD 118 (51.2% to 48.8%).

[20] In HD 26, the Republican received 61 more votes than the Democrat, while in HD 89, the Republican received 32 more votes than the Democrat. *See* ECF No. 198-1, at 263, 268.

opposing party's candidates, the Democratic Party would likely be within striking distance of winning a majority of Florida House seats. Tr. 87:22-88:4.

Though this Court finds, as a matter of fact, that first-listed candidates in Florida have gained an average electoral advantage of five percentage points due to their position on the ballot, the Court further finds that even if the magnitude of the name order effect in Florida were far less than Dr. Krosnick estimates, in the context of this State's increasingly small electoral margins, the advantage conferred upon first-listed candidates has been in the past, and likely will be in the future, outcome determinative in Florida elections.

\*     \*     \*

For all of these reasons, the Court finds that the Statute's impact on elections in Florida has been significant and that it imposes a severe burden on Plaintiffs' First and Fourteenth Amendment rights.

## B

The State's proffered interests cannot justify the burdens imposed by the Statute. Given that the Statute imposes a severe burden on Plaintiffs' rights, heightened scrutiny applies, and any purported state interests must be sufficiently weighty to justify the heavy burden which the Statute mandates. But even if the Statute were subject to a far less stringent level of scrutiny, it still could not survive challenge based on the record in this case.

Crucially, Defendants have never claimed an interest in favoring the political party of the last-elected governor. *See* Pls.' Ex. 73, at 2; *see also* Tr. 764:8-789:13. This is not surprising. "Political patronage is not a legitimate state interest which

may be served by a state's decision to classify or discriminate in the manner in which election ballots are configured as to the position of candidates on the ballot." *Graves*, 946 F. Supp. at 1580-81; *McLain*, 637 F.2d at 1167 (finding state's "favoritism" of the political party that received the most votes in the last congressional election failed rational basis test); *Holtzman*, 62 Misc. 2d at 1024 (holding no rational basis for "favoritism to a candidate merely on the basis of his having been successful at a prior election"). As a result, Defendants fall back on a series of vague and diffuse interests, none of which justifies—much less makes "necessary," *Burdick*, 504 U.S. at 434—the unlevel playing field created by the Statute in every single partisan election in Florida, which consistently disadvantages candidates simply because of the political party with which they associate.

Before evaluating each of Defendants' asserted interests, it is important to clarify the role of remedy in the Court's analysis of the merits under *Anderson-Burdick*. The existence of a viable alternative ballot ordering system is relevant not because it is critical for Plaintiffs' standing or a necessary prerequisite to establish a constitutional violation, but because it helps demonstrate the extent to which Defendants' asserted interests "'make it necessary to burden [Plaintiffs'] rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). Where, as here, Plaintiffs have identified an alternative ballot ordering system that would largely satisfy the "precise interests put forward by the State," *id.*, the proposed alternative serves as evidence that those interests do not justify the burdens imposed by the Statute. Indeed, here, Defendants have not asserted any state interest in *this* ballot

ordering scheme, favoring the political party of the Governor—just in *a* ballot ordering scheme that provides for an orderly election. The evidence at trial amply demonstrated that there are alternative ways to achieve the State's goals without favoring one similarly situated party over another or otherwise infringing on Plaintiffs' constitutional rights.

### 1

Defendants' argument that the Statute should be upheld simply because Florida has an interest in defending the constitutionality of the Statute is a non-starter. *See* Tr. 773:4-18. Indeed, if that were the law (and the Secretary has identified no authoritative cases reaching that conclusion), it would effectively doom every *Anderson-Burdick* claim before it began. To the contrary, it is well-established that states do not have a legitimate interest in enforcing unconstitutional laws. *See, e.g.*, *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998); *Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003).

### 2

As for Defendants' invocation of Florida's general interest in "upholding its policy of ballot uniformity," they similarly can identify no case law that could justify a law consistently placing its thumb on the scale in favor of one political party in all elections.[21] Moreover, the State's so-called policy of ballot uniformity

---

[21] Contrary to the Secretary's suggestion in earlier briefing, *Bush v. Gore*, 531 U.S. 98 (2000), did not mandate that ballots be uniform across Florida. The Court made clear that its ruling did not implicate "whether local entities, in the exercise of their expertise, may develop different systems for implementing elections." *Id.* at 109.

is belied by its current proliferation of multiple ballot styles, usually with a separate ballot style for each precinct. *See* Tr. 459:11-18, 591:15-592:14; *see also* ECF No. 162, at 11-12, ¶¶11-12. That means there are many different ballot styles within each county. Indeed, in primary elections, there are even multiple ballot styles within each precinct. Tr. 459:16.

In any event, even assuming an interest in uniformity, the State could satisfy that interest with respect to candidate order in numerous ways, including by listing major party candidates alphabetically. It is not necessary to burden a similarly situated class of voters or candidates simply to ensure that candidates appear in a uniform order across the State. *See Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 634 (6th Cir. 2016) ("Nor does Ohio's interest in uniformity 'make it necessary to burden' the right to vote with a technical-perfection requirement.").

### 3

Nor can Defendants' claimed interest in avoiding administrative burdens justify the Statute. First, Defendants' administrative-burden argument fails as a matter of law. "[N]umerous cases have refused to permit the state to justify discriminatory legislation on the basis of similar 'administrative efficiency' interests." *Gould*, 14 Cal. 3d at 675; *see also Obama for Am.*, 697 F.3d at 434 (6th Cir. 2012) (finding state interest in "smooth election administration" insufficient to justify disparate burden on voters); *Fla. Democratic Party v. Detzner*, No. 4:16CV607-MW/CAS, 2016 WL 6090943, at *7 (N.D. Fla. Oct. 16, 2016) (finding

---

Rather, the Court simply required the formulation of uniform rules to determine voter intent in conducting manual recounts. *Id.* at 106.

administrative inconvenience in allowing voters to cure vote-by-mail ballots insufficient to justify burden on voters).

Second, Defendants' burden arguments are directed at just one of a host of potential *remedies*—*i.e.*, precinct-by-precinct rotation. In the face of Plaintiffs' proposed alternative ballot ordering scheme of county-by-county rotation, however, Defendants' claims of burden fall away.[22] Defendants contend, for example, that rotating major party candidates on the ballot could raise issues with election administration, including with the preparation and testing of voting equipment and the tabulation of election results at the state level. *See* Tr. 776:21-783:15. But all of the supervisors who testified—whether on behalf of Plaintiffs or the Secretary—agree that county-by-county rotation could be implemented seamlessly at the county level. Tr. 235:13-243:4, 256:11-14 (Sancho); 451:9-452:7 (White); 478:13-479:10 (Edwards); 523:17-19 (Earley); 570:20-23, 571:9-13 (Lux). Florida's Director of Elections, Maria Matthews, confirmed that each of Florida's 67 counties has the capability to design, code, and accurately count ballots independently with either Republicans or Democrats in the first ballot position. *See* Tr. 801:6-16, 802:11-18. She also confirmed that from the perspective of each independent county, the process of setting up and conducting the election is the same whether Republicans or Democrats are listed first on the

---

[22] Plaintiffs describe their proposed county-by-county rotation alternative as a system in which "half of the counties continue to list Republican candidates first on all ballots, exactly as they do now, and half of the counties list Democrats first on all ballots, exactly as they are required and equipped to do whenever the party of the Governor changes hands." Tr. 29:25-30:4.

ballot. Tr. 802:19-803:2. Similarly, representatives from Election Systems & Software and Dominion Voting Systems—the two voting-systems vendors in Florida—testified that their voting technology can easily accommodate county-by-county rotation. *See* ECF No. 196-3, at 37:10-39:15; 42:4-45:7; ECF No. 196-2, at 48:2-54:19. There would thus be no need to need to alter, test, or recertify voting equipment to implement county-by-county rotation.

With respect to the tabulation of votes at the State level, the Court finds that a system of county-by-county rotation will have no appreciable impact on the process. The evidence and testimony at trial demonstrated that, since July 1, 2017, each county within the state has been required to use one standardized form—called the XML Schema—when reporting election results to the Division of Elections. Pls.' Ex. 51; Tr. 807:10-808:9; *id.* at 810:12-811:15. Using the XML Schema, each county reports the results of the election on a candidate-by-candidate basis, identifying the candidate by a unique, state-assigned candidate identification number. Tr. 817:16-818:5. The votes cast for each candidate in each county can thus be added together without difficulty regardless of the candidate's position on the ballot. Indeed, Ms. Matthews could not articulate any reason why varying candidate order by county would have any impact whatsoever on the state tabulation given the current requirements. *See* Tr. 819:13-831:9. The most she could muster was to suggest that some unknown problem might arise simply because candidate order has never varied by county before. *See id.* But given that there is no logical reason why candidate order at the county level would affect the state-level tabulation process, the Court does not give Ms. Matthews' speculative

concern any weight. In any event, even if some testing or tweaking of the tabulation process were required, such routine administrative burdens cannot justify a constitutional violation. The next election is more than 15 months away. The Division of Elections thus has ample time to "do[] [its] due diligence." Tr. 823:8-12.

Accordingly, the Court finds, as a matter of fact, that a system of county-by-county rotation would not add any meaningful burdens on the State's elections administration, and accordingly, this asserted state interest does not render it "necessary to burden [Plaintiffs'] rights," *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789).

**4**

For similar reasons, the State's purported interest in reducing voter confusion cannot sustain the Statute. For one, Defendants fail to explain why a constitutional system would be any more confusing than the current system. Whether the first candidate on the ballot secured that favorable position through political favoritism or through some more equitable method of selection should make no difference to the voter. *See Sangmeister*, 565 F.2d at 467 (finding it "difficult to understand" how the practice of County Clerks placing their own political party in the first ballot position avoids confusion or maintains ballot predictability "any more efficiently than would a neutral system of ballot placement"). Plaintiffs do not challenge the part of the law that requires that ballots clearly designate candidates' party affiliations. *See* Fla. Stat. § 101.151(3)(a) (providing that "[t]he names of the candidates" be listed "together with an

appropriate abbreviation of the party name"). Nor do Plaintiffs challenge Flat. Stat. § 101.151(3)(b) or seek wholesale random rotation; rather, consistent with Florida's tiered system, the major parties would still be listed first, and their relative order would remain consistent down the ballot of any particular voter. *Compare Alcorn*, 826 F.3d at 713. Voters could find and select candidates from their preferred party all the way down the ticket, as easily as now.

None of the witnesses presented by Defendants at trial could cogently explain why or how voters would be confused by a change in Florida's ballot order. The only voter who might conceivably be "confused" is one committed to voting for candidates with the same party affiliation as the last-elected Governor, who does not know what party that is, yet is acutely aware that the Statute requires that those candidates be listed first. It is inconceivable such a voter exists, much less that their highly unusual perspective could justify maintaining the Statute. Plaintiffs pointed this out at the outset of this case, *see* ECF No. 38, at 14, and more than a year later, Defendants have not identified even a single voter fitting this profile.[23]

Two supervisors (Mr. Earley and Mr. Lux) speculated that voters might be confused by a potential mismatch between their actual ballots and county-issued sample ballots (Tr. 500:2-502:07, 585:18-591:10), but the Court does not find that theory credible. The evidence at trial confirmed that each county mails or publishes

---

[23] Indeed, both Ms. White and Mr. Sancho testified that the only questions or complaints they had ever received regarding ballot order were from voters concerned about why Republicans are listed first or from candidates wondering why they are not listed first. *See* Tr. 234:9-15 (Sancho); *id.* 458:25-459:7 (White).

a single, composite sample ballot listing all the races in that county. *See, e.g.*, Tr. 459:8-460:10, 499:7-9. Accordingly, if candidate order varies only by county (rather than by precinct), there will be no mismatch. Tr. 589:5-10. The supervisors nonetheless observed that there would be a mismatch if a voter received a copy of the sample ballot in one county after the primary, moved to another county, and went to their new polling place with their sample ballot from their previous county. *See* Tr. 589:11-591:10. But in that (rather unlikely) scenario, there would be different down-ballot races on the ballot as well. The Court finds that any variation in the order of major party candidates would cause no more confusion than the necessary variation in races from one county to the next. Tr. 591:3-592:21.[24] The supervisors also acknowledged that each county's sample ballot is clearly marked with the county's name, Tr. 502:17-25, and that poll workers can be trained to answer any hypothetical questions voters might have about ballot order, Tr. 593:7-594:6.

Nor does the Court find credible the speculative and ill-explained concern that voters residing in different counties that share a media market would somehow be confused by a county-by-county rotation system. *See* Tr. 498:24-502:7, 574:3-10, 584:19-586:4. Mr. Earley acknowledged that in his 33 years at the supervisor's office, he had never heard of, and his office had never run, any television or radio advertisement discussing ballot position. Tr. 501:20-502:7. Mr. Earley also seemed

---

[24] Notably, even without the complication of moving counties, there is *always* a mismatch between a voter's actual ballot and the composite ballot because, as Mr. Lux acknowledged, the composite ballot lists more races than appear on the voter's actual ballot. *See* Tr. 591:11-592:14; *see also* Tr. 459:8-13.

to obliquely express some hypothetical concern about a combination of ballot order and a new Florida law allowing voters to post pictures of ballots leading to voter confusion, Tr. 503:12-18, but acknowledged that he did not expect many voters to be confused by this, *id.*, and testified that his true concern regarding Senate Bill 7066, which permits the photographing of ballots, is "maintain[ing] the sanctity of the polling place." Tr. 503:21-504:15. Neither the Secretary nor Intervenors presented the testimony of a single voter who has ever been confused by her county's change in name order under the Statute, has relied on pictures from social media in determining how to fill out her own ballot, or has been confused by the sample ballots issued by neighboring counties bearing different county names and featuring different races.

Moreover, the evidence from states that rotate name order confirms the obvious—voters are not confused. Jessica Burns, the Executive Director of the nonpartisan League of Women Voters in New Jersey, has never heard of voter confusion resulting from that state's ballot order system, which determines name order of major party candidates for each county by lottery. *See* ECF No. 196-1, at 13:20-15:9; N.J. Stat. Ann. § 19:14-12. Likewise, Michael Beazley, an administrative official who has been involved in Ohio elections for almost half a century, has never heard of voter confusion resulting from that state's system of ballot rotation. *See* Tr. 209:19-211:1, 218:6-219:7; Ohio Rev. Code Ann. § 3505.03. Nor has he heard of any problems with sample ballots associated with name-order rotation. Tr. 214:10-14, 216:3-12. And although the Florida Statute contemplates a wholesale change in ballot order whenever the Governor is elected

from a different party, no witness recalled any voter confusion resulting from that change in the past. *See, e.g.*, Tr. 232:4-235:12 (Sancho), 518:22-519:1 (Earley).

Courts considering schemes similar to the system of political favoritism at issue here have rejected arguments that purported concerns about voter confusion justify their disparate and burdensome impacts. *See, e.g.*, *McLain*, 637 F.2d at 1167 (finding "making the ballot as convenient and intelligible as possible for the great majority of voters" is not a legitimate state interest that can justify uniform first-listing of candidates of party receiving most votes in last congressional election); *Gould*, 14 Cal. 3d at 672 (rejecting argument that interest in promoting "efficient, unconfused voting" justified incumbent-first ballot order system); *Sangmeister*, 565 F.2d at 467 (ordering names on ballot based on past electoral success not justified by "the administrative need to avoid confusion and to have a consistent practice so that voters will know in advance where the parties will be on the ballot"). This Court reaches the same conclusion here; Defendants' concerns about potential voter confusion are not supported by credible evidence, are, in any event, insubstantial, and are far outweighed by the burden on Plaintiffs' constitutional rights.

**5**

Finally, the State's generalized interest in the integrity of the elections process is also insufficient to justify the burdens imposed on Plaintiffs by the Statute's consistent favoritism of the last-elected Governor's party. Like many of the other interests that the Secretary asserts, it is exceedingly vague. The Secretary never explains how skewing elections in favor of the Governor's party promotes

elections integrity. Although counsel for the Secretary argued that the current ballot ordering scheme "give[s] people confidence in the elections process," Tr. 34:11-13, the evidence at trial did not support this claim. In fact, the only voter to testify on the issue testified that the current system, by advantaging one party over the over, has caused her to lose confidence in Florida's elections. Tr. 55:12-56:3. In any event, any concerns about election integrity appear to be bound up with concerns about purported administrative burdens and voter confusion, already discussed above.

*     *     *

In sum, Defendants have failed to show why it is at all "necessary" to burden Plaintiffs' rights by awarding the top ballot position to members of the Governor's party. Even if the Court had found that the Statute imposed a lesser burden on Plaintiffs' rights, the State's purported interests are neither legitimate nor sufficiently weighty to overcome that burden. Accordingly, the Court declares the Statute unconstitutional and enjoins its enforcement.

IV

Having found the Statute unconstitutional and enjoined its enforcement, the final question is whether specific equitable relief is appropriate to "fit the exigencies of [this] particular case." *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 607-08 (1957).

As noted, "once a plaintiff has established the violation of a constitutional . . . right . . . [,] courts have broad and flexible equitable powers to

fashion a remedy that will fully correct past wrongs." *N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 239 (4th Cir. 2016) (quotation marks and alterations omitted). Courts have "substantial flexibility" in crafting equitable decrees tailored to the particular facts of each case. *Brown v. Plata*, 563 U.S. 493, 538 (2011).[25] In *Plata*, for example, prisoners demonstrated that they received inadequate health care in violation of the Eighth Amendment because of prison overcrowding. *Id.* at 499-502. To remedy the constitutional violation, a three-judge district court entered an order requiring the State to reduce its prison population to 137.5 percent of design capacity within two years. *Id.* at 509-10. The Supreme Court affirmed, holding that "the court-mandated population limit [was] necessary to remedy the violation of prisoners' constitutional rights." *Id.* at 502.

Courts adjudicating election-related issues have issued similarly detailed remedial orders in a wide variety of factual circumstances.[26] And at least two

---

[25] *See also, e.g.*, *Kansas v. Nebraska*, 135 S. Ct. 1042, 1058 (2015) ("flexibility [is] inherent in equitable remedies"); *McCullen v. Coakley*, 573 U.S. 464, 492 (2014) ("[G]iven the equitable nature of injunctive relief, courts can tailor a remedy to ensure that it restricts no more speech than necessary."); *Carter-Jones Lumber Co. v. Dixie Distrib. Co.*, 166 F.3d 840, 846 (6th Cir. 1999) ("[A] court of equity has traditionally had the power to fashion any remedy deemed necessary and appropriate to do justice in a particular case."); D. Dobbs, Law of Remedies 47 (3d ed. 2018) (explaining that equity is characterized by "a high degree of judicial discretion," which "includes the ability to shape equitable relief").

[26] *See, e.g.*, *United States v. Brown*, 561 F.3d 420 (5th Cir. 2009) (holding that where political party's county executive committee engaged in racially motivated manipulation of the electoral process, the district court did not abuse its discretion in appointing a referee-administrator to organize party's county primary elections and limiting defendants' role in supervising future primary elections); *Obama for Am. v. Husted*, No. 2:12-CV-636, 2014 WL 2611316, at *5 (S.D. Ohio June 11, 2014) (ordering Secretary of State to set uniform and suitable in-person early

courts have ordered name order rotation to remedy the effects of position bias. *See Kautenburger v. Jackson*, 85 Ariz. 128, 130 (1958) (ordering "the names of candidates be rotated on the voting machines in the most practicable and fair way possible"); *Elliott v. Sec'y of State*, 295 Mich. 245, 250 (1940) ("[I]t is clearly the duty of the defendants in this case, acting as election officials, to rotate on the non-partisan ballots the names of candidates for the office of Supreme Court Justice[.]").

Exercising its equitable discretion in accordance with these precedents, the Court finds it appropriate in this case to issue an order directing the Secretary to require that the order of major party candidates on the ballot be rotated by county, as set forth below, unless and until the Legislature replaces the Statute with a constitutionally compliant ballot order system. The Court finds, as a matter of fact and based on the record before it, that requiring the Secretary to implement the county-by-county rotation system described below is appropriate, feasible, and adequate to redress the constitutional violation.

First, specific equitable relief is appropriate under the circumstances. Because the Statute has been enjoined, a constitutionally-permissible method of determining name order must be devised to fill the void until the Legislature can

---

voting hours for all eligible voters for the three days preceding all future elections); *United States v. Berks Cty., Pennsylvania*, 277 F. Supp. 2d 570 (E.D. Pa. 2003) (prohibiting English-only elections in the City of Reading, ordering defendants to recruit and train persons to serve as bilingual poll officials or interpreters, and authorizing the appointment of federal examiners to serve through 2007).

act. It is therefore appropriate for the Court to fashion such a method to bridge the gap.

Second, county-by-county rotation is eminently feasible. As noted, the evidence at trial established, and this Court finds, that county-by-county rotation would impose no additional administrative burdens on the counties. *See supra*, at 49-51. Nor would it cause voter confusion or undermine confidence in the electoral process. *See supra*, at 51-56. The voting systems in place in each county are already capable of adjusting candidate order, as they are required to do pursuant to the Statute if the out-of-power party captures the Governor's mansion. And aside from Ms. Matthews's speculative testimony about unknown unknowns, there is no evidence that county-by-county rotation would complicate the statewide tabulation process. Indeed, the Secretary has essentially acknowledged that county-by-county rotation is practically feasible, arguing instead that it is "constitutionally infeasible" because it purportedly would not do enough to rectify the Statute's constitutional harms. *See* ECF No. 115, at 8, 17-18.

The Court finds unpersuasive Defendants' professed concern that a county-by-county rotation system would not go far enough. To the contrary, such a system would substantially ameliorate Plaintiffs' injuries. Plaintiffs have shown, and this Court finds, that if the order of the major parties were alternated based on the registered voter population in each county, 53% of voters would receive ballots with one major party listed first and 47% would receive ballots with the other listed first—a near-even split. *See* Tr. 91:17-92:3. While position bias would remain a factor in races contested within a single district, the direction of the effect

would no longer be uniform or constant over time, remediating injuries Plaintiffs suffer all the way down the ticket. This is true not only of the individual candidates who would no longer be perennially relegated to second position merely because they associate with the party whose candidate placed second in the last gubernatorial race, but of all candidates who associate with that party, regardless of their individual position on the ballot in each election year, because they share the associational injuries their party suffers as a whole under the present all-or-nothing system. *See* Tr. 94:15-24 (the DLCC's mission is to "build a majority" "across the state," and a county-by-county rotation system would at least provide Democrats "the opportunity to be listed first in some districts across the state"); *see also* Tr. 123:14-24.

Defendants' suggestion that a county-by-county rotation system would invite future litigation from candidates who appear on the ballot in only a single county, *see, e.g.*, Tr. 41:3-11, 464:12-465:12; 490:17-22, is entirely speculative and completely misapprehends the nature of the constitutional violation. The fact that one candidate may consistently appear at the top of the ballot does not, by itself, render a ballot ordering scheme unconstitutional. The constitutional burden is based on the disparate treatment of similarly situated major parties in determining ballot order. *See supra*, at 36-37. Indeed, ballot order schemes in which order is determined by lottery have passed muster in the courts, notwithstanding the fact that such schemes do not rotate candidate names at all. *See Alcorn*, 826 F.3d at 712 (sanctioning system in which order of major-party candidates is determined by lot); *Culliton v. Bd. of Election Comm'rs of DuPage*

- 60 -

*Cty.*, 419 F. Supp. 126, 129 (N.D. Ill. 1976) (ordering lottery scheme as temporary remedy); *Holtzman*, 62 Misc. 2d at 1025 (ordering that ballot position be decided by lot, as was required under prior law). This Court finds that, in light of the realities of modern-day technology and Florida's county-based election administration system, county-by-county rotation would be just as feasible and easily administrable as a lottery system, while also allowing for a more equitable distribution of the benefits and burdens that result from name order effects and preserving the State's policy preference for a tiered ballot ordering system that prioritizes major party candidates over minor-party and non-party candidates.

To be sure, a more granular system of ballot rotation (like rotation by precinct) would do even *more* to neutralize the effects of position bias, and the Legislature may well decide to enact such a system. But the fact that a particular equitable decree "would not provide a complete remedy . . . does not preclude the [c]ourt from granting equitable relief that would solve the problem in part." *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 639 (S.D.N.Y. 2014). The Constitution does not hold the Court to a "Goldilocks" standard, whereby it must enter the "just right" remedy or none at all. The law does not allow perfect to be the enemy of good in these situations.

Accordingly,

IT IS ORDERED:

1. Fla. Stat. § 101.151(3)(a) (the "Statute") is unconstitutional. The Secretary is permanently enjoined from enforcing the Statute.

- 61 -

2. The Secretary shall direct the Division of Elections to create a list of Florida's 67 counties ranked by number of registered voters prior to each general election.

3. The Secretary shall randomly determine (by lottery or coin toss) whether Republicans or Democrats shall be listed first on all ballots in the county ranked first by number of registered voters.

4. The Secretary shall then direct that the other major party's candidates be listed first on all ballots in the county ranked second by number of registered voters, and assign first position to either Republicans or Democrats on an alternating county-by-county basis progressing down the list, such that all ballots in any one county will list either Republicans or Democrats first for all partisan races in that county.

5. The Clerk is directed to enter judgment in favor of Plaintiffs.

6. The Court reserves jurisdiction to entertain any motion for attorneys' fees and costs, and any other enforcement procedures related to this matter.


SO ORDERED on _____, 2019.

Respectfully submitted,

/s/ Frederick S. Wermuth
Frederick S. Wermuth
Florida Bar No.: 0184111
KING, BLACKWELL, ZEHNDER
     & WERMUTH, P.A.
P.O. Box 1631
Orlando, FL 32802-1631
Telephone: (407) 422-2472
Facsimile: (407) 648-0161
fwermuth@kbzwlaw.com

Marc E. Elias
Elisabeth C. Frost*
Jacki L. Anderson*
John M. Geise*
PERKINS COIE LLP
700 Thirteenth St., N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-9959
melias@perkinscoie.com
efrost@perkinscoie.com
jackianderson@perkinscoie.com
jgeise@perkinscoie.com

Abha Khanna*
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: (206) 359-8000
Facsimile: (206) 359-9000
akhanna@perkinscoie.com

*Counsel for the Plaintiffs*
*Admitted Pro Hac Vice*

- 1 -