## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**NANCY CAROLA JACOBSON,**
**et al.,**

       ***Plaintiffs,***

**v.**                               **CASE NO.: 4:18cv262-MW/CAS**

**LAUREL M. LEE, et al.,**

       ***Defendant/Intervenors.***

_____/

## FINAL ORDER FOLLOWING BENCH TRIAL

In political circles, it is widely believed that the candidate who is listed first on the ballot has an advantage in the election—an advantage which can be decisive.[1] This advantage supposedly comes from a phenomenon called the primacy effect, which is the human tendency to choose the first item in a list of options. The portion of the vote a candidate supposedly gains this way is called the "primacy effect" vote, the "windfall vote," or the "donkey vote."[2] *See Sarvis v. Judd*, 80 F. Supp. 3d 692, 699 (E.D. Va. 2015).

_____

[1] It bears noting that Intervenors—a group of Republican organizations—originally sought to intervene in this case on the basis that Republican candidates and organizations "stand to be most directly harmed by a change" in Florida's ballot order scheme, although they now argue it awards no significant advantage to any candidate or party. ECF No. 23 at 16.

[2] Here, "donkey" probably substitutes for a more colorful term. *See* Richard Leighton, *Don't be a smartass and confuse donkeys, mules*, The Ellsworth American (July 12, 2019)

In Florida, the order in which candidates appear on the ballot is determined by the previous election for governor.  The party in control of the Governor's Mansion has its candidates listed first in every race, all along the ballot.  The party that came in second has its candidates listed in the second position in each race.  So, if the Governor of Florida is a Democrat, then Democrats will be listed first in every race on every ballot for the next four years, just because they are also Democrats.

The implication is obvious.  Assuming the so-called "donkey vote" exists, Florida's ballot order statute ensures one party's candidates receive that advantage in every race, all down the ballot, in every election.  In practical terms, when the governor is a Democrat, this means every Democratic candidate has a small but significant advantage in every election over the Republican candidate, and that they have this advantage solely because they are Democrats.  When a Republican is governor, Republicans have the advantage, solely because they are Republicans.

The first issue in this case is whether Plaintiffs have proven the primacy effect exists and affects Florida's elections.  This Court finds they have done so.  The second issue is whether the Constitution allows a state to put its thumb on the scale and award an electoral advantage to the party in power.  The answer is simple.  It does not.

---

https://www.ellsworthamerican.com/living/arts-a-living/dont-be-a-smartass-and-confuse-donkeys-mules/ (explaining the history of the term "jackass," meaning a male donkey).

**The Florida Statute at Issue**

Florida's ballots are arranged in an office block pattern, meaning that all the candidates for a given office are listed together in a section of the ballot labelled with the title of the office they are running for. § 101.151(2)(a), Fla. Stat. (2019). Within each office block, the candidates' names are arranged according to the following scheme:

> The names of the candidates of the party that received the highest number of votes for Governor in the last election in which a Governor was elected shall be placed first for each office on the general election ballot, together with an appropriate abbreviation of the party name; the names of the candidates of the party that received the second highest vote for Governor shall be placed second for each office, together with an appropriate abbreviation of the party name.

*Id.* § 101.151(3)(a).[3]  For all partisan races in the general election, therefore, the candidates affiliated with the political party of the last-elected governor will be listed first within each office block.

---

[3] Florida law further provides that names of "[m]inor political party candidates" appear on the ballot after the names of candidates of "recognized political parties" in the order they were qualified to appear on the ballot. § 101.151(3)(b), Fla. Stat. (2019). Candidates with no party affiliation appear last, in the order in which they were qualified. *Id.* Minor political parties are those parties which have fewer than five percent of the total registered electorate as members. § 97.021(19), Fla. Stat. (2019). The statute does not explain what would result if a candidate from a "minor political party" were elected governor or won the second-largest number of votes, or if more than two parties were able to cross the five-percent threshold. The Florida Statutes do not define "recognized political party." Additionally, this ordering procedure applies only to general elections. In primary elections, candidates are listed alphabetically within office blocks. § 101.151(4)(a), Fla. Stat. (2019).

## Preliminary Miscellanea

In what has become a familiar exercise for this Court in cases concerning voting rights and procedure, Defendants[4] throw a hodgepodge of preliminary issues at the wall, hoping one will stick and prevent this Court from considering this case on the merits. *See, e.g.*, *Rivera Madera v. Detzner*, 325 F. Supp. 3d 1269, 1275–78 (N.D. Fla. 2018); *League of Women Voters of Fla., Inc. v. Detzner*, 314 F. Supp. 3d 1205, 1212–14 (N.D. Fla. 2018); *Fla. Democratic Party v. Detzner* (*Fla. Democratic Party I*), Case No. 4:16cv607-MW/CAS, 2016 WL 6090943, at *4–*5 (N.D. Fla. Oct. 16, 2016); *Fla. Democratic Party v. Scott (Fla. Democratic Party II)*, 215 F. Supp. 3d 1250, 1254–55 (N.D. Fla. 2016). In the present case, Defendants claim Plaintiffs lack standing; that Plaintiffs' claims are barred by the applicable statute of limitations, estoppel, and laches; and that this case is not justiciable.

In a prior order, this Court summarily rejected Defendants' arguments on these preliminary matters as "unpersuasive." ECF No. 158 at 1. Defendants renewed these arguments at trial citing supplemental authority, and this Court remains unpersuaded. Although it entails a lengthy diversion to tilt at Defendants' windmills, this Court will address each preliminary matter in turn.

---

[4] For rhetorical convenience, this Court will refer to Defendant Lee and Intervenors collectively as "Defendants."

*Justiciability*

This Court need not struggle with the question of justiciability.  The Supreme Court has summarily affirmed a district court's decision which held that, where applicable law required candidates to be listed on the ballot in the order in which they filed their qualification paperwork, a discretionary policy of resolving ties in favor of incumbents was "a purposeful and unlawful invasion of [the] plaintiffs' Fourteenth Amendment right to fair and evenhanded treatment." *Mann v. Powell*, 314 F. Supp. 677, 679 (N.D. Ill. 1969), *aff'd without opinion*, 398 U.S. 988 (1970). The Supreme Court's summary affirmances are binding precedent unless and until the Court specifically disclaims them.  *See Hicks v. Miranda*, 422 U.S. 332, 344 (1975) (holding "that the lower courts are bound by summary decisions by this Court until such time as this Court informs them that they are not" (internal marks and quotation omitted)); *see also Hardwick v. Bowers*, 760 F.2d 1202, 1207 (11th Cir. 1985), *rev'd on other grounds*, *Bowers v. Hardwick*, 478 U.S. 186 (1986) ("A summary affirmance of the Supreme Court has binding precedential effect.").

The strength of this principle is such that summary affirmances by the Supreme Court remain binding even in the face of decades of seemingly contrary decisions.  In *Hand v. Scott*, 285 F. Supp. 3d 1289 (N.D. Fla. 2018), this Court addressed the precedential effect of the Supreme Court's summary affirmance of *Beacham v. Braterman*, 300 F. Supp. 182 (S.D. Fla. 1969), *aff'd without opinion*,

369 U.S. 12 (1969).  This Court concluded it was not bound by *Beacham* because "[u]nlike a fine wine, this summary affirmance has not aged well" in light of subsequent Supreme Court decisions which seemed to recede from, or at least contradict, that decision.  285 F. Supp. 3d at 1307.  On appeal from this Court, the United States Court of Appeals for the Eleventh Circuit admonished that "we are bound to follow Supreme Court precedent in *Beacham*" and the Supreme Court's other "summary determinations."  *Hand v. Scott*, 888 F.3d 1206, 1208 (11th Cir. 2018).  The summary affirmance of *Mann* would alone compel the conclusion that Plaintiffs' claims are justiciable.

Furthermore, in *Cook v. Gralike*, 531 U.S. 510 (2001), the Supreme Court held a provision of the Missouri Constitution which required the words "DISREGARDED VOTERS' INSTRUCTIONS ON TERM LIMITS" to appear alongside the names of certain candidates on Missouri's ballots was unconstitutional.  Defendants agree *Cook* is binding authority—in fact, Intervenors cited it during trial of this case in response to this Court's question of whether a law could be challenged which placed a "thumbs-up" symbol next to certain candidates on the ballot, T. at 42–43, 70.[5]  *Cook* clearly holds that questions of *what appears*

---

[5] Citations to the trial transcript will be formatted "T. at ___" followed by the transcript page number.

*on the ballot and how* are justiciable.  Defendants' arguments make up in temerity for what they lack in merit.

Notwithstanding those binding precedents, Defendants argue that the ordering of candidates' names on the ballot is a nonjusticiable political question, relying on the Supreme Court's recent decision in *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019).  In that case, the Court decided "that partisan gerrymandering claims present political questions beyond the reach of the federal courts" because resolving such claims would require federal courts "to reallocate political power between the two major political parties, with no plausible grant of authority in the Constitution, and no legal standards to limit and direct their decisions."  *Id.* at 2506–07.  Such claims are problematic, the Court explained, because they

> inevitably ask the courts to make their own political judgment about how much representation particular political parties *deserve*—based on the votes of their supporters—and to rearrange the challenged districts to achieve that end.

*Id.* at 2499.  But the Court specifically distinguished other types of voting-rights claims, such as "one-person, one-vote rule" claims which are "relatively easy to administer as a matter of math," *id.* at 2501; and even other types of gerrymandering claims, such as racial gerrymandering, *id.* at 2502.  Unlike claims of partisan gerrymandering, the Court concluded, claims of vote dilution or racial gerrymandering "could be decided under basic equal protection principles," *id.* at 2496, without the need for a federal court to decide whether the legislature's decision

7

is fair. Defendants contend that, if partisan gerrymandering claims are political questions, ballot order claims must be too.

Hogwash. The legislative power is not a Midas touch that gilds a matter on contact and insulates it from judicial review, and a decision does not become a political question merely because it is made by a political branch of government. *See Fla. Democratic Party II*, 215 F. Supp. 3d at 1258–59 ("It has been suggested that the issue of extending the voter registration deadline is about politics. Poppycock. This case is about the right of aspiring eligible voters to register and have their votes counted."). If this were so, federal courts would be unable to review legislative enactments of any kind and would instead be bound to slavishly defer to legislative enactments without respect to the dictates of the Constitution. This plainly is not the case.[6] *See also Williams v. Rhodes*, 393 U.S. 23, 28 (1968) (explaining the argument that ballot access claims were nonjusticiable political questions had been "squarely rejected" and "requires little discussion"). And by its plain terms, *Rucho* is an extremely narrow decision. The Court in *Rucho* explained in no uncertain terms that its reasoning was limited to claims of partisan gerrymandering, and did not even extend it to other types of gerrymandering claims,

---

[6] The federal courts' ability to review the constitutionality of legislative acts was not always taken for granted but is now a well-established pillar of constitutional doctrine. *See Marbury v. Madison*, 1 Cranch 137, 177–80 (1803) (elucidating the constitutional basis for judicial review of legislative enactments and the supremacy of the Constitution); U.S. Const., art. VI, cl. 2 (establishing the Constitution as "the supreme Law of the Land").

let alone other species of election law claims such as the one this case presents. *Rucho*, 139 S. Ct. at 2501–02.[7]

This case asks this Court to apply nothing more than "basic equal protection principles," *id.* at 2496, and is therefore justiciable under any fair reading of *Rucho*. Plaintiffs do not ask this Court to determine whether section 101.151(3)(a) treats all candidates *fairly in light of their partisan affiliation*; rather, they ask this Court to determine whether it treats all candidates *equally without regard to their partisan affiliation*. This question does not implicate issues of political "fairness," and to contend otherwise "is worse than solemn mockery." *See Marbury*, 1 Cranch at 180.

As explained in more detail below, the issues presented in this case are not novel. In a jurisprudential sense, they are not even particularly challenging. They are "grounded in 'a limited and precise rationale' and [are] 'clear, manageable, and politically neutral,' " because they are "basic equal protection principles," nothing more. *Rucho*, 139 S. Ct. at 2496–98 (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 306–08 (2004) (Kennedy, J., concurring in the judgment)). The fact that this Court must determine which level of scrutiny to apply in the context of an equal protection claim also is not a new idea; in point of fact, Disney World, the states of Alaska and

---

[7] Additionally, the Supreme Court "does not normally overturn, or so dramatically limit, earlier authority *sub silentio*." *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000). Defendants' arguments on justiciability ask this Court to conclude the Supreme Court in *Rucho* did just that, and in dramatic fashion, receding from decades of decisions without even the smallest explicit signal of that intention. This Court declines Defendants' invitation to ignore this foundational principle of *stare decisis*.

Hawaii, and the undersigned himself are newer additions to the world than this concept.[8] *See, e.g.*, *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938) (noting the possibility of "a correspondingly more searching judicial inquiry" and "more exacting judicial scrutiny under the general prohibitions of the Fourteenth Amendment" when legislation impacts fundamental rights or protected classes). As detailed below, the analytical framework this Court applies today has been applied numerous times by this Court and other federal courts, without difficulty or confusion. *Cf. Rucho*, 139 S. Ct. at 2491 (holding a claim was not justiciable because, in part, courts had "struggled without success over the past several decades to discern judicially manageable standards for deciding such claims"). Although this Court must make hard judgments about the effects and justifications of the challenged statute, there is no strange misprision in the law which might cloud this Court's perceptions and confuse its judgment. This Court simply does not face the same sort of conundrum the Supreme Court did in *Rucho*.

In sum, therefore, Defendants claim this issue is not justiciable, but then rely upon cases which are binding precedent on this Court and show not just that these issues are indeed justiciable but also that the content and ordering of candidates on

---

[8] The application of different levels of scrutiny to equal protection claims is very nearly older than *sliced bread*. *See* Jim McCarty, *Chillicothe's Slice of History*, City of Chillicothe, MO (Sept. 2006) http://www.chillicothecity.org/bread/breadnews1.html (explaining sliced bread was invented in 1928).

the ballot can violate voters' constitutional rights.  Defendants' reliance on these cases cannot be reconciled with their position that this Court cannot decide the present case.  In the alternative, Defendants ask this Court to transmogrify a recent Supreme Court decision into a far more expansive ruling than it was, in contradiction of clear, explicit limits announced in that decision itself and of its fundamental rationale.  Even if this Court had the power to overlook those restrictions, this Court would nevertheless conclude this case was justiciable.  No matter the trappings Defendants try to drape it in, this donkey is a donkey, not a racehorse.

*Standing*

A party has standing to sue if they have suffered an injury in fact which is fairly traceable to the defendant's conduct and which is likely to be redressed by a decision in their favor. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Defendants claim Plaintiffs have failed to prove the first and third elements of this rule—that is, they claim Plaintiffs have not suffered an injury in fact and have not proven their claims are redressable.  Neither of these arguments passes muster.

Defendants' arguments concerning injury in fact fall into two basic categories. Regarding the organizational Plaintiffs in this action, Defendants contend those Plaintiffs have not shown they suffered any concrete and particularized injury because they did not show Florida's ballot order statute impacted any specific resource allocation decision; and Defendants furthermore contend that harm to

11

Democratic voters generally (as Defendants characterize Plaintiffs' claims) is not sufficient to impart standing to the organizational Plaintiffs. Regarding the individual Plaintiffs in this case, Defendants argue no individual Plaintiff proved Florida's ballot order statute impacted their individual voting rights—that is, Florida's ballot order statute did not prevent them from voting and having their vote counted.

The organizational Plaintiffs have standing to sue based on injuries to themselves or to their members, if either has been affected in a tangible way. *See U. Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544 (1996). An organization has standing to sue to

> enforce the rights of its members "when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."

*Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1342 (11th Cir. 2014) (quoting *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). "[T]he rule in this Circuit is that organizational plaintiffs need only establish that 'at least one member faces a realistic danger' of suffering an injury." *Id.* (quoting *Fla. State Conference of the NAACP v. Browning*, 522 F.3d 1153, 1163 (11th Cir. 2008)). As this Court has previously explained, "political parties have standing to assert, at least, the rights of [their] members who will vote in an upcoming election." *Fla.*

*Democratic Party II*, 215 F. Supp. 3d. at 1254 (citing *Fla. Democratic Party v. Hood*, 342 F. Supp. 2d 1073, 1078–79 (N.D. Fla. 2004) (Hinkle, J.)).  In that case, which concerned extension of Florida's voter registration period, this Court concluded the plaintiff had standing to sue on its members' behalf, reasoning the plaintiff "need not identify *specific* aspiring eligible voters who intend to register as Democrats and who will be barred from voting; it is sufficient that some inevitably will."  *Id.*

Plaintiffs in the present case go one step further.  Not only do the organizational Plaintiffs provide evidence of how Florida's ballot order statute impacts their own interests and the interests of their numerous members, they are also joined in this suit by *individual* Plaintiffs whose individual interests are affected by Florida's ballot order statute independent of their membership in an organization.  The organizational Plaintiffs represent their members, many of whom are voters, and their common mission in one form or another is to support Democratic candidates for elected office.  Contrary to Defendants' theory, an injury is not converted into a "generalized grievance" solely because a large number of people are aggrieved by it.  Furthermore, "[e]ach provision of a[n election] code, 'whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends.' "  *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Anderson v. Celebrezze*, 460

U.S. 780, 788 (1983)); *see also id.* at 434 ("There is no doubt that the Hawaii election laws, *like all election regulations*, have an impact on the right to vote." (emphasis added)).  In contrast to Defendants' hyper-formalistic approach to voting rights, "the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates *always* have at least some theoretical, correlative effect on voters." *Bullock v. Carter*, 405 U.S. 134, 143 (1972) (emphasis added).  It is thus no answer to Plaintiffs' claims for Defendants to argue that individual Plaintiffs have been able to vote and have their vote counted, or that organizational Plaintiffs do not vote but instead attempt to support and elect Democratic candidates.[9]  This Court declines to adopt Defendants' cramped (and jurisprudentially anomalous) interpretation of the scope of the right to vote.[10]

It is worth noting again that, in seeking to intervene in this case, Intervenors claimed Republican candidates and the organizations which support them—as organizational Plaintiffs support Democratic candidates—"stand to be most directly

---

[9] Furthermore, drain on resources has long been recognized as sufficient grounds for organizational standing.  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).  The testimony presented during trial was more than sufficient to establish that organizational Plaintiffs have standing under this theory as well.

[10] Intervenors note that Plaintiffs Bottcher and Fleming did not testify at trial and were not produced for *de bene esse* depositions.  Therefore, Intervenors claim, Plaintiffs Bottcher and Fleming lack standing.  This Court disagrees.  The cases cited in this paragraph—precedent this Court is bound to follow—do not limit the "impact on the right to vote" common to all election laws, *Burdick*, 504 U.S. at 433, to a discrete group or subclass of voters.  Plaintiffs Bottcher and Fleming introduced sufficient evidence to establish their individual standing, although they themselves did not testify.

14

harmed by a change" in Florida's ballot order scheme. ECF No. 23 at 16. In other words, Intervenors' whole interest in this lawsuit rests upon the idea that a change in Florida's ballot order scheme would worsen their position by depriving them of an existing advantage. But they now claim that Florida's ballot order scheme does not injure Plaintiffs, or in other words that Democratic candidates suffer no cognizable disadvantage, and that Plaintiffs therefore lack standing. Because the electorate is finite, elections are a zero-sum game, and this Court is at a loss to see how awarding an advantage to one group of candidates would not also disadvantage a competing group. *See Green Party of Tenn. v. Hargett*, 791 F.3d 684, 695 (6th Cir. 2015) (holding that requiring minor political parties to pass same electoral threshold as major parties in less time violates the Equal Protection Clause); *Nat. Law Party of U.S. v. Fed. Election Comm'n*, 111 F. Supp. 2d 33, 44 (D.D.C. 2000) (explaining that, in the context of Equal Protection Clause claims, injury arises from denial of the opportunity to compete on an equal footing). Intervenors cannot contend both that their interests are implicated but Plaintiffs have not been injured without doing violence to basic logic. Plaintiffs have satisfied the first element of Article III standing.

Defendants also claim Plaintiffs have not satisfied the redressability prong of standing; first, because Plaintiffs' requested solution will not remove the influence *vel non* of the primacy effect on elections, and second, because this Court lacks the

power to order a specific remedy.  These two distinct arguments share a common flaw in that they misconstrue Plaintiffs' claims.  Plaintiffs' alleged injury in this case is not based on the mere existence of the primacy effect vote and its impact on elections.  Rather, their claims concern the fact that Florida's ballot order statute allocates the primacy effect vote to groups of candidates on the sole basis of partisan affiliation.  If the remedy (or remedies) Plaintiffs seek would cure this alleged injury on either basis—that is, by eliminating the primacy effect vote altogether, or by removing the alleged partisan basis for its allocation—then Plaintiffs have shown redressability.  In addition, "[t]o have Article III standing, a plaintiff "need not demonstrate anything 'more than . . . a substantial likelihood' of redressability." *Wilding v. DNC Servs. Corp.*, No. 17-14194, 2019 WL 5539021, at \*5 (11th Cir. Oct. 28, 2019) (quoting *Duke Power Co. v. Carolina Envt'l Study Grp., Inc.*, 438 U.S. 59, 79 (1978)) (alteration in original); *see also id.* (noting "even partial relief suffices for redressability" and citing *Made in the USA Found. v. United States*, 242 F.3d 1300, 1310–11 (11th Cir. 2001)).  Defendants' contention that Plaintiffs have failed to identify a complete solution to the claimed injury is therefore inapposite.

Furthermore, this Court need not have the ability to order a specific remedy for Plaintiffs to satisfy the redressability element of standing, so long as this Court has the power to order a remedy which will to some extent cure Plaintiffs' injury. If, as Plaintiffs allege, there are multiple means of arranging the candidates on

16

Florida's ballots which would satisfy the Constitution and prevent Plaintiffs' alleged injuries from continuing forward, all that is required for Plaintiffs to have standing is for this Court to be empowered—as it is empowered—to say what the Constitution does and does not permit, even if this Court cannot order the Florida Legislature to adopt a specific ballot order scheme from among the available options. Indeed, as explained below, this is precisely what this Court will do. As a practical matter, there must be *some* sort of ballot order scheme, and as this Court will explain, the choice of which ballot order scheme Florida shall use is in this case a question for the Florida Legislature to resolve. But this Court has the power to determine whether Florida's existing ballot order scheme comports with the Constitution and to explain what the Constitution does and does not allow, i.e., "to say what the law is," *Marbury*, 1 Cranch at 177, and thus to decide whether there are certain ballot order schemes Florida cannot use. "This is of the very essence of judicial duty." *Id.* at 178.

Finally, Intervenors claim this Court cannot redress Plaintiffs' injuries because any new ballot order scheme would have to be implemented by third parties not before this Court; i.e., by county supervisors of elections and not Defendant Lee. If this argument sounds familiar to readers well versed in this Court's voting rights jurisprudence, there is a good reason for that. We have been here before.

> As this Court notes with tiresome regularity, Defendant [Lee] is Florida's "chief election officer." This statutory job description is not

window dressing.  The Secretary of State must "obtain and maintain uniformity in the interpretation and implementation of the election laws" and promulgate rules for the "proper and equitable interpretation and implementation of election laws.  Additionally, the Department of State "shall have general supervision and administration of the election laws, corporation laws and such other laws as are placed under it by the Legislature." . . .  Defendant [Lee] has the responsibility to enforce the Department of State's rules on each county supervisor of elections.  [She] also has the responsibility to "provide written directions and opinions to the supervisors of elections on the performance of their official duties with respect to . . . rules adopted by the Department of State."

*Rivera Madera*, 325 F. Supp. 3d at 1276 (internal marks and citations omitted) (final alteration in original).  The Eleventh Circuit has agreed, denying a stay of this Court's ruling in a different case on the basis that, "[b]ecause the Secretary is the state's chief election officer with the authority to relieve the burden on Plaintiff's right to vote, she was appropriately sued for prospective injunctive relief." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019).  This Court, the parties, and—pursuant to the prior panel rule—even the Eleventh Circuit itself are bound by this holding unless and until the Eleventh Circuit recedes from it *en banc*.  This issue is settled.  It is perplexing that Intervenors would continue to raise it.  Defendant Lee is the proper defendant against whom to award the relief Plaintiffs seek.

Plaintiffs have shown they have suffered an injury in fact and this Court has the power to vindicate Plaintiffs' claims.  Plaintiffs therefore have standing.

*Statute of Limitations*

Next, Defendant Lee claims Florida's statute of limitations bars Plaintiffs' claims.[11]  Florida law provides a four-year limitation period for "action[s] founded on statutory liability," § 95.11(3)(f), Fla. Stat. (2019), and for "[a]ny action not specifically provided for in these statutes," *id.* § 95.11(3)(p).  Florida's statute of limitations applies to the claims at issue in this action.  *See Boyd v. Warden, Holman Corr. Facility*, 856 F.3d 853, 872 (11th Cir. 2017) ("All constitutional claims brought under § 1983 are tort actions and, thus, are subject to the statute of limitations governing personal injury actions in the state where the § 1983 action has been brought.").  In Florida, "[a] cause of action accrues when the last element constituting the cause of action occurs."  § 95.031(1), Fla. Stat. (2019); *see also Hearndon v. Graham*, 767 So. 2d 1179, 1184–85 (Fla. 2000).  Generally, the last element which will occur is the injury giving rise to the claim.  *State Farm Mut. Auto. Ins. Co. v. Lee*, 678 So. 2d 818, 821 (Fla. 1996).

The Florida Legislature adopted Florida's ballot order scheme in 1951.  Defendant Lee claims all subsequent harms flow from this enactment and therefore the statute of limitations began to run at that point, meaning Plaintiffs' timely filing

---

[11] Plaintiffs argue Defendant Lee waived this argument.  Plaintiffs are mistaken.  It is true Defendant Lee raised the statute of limitations defense for the first time in her motion for summary judgment, ECF No. 115 at 32, but Eleventh Circuit precedent allows this so long as the opposing party has sufficient notice of the defense and a chance to rebut it.  *Navarro v. Santos Furniture Custom Design, Inc.*, 372 F. App'x 24, 27 (11th Cir. 2010).  Defendant Lee therefore did not waive this defense.

window expired in 1955.[12]  Of course, the issue is more complicated than that, and ultimately ties itself in knots.  Each individual Plaintiff became aware of the alleged existence and effects of the primacy effect vote at various times, though under Florida law it is not clear whether this would be relevant.  *Compare Davis v. Monahan*, 832 So. 2d 708, 710–12 (Fla. 2002) (declining to apply the delayed discovery doctrine absent a statutory basis or allegations that the defendant's conduct delayed the plaintiff's discovery of the factual basis for the lawsuit) *with Chappell v. Rich*, 340 F.3d 1279, 1283 (11th Cir. 2003) (delayed discovery doctrine applies to section 1983 claims).  And if any Plaintiff was not born (or founded) until after that point, what of their claim's accrual date?  Assuming no other issues of access to courts apply,[13] under Defendant Lee's theory, Plaintiffs' individual claims accrued either in 1951 or at whatever point thereafter their constitutional rights were first allegedly violated, and became time-barred four years thereafter.

---

[12] In the most technical sense, the statute of limitations applicable to Plaintiffs' claims under Defendant Lee's theory of the case is not the 2018 version (current when Plaintiffs filed this action) nor the 2019 version (current now), but rather the 1951 version. *See Merkle v. Robinson*, 737 So. 2d 540, 542 n.6 (Fla. 1999) (statutes of limitation "bar actions by setting a time limit within which an action must be filed as measured from the accrual of the cause of action"); *Dade Cty. v. Rohr Inds., Inc.*, 826 F.2d 983, 989 (11th Cir. 1987) (ruling "that the timing of the cause of action determines the applicable statute of limitations").  The 1951 version also provided a four-year limitations period.  *See* § 95.11(4), Fla. Stat. (1951).  For uniformity and convenience, this Court will cite the 2019 Florida Statutes throughout this Order, except where some relevant difference exists between the applicable version and current version beyond the numbering of the sections and subsections.

[13] *See, e.g.*, *Cates v. Graham*, 451 So. 2d 475, 476–77 (1984) (discussing the interplay between statutes of limitation, statutes of repose, and the Florida Constitution's right of access to courts).

If section 101.151(3)(a), Florida Statutes, had been applied only to an election seventy years ago, Defendant Lee's argument might have merit. As things stand, however, irrespective of how many times Plaintiffs allege their rights have been violated in the past, their rights are violated anew each time an election is held and the candidates' names are arranged in their respective office blocks in the order prescribed by section 101.151(3)(a). Moreover, Plaintiffs seek declaratory and injunctive relief, not damages or other retrospective relief. By way of analogy, assume there was a Florida Statute which required all registered Republicans to pay $10 at their designated polling site before voting in each election. Assume this flagrantly illegal statute was adopted in 1910, but never challenged—instead, for more than one hundred years, all registered Republicans quietly paid the infamous poll tax. Further assume that, in 2018, a few Republican voters—backed by Republican political organizations—decided enough was enough, and it was time to strike that statute from the books so as to avoid paying the $10 during the 2020 election. Each historical $10 payment would be a separate, recurring injury.

In the present case, Plaintiffs contend their rights were violated each time an election was held and the challenged statute was enforced. The most recent election before Plaintiffs filed their claims was in 2016, and Plaintiffs filed their claims in 2018. If Florida's ballot order statute stands, it will be enforced during the 2020 election cycle and, Plaintiffs allege, their injuries will recur. Plaintiffs' claims relate

to alleged violations of their rights which have occurred in the recent past and will continue to recur in the future.  *See Hillcrest Prop., LLC v. Pasco Cty.*, 754 F.3d 1279, 1282–83 (11th Cir. 2014) (explaining that, outside the context of substantive due process takings claims, "the harm inflicted by the statute is continuing, or does not occur until the statute is enforced—in other words, until it is applied," quoting *Levald, Inc. v. City of Palm Desert*, 998 F.2d 680, 688 (9th Cir. 1993)); *see also Moore v. Ogilvie*, 394 U.S. 814, 816 (1969) (holding election statute unconstitutional although the challenged election was over because the statute "remain[ed] and control[led] future elections," and the issue was therefore not moot).  In short, the statute of limitations does not bar Plaintiffs' claims.

### *Laches and Constitutional Estoppel*

Finally, Defendants each argue Plaintiffs' claims are barred by separate equitable doctrines.  Specifically, Intervenors assert the doctrine of laches bars Plaintiffs' claims, and Defendant Lee asserts the doctrine of estoppel—to be precise, *constitutional* estoppel—bars them.  Neither argument has merit.

To succeed on a laches claim, a defendant must demonstrate the plaintiff inexcusably delayed in bringing their claim and that such delay unduly prejudiced the defendant.  *United States v. Barfield*, 396 F.3d 1144, 1150 (11th Cir. 2005).  It is not clear whether laches applies at all to claims for prospective relief from continuing constitutional violations.  *See Garza v. Cty. of Los Angeles*, 918 F.2d 763,

772 (9th Cir. 1990); *Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters. Int'l*, 533 F.3d 1287, 1321 (11th Cir. 2008) (stating, in a copyright case, that "laches serves as a bar only to the recovery of retrospective damage, not to prospective relief"); *see also Democratic Exec. Comm. of Fla.*, 915 F. 3d at 1326 ("We need not consider whether laches applies to bar prospective relief from constitutional harms, because the NRSC cannot satisfy the laches elements.").[14] This Court would conclude laches does not apply to the kind of prospective relief at issue in this case; but even if it does, Intervenors' laches claim fails on the merits.

First, Plaintiffs have not inexcusably delayed bringing their claims because the event chiefly complained of—the 2020 election—has not happened yet. Whether Plaintiffs could have made similar claims about an earlier election is not relevant. Plaintiffs do not seek redress for past harms, they seek prospective relief from future ones. Furthermore, it is unclear whether Plaintiffs would have been able to prosecute their claims without substantial data on the primacy effect collected over time—a fact which would arguably excuse at least some delay. Second, even assuming Plaintiffs had delayed without a valid excuse, Intervenors have not shown they have suffered any undue prejudice. The undue prejudice cognizable in laches

---

[14] It is also not clear that laches can bar a claim where the applicable statute of limitations has not run. *See Merck & Co. v. Reynolds*, 559 U.S. 633, 652 (2010) ("Laches within the term of the statute of limitations is no defense at law.") (quoting *United States v. Mack*, 295 U.S. 480, 489 (1935)).

can be either substantive or procedural—that is, it may concern both the inability to defend against claims because memory fades or evidence is otherwise unavailable, and also the reliance costs of acting in conformity with what one believed the law to be during the period of delay; but it does not embrace any delay or expenditure whatsoever. *See, e.g.*, *Gardner v. Panama R.R. Co.*, 342 U.S. 29, 30 (1951) (per curiam) (explaining laches will not bar relief "where no prejudice to the defendant has ensued from the mere passage of time"); *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1286 (11th Cir. 2015) ("Any harm demonstrated by the Intervenors must stem specially from Riverkeeper's delay in bringing suit, rather than from the consequences of an adverse decision on the merits . . .. The paradigmatic example of prejudice is when a defendant has expended substantial sums of money or completed a significant amount of construction by the time the plaintiff decides to file suit.").  The only prejudice Intervenors identify is the cost to the State of Florida in time and resources to adjust its conduct of elections into conformity with the Constitution, if this Court finds for Plaintiffs.  This is not equivalent in kind or quantity to, say, demolishing a building.  It is not a cognizable prejudice within the doctrine of laches at all, much less an undue one—it is precisely and exclusively a "consequence[] of an adverse decision on the merits."  *Id.*  Intervenors might be able to claim prejudice if Plaintiffs had sought, for instance, to

invalidate past results and hold new elections; but Plaintiffs do not.  Even assuming

the doctrine of laches could bar this action, Intervenors' argument fails on the merits.

Turning to constitutional estoppel, Defendant Lee contends Plaintiffs cannot

argue against the constitutionality of Florida's ballot order scheme because, in the

past, Democrats have been governors of Florida and Democratic candidates have,

fittingly, benefitted from the donkey vote.  In general, constitutional estoppel applies

to prevent a party from enjoying the benefits of a government action while

simultaneously challenging the constitutionality of that government action.

*Robertson v. Fed. Election Comm'n*, 45 F.3d 486, 489–90 (D.C. Cir. 1995).  But

"[t]he doctrine of constitutional estoppel . . . has its limits.  The government may not

interpose the doctrine as a defense if a party wishes to challenge an unconstitutional

condition which is imposed on the receipt of federal funds."  *Id.* at 490 (citing

*Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450, 456–57 (1988)).  And the Supreme

Court has expressed "doubt that plaintiffs are generally forbidden to challenge a

statute simply because they are deriving some benefit from it."  *Kadrmas*, 487 U.S.

at 456–57.  Plaintiffs in this case are not seeking to, for example, retain federal funds

awarded by an agency while also challenging the existence or composition of that

agency as unconstitutional.  *Cf. Robertson*, 45 F.3d at 488–89.  And whatever the

situation was in the past, Democratic candidates certainly do not enjoy any

advantage or benefit as a result of Florida's ballot scheme at present.  The doctrine

does not apply here at all, and Plaintiffs are not constitutionally estopped from pursuing their claims in this case.

Having disposed of those preliminary matters, this Court will now analyze the merits of the case.

## Merits of the Case

"Voting is the beating heart of democracy.  It is a 'fundamental political right, because [it is] preservative of all rights.'  'It is beyond cavil that voting is of the most fundamental significance under our constitutional structure.' "  *League of Women Voters*, 314 F. Supp. 3d at 1215 (alteration in original) (citations omitted).  As the Eleventh Circuit recently opined: "We can't say it any better than that."  *Democratic Exec. Comm.*, 915 F.3d at 1315.  And it is central to the civic life of our Republic that elections shall not just be held—because "voting alone is not enough to keep democracy's heart beating," *id.*—but that they shall be fair and free, and that the state shall not take sides.  We have neither monarch, nor nobles, nor electors palatine, and in our democracy there are no head starts.

"It does not follow, however, that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute."  *Burdick*, 504 U.S. at 433.  "[A]s a practical matter, there must be substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."  *Storer v. Brown*, 415 U.S. 724, 730 (1974).

That said, "these granted powers are always subject to the limitation that they may

not be exercised in a way that violates other specific provisions of the Constitution."

*Williams*, 393 U.S. at 29.   To evaluate First and Fourteenth Amendment voting

claims, a federal court

> must first consider the character and magnitude of the asserted injury
> to the rights protected by the First and Fourteenth Amendments that the
> plaintiff seeks to vindicate.   It must then identify and evaluate the
> precise interests put forward by the State as justifications for the burden
> imposed by its rule.   In passing judgment, the Court must determine not
> only the legitimacy and strength of each of those interests; it must also
> consider the extent to which those interests make it necessary to burden
> the plaintiff's rights.   Only after weighing all these factors is the
> reviewing court in a position to decide whether the challenged
> provision is unconstitutional.

*Anderson*, 460 U.S. at 789.   "Under this standard, the rigorousness of [a reviewing

court's] inquiry into the propriety of a state election law depends upon the extent to

which a challenged regulation burdens First and Fourteenth Amendment rights."

*Burdick*, 504 U.S. at 434.   If a law imposes a mild or minor burden on these rights,

it can usually be justified by showing the law in question serves a legitimate state

interest.   *See Anderson*, 460 U.S. at 788 ("Nevertheless, the state's important

regulatory interests are generally sufficient to justify reasonable, nondiscriminatory

restrictions.").   Although that level of scrutiny presents a low bar, it is not a

meaningless one, and "[h]owever slight that burden may appear, . . . it must be

justified by relevant and legitimate state interests 'sufficiently weighty to justify the

limitation.' "   *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008)

27

(quoting *Norman v. Reed*, 502 U.S. 279, 288–89 (1992)).  "Laws imposing 'severe' burdens, on the other hand, 'must be narrowly drawn to advance a state interest of compelling importance.' " *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 717 (4th Cir. 2016) (quoting *Burdick*, 504 U.S. at 434).  In all cases, courts conduct a "realistic appraisal" of the challenged law, *Anderson*, 460 U.S. at 806, and examine whether the state's asserted interests "justify the specific restriction . . . at issue," *id.* at 796.

As this Court has explained above, there is nothing novel about this framework, at any level.  This Court and other courts have applied the *Anderson*/*Burdick* interest-balancing framework to a wide variety of voting-related issues, including claims relating to ballots.  *See Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 197–200 (1999) (evaluating Colorado statute requiring those circulating initiative petitions to wear identification badges); *Democratic Exec. Comm.*, 915 F.3d at 1319 (evaluating Florida's voter signature-matching scheme).  Courts have also applied it to cases involving ballot order.  *See Alcorn*, 826 F.3d at 714–21; *Graves v. McElderry*, 946 F. Supp. 1569, 1579–82 (W.D. Okla. 1996).  The only thing distinguishing the present case from those cases is, the present case represents the first time there has been a fully developed evidentiary record upon which to evaluate a ballot order claim.  And as this Court earlier explained, the Supreme Court's summary affirmance in *Mann* indicates ballot order claims

28

implicate the Equal Protection Clause, *see* 314 F. Supp. at 679, and that summary affirmance is binding on this Court. There is nothing new about the *Anderson*/*Burdick* standard, nor its application to this type of claim.

To apply the *Anderson*/*Burdick* standard, this Court will first examine whether and to what extent Plaintiffs' rights have been burdened by Florida's ballot order scheme. This entails investigating whether the primacy effect exists, how large it is, and the character of its effects on Plaintiffs' rights. Next, this Court will consider the justifications Defendants advance for Florida's current ballot order scheme and determine the strength and legitimacy of those justifications. Finally, this Court will weigh the burden on Plaintiffs' rights against Defendants' justifications to determine whether Florida's current ballot order scheme violates Plaintiffs' First and Fourteenth Amendment rights.

The existence and magnitude of the primacy effect vote have been the central questions of fact in this case. This Court denied the cross-motions for summary judgment in this case because there were "material issues of disputed fact regarding 'position bias' and its purported effects on Florida elections as well as the viability of alternatives to the current [ballot order] scheme." ECF No. 158 at 1. Following the contours of the *Anderson*/*Burdick* standard, the bench trial held in this case focused on whether Florida's ballot order scheme awarded candidates affiliated with the party of the last-elected governor a systematic advantage on the basis of their

political affiliation.  Defendants elected to center their defense on disputing whether Plaintiffs have proven the quantum of the primacy effect, not on whether it exists at all.  Defendants did not call an expert to dispute the existence of the primacy effect.[15]  Instead, as will shortly be seen, their expert only disputed Plaintiffs' experts' calculations concerning the magnitude of the primacy effect.

This proceeding was a bench trial, and this Court therefore sits as the factfinder.  This Court must consider all the evidence presented, but it need not accept all the evidence as true or accurate.  This Court must decide whether it believes what each witness had to say, and how important that testimony was.  This Court may believe or disbelieve any witness, in whole or in part, just as a jury would be free to do.  This includes expert witnesses: as with any other witness, this Court must weigh the testimony of an expert witness and decide whether to rely upon that expert's opinion.  Furthermore, this Court may use reasoning and common sense to make deductions and reach conclusions, just as a jury would.

As explained below, this Court concludes section 101.151(3)(a) imposes a discriminatory burden on Plaintiffs' voting rights which is not of the same magnitude as entirely denying Plaintiffs the franchise, but is not negligible either.  This Court

---

[15] The parties offered numerous studies on the primacy effect into evidence, and only one of those—a study concerning elections in Afghanistan—found no statistically significant evidence of a primacy effect.  Pls. Ex. 1 at 29–32 (citing B.T. Hansen and A.L. Olsen, *Order in chaos: Ballot order effects in a post-conflict election?*, Research and Politics 1–4 (Oct.-Dec. 2014)).  This lone exception, however, does not disprove the rule.

further finds many of the justifications Defendants offered are not justifications for Florida's *specific* ballot order scheme, but rather justifications for not changing an existing ballot order scheme irrespective of what that scheme happens to be. To the extent Defendants' justifications pertain to Florida's specific ballot order scheme, this Court finds they are weak and entitled to little weight. Weighing the discriminatory burden on Plaintiffs' rights against Defendants' meager justifications, this Court concludes Florida's current ballot order scheme violates Plaintiffs' First and Fourteenth Amendment rights.

*Character and Magnitude of Injury*

The first step in this Court's analysis is to "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Anderson*, 460 U.S. at 789. The character and magnitude of Plaintiffs' injuries are functions of the primacy effect itself—of whether it exists, how large it is, and what effect it has under Florida's current ballot order scheme. Consideration of these items determines the weight this Court will accord to the burden on Plaintiffs' rights, and it also calibrates the scales upon which that weighing is done by determining the appropriate level of scrutiny to which this Court will subject the challenged law. *See Anderson*, 460 U.S. at 788 (stating "the state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions"); *Burdick*, 504 U.S. at 434 (explaining

31

laws which severely burden voting rights "must be narrowly drawn to advance a state interest of compelling importance").

As to magnitude, Dr. Jon Krosnick, a political scientist and a preeminent expert on candidate name order effects,[16] testified on Plaintiffs' behalf.  *See* T. at 279–90, 292–93.  Although Dr. Krosnick's extensive qualifications and status as the preeminent expert in his field do not automatically establish his credibility, this Court finds them probative of that issue.  This Court does not blindly credit Dr. Krosnick's methods, analysis, and conclusions; but after close and attentive scrutiny, this Court finds Dr. Krosnick's methods and conclusions reasonable, reliable, and credible.

Dr. Krosnick provided a comprehensive review of seventy years' worth of academic scholarship on candidate name order effects, which overwhelmingly found primacy effects were evident in the elections studied across that time period.  T. at 295–96, 302–25; Pls. Ex. 1 at 15–39.  To be precise, of the 1,086 unique tests reported in the literature, eighty-four percent manifested differences in the direction of primacy, a result which Dr. Krosnick calculated had a less than one one-thousandth of a percent chance (in fact, a 0.0001% chance) of occurring for some

---

[16] Although this Court and numerous other sources refer to this phenomenon by many names, such as the "primacy effect" or "ballot order effect," Dr. Krosnick testified that "candidate name order effects" is "the clearest term" to refer to "the possibility that the order in which candidates' names appear on a ballot might influence the behavior of voters and, therefore, influence the outcome of an election."  T. at 290–91.

reason other than candidate name order.  T. at 304.  Dr. Krosnick also testified concerning the effect of candidate name order on Florida elections from 1978 through 2016.  T. at 299.  Based on his study of these results, Dr. Krosnick opined that first-listed candidates in Florida have historically gained an average advantage of five percentage points[17] due to their position within their office block on the ballot, T. at 299–301; Pls. Ex. 1 at 3, 63–64, 83; a result which has a less than one-percent probability of occurring by chance.  T. at 343; Pls. Ex. 1 at 110.  Moreover, because votes for one candidate are necessarily votes which do not go to another, Dr. Krosnick testified the five-percent advantage enjoyed by first-listed candidates equates to a ten-percent difference between those candidates and their competitors in two-candidate races.  T. at 299.

To oppose Dr. Krosnick, Intervenors called Dr. Michael Barber, a political science scholar and professor at Brigham Young University who specializes in campaign finance and quantitative analysis.  T. at 597–609.  As noted above, Dr. Barber did not dispute the central findings of the significant body of academic literature concerning candidate name order effects, nor did he dispute that such

---

[17] Dr. Krosnick testified Republican candidates in Florida have historically enjoyed an average primacy effect advantage of approximately 5.35% while Democratic candidates in Florida have historically received an average advantage of 4.57%.  T. at 301.  The average of these two primacy effect advantages—and thus the approximate average for all candidates in partisan races in Florida for the years studied (because addition and multiplication are, after all, commutative)— is 4.96%, which Dr. Krosnick rounded up to an estimated average primacy effect in Florida of 5%.  *Id.*  Although Dr. Krosnick's off-the-cuff calculation of this average was 4.97%, *id.*, this Court does not find this minor discrepancy affects his credibility in a negative way.

effects are more pronounced in down-ballot races.  T. at 711, 729.  Instead, Dr. Barber focused his testimony on speculative critiques of Dr. Krosnick's methods with particular relation to whether Dr. Krosnick's estimate of a 5% average primacy effect vote was reliable.  Dr. Barber suggested Dr. Krosnick could have adjusted his study to control for certain demographic characteristics that are linked to different voting preferences, T. at 619–44, but clarified upon questioning by this Court that such disaggregation was only appropriate "if you have a theoretical reason to believe those differences are meaningful" to the hypothesis one is attempting to investigate. T. at 624–25.  But what Dr. Barber testified was that "it's *not unreasonable* to believe that it's very *possible* that those differences *could* manifest themselves in other ways related to elections, such as ballot order effects." T. at 621 (emphasis added).  Indeed, this Court had sufficient opportunity to closely observe not just the substance of Dr. Barber's testimony, but his demeanor as a witness, and his labored responses to questioning by counsel and this Court serve only to highlight his unconvincing equivocations.

On cross-examination by Ms. Khanna for the Plaintiffs, Dr. Barber's testimony crumbled.  In an artful *tour de force* that should be studied by law students as a textbook demolition of an expert witness, Ms. Khanna methodically walked Dr. Barber through his direct examination testimony and forced him to admit almost all of it was either speculative, unsound, or both.  Dr. Barber admitted that, although

34

Dr. Krosnick *could* have controlled for those demographic factors in his regression analysis, there was no reason Dr. Krosnick *should* have, and none to believe doing so would make a material difference—in other words, there was no reason to believe those demographic variables had any meaningful impact on the validity of Dr. Krosnick's conclusions.  T. at 713–19.  In sum, Dr. Barber admitted that, although the demographic factors he identified correlate with individuals' preferences expressed through voting, there is no reason to believe they are connected in any way to voters' susceptibility to candidate name order effects.  In plain English, although a person's demographic characteristics can help predict how they may consciously choose to vote, they do not predict their susceptibility to the psychological phenomenon at issue in this case.

Dr. Barber's testimony demonstrated that, for his analysis of this case, statistical rigor was a matter of convenience, not principle.  For example, Dr. Barber criticized Dr. Krosnick's analysis concerning its small sample size, but also tried to undermine Dr. Krosnick's conclusions by pointing to outlier results in individual elections and attempting to generalize from them, a practice this Court finds unreliable and nonsensical.  In a further baffling inconsistency, although Dr. Barber criticized Dr. Krosnick's methodology and attempted to discredit his results, Dr. Barber testified he did not dispute the numerous other studies in the record which found and analyzed candidate name order effects.  *See, e.g.*, T. at 729.  It is probative

of both Dr. Barber's credibility and reliability, and also of Dr. Krosnick's credibility and reliability, that Dr. Krosnick's analysis agrees with the overwhelming majority of the academic literature in the record, and Dr. Barber does not dispute the reliability of those other studies.

Ms. Khanna's skillful evisceration of Dr. Barber's testimony was sufficient to undermine his conclusions, but—as Ms. Khanna also elucidated through her cross-examination—Dr. Krosnick also performed a second regression analysis incorporating those of Dr. Barber's suggestions that could have affected the analysis. This second analysis returned a slightly lower estimate of an overall average primacy effect—about three-and-a-half percent, all told.  T. at 730–31, 740–42; Pls. Ex. 1 at 73–74, 78–80; Pls. Ex. 11 at 4–5, 10.  This small change did not in any way undermine Dr. Krosnick's conclusion that candidate name order has a statistically significant impact on Florida's elections.  Dr. Krosnick also followed Dr. Barber's suggestion and weighted counties by size, but this did not significantly impact his results either.  T. at 730–31; Pls. Ex. 1 at 73–74; Pls. Ex. 11 at 10.

The same was true of Dr. Barber's suggestion that clustering of standard errors could improve Dr. Krosnick's analysis: Dr. Krosnick performed a second analysis in which he clustered standard errors as Dr. Barber suggested, and that analysis found candidate name order effects of a similar magnitude, though at a marginally reduced level of certainty.  T. at 666–67, 736–43.  For example, clustering by

36

governor cycle reduced the *p*-value to .14 for Republican candidates and .16 for Democratic candidates, reflecting an 84% and 86% chance, respectively, that the increased vote share was a result of candidate name order effects. *Id.*

This does not undermine Dr. Krosnick's results, for two reasons. First, an 84% or 86% level of confidence in a result is sufficient, on the facts of this case, for this Court to find it credible, especially in concert with the totality of the testimony presented in this case.[18] The burden of proof does not require Plaintiffs to establish the existence and magnitude of candidate name order effects with absolute statistical certainty—although in this case this Court finds they very nearly have—but rather to establish them by a preponderance of the evidence. Second, as Dr. Krosnick described, although clustering can be helpful, too much clustering can have the effect of obscuring the detail of a result and making it appear less accurate than it in fact is. T. at 354–55 (analogizing "the equivalent of too much clustering is putting dirt on the lens of the telescope"). This Court finds Dr. Barber's suggested level of clustering had precisely this effect on Dr. Krosnick's analysis; that is, in attempting to control for the possible influence of factors not being tested, the clustering reduced

---

[18] Despite Dr. Barber's assertions that the .14 and .16 *p*-values render Dr. Krosnick's analysis unreliable, Dr. Barber admitted that he has reported coefficients as statistically significant at a *p*-value of .15 in his own published work. T. at 733–36. This significantly impairs Dr. Barber's credibility on this point.

the accuracy of the investigation into the factors being tested for.[19]  This, Dr. Krosnick explained, is known as "null hacking," which "is hunting around for a way to analyze the data to make an effect disappear," such as by "clustering so severely that the statistical power [of the data] is compromised in a way that an effect that's clearly present in the data is no longer statistically significant."  T. at 355.  This is precisely what Dr. Barber attempts to do here.  His suggestions concerning clustering are intended to muddy the water, not to clear it.

Dr. Krosnick's analysis was further supported by testimony from Plaintiffs' other experts.  Plaintiffs also called Dr. Jonathan Rodden, a professor of political science at Stanford University, as an expert in elections and data analysis.  T. at 135–40.  Dr. Rodden testified concerning the effects of candidate name order on down-ballot races—both statewide and local races—where voters presumably have less information about each candidate than they do about top-of-ticket candidates and would, therefore, theoretically be more susceptible to candidate name order effects.  Specifically, Dr. Rodden compared the performance of down-ballot candidates with top-of-ballot candidates of the same party to determine whether candidate name order effects were more pronounced in either case.  *See* Pls. Ex. 5 at 2–5.  Dr. Rodden

---

[19] As Dr. Barber acknowledged, this reduced accuracy could be linked to the relatively small number of governor cycles (eleven since 1978) by which this analysis would be clustered. T. at 736.  It is therefore not the case that clustering this data would *always* reduce its accuracy, but many more gubernatorial elections will have to occur before the full effect of such clustering would be determinable with precision.

concluded down-ballot candidates who were listed second in their respective office block garnered an average of 3.1% to 5.6% fewer percentage points of the vote than did their top-of-ballot co-partisans in Florida elections.  T. at 161; Pls. Ex. 5 at 4–5, 22.  Dr. Rodden also found that, by contrast, down-ballot candidates who were listed first in their respective office blocks consistently outperformed their top-of-ticket co-partisans in Florida elections.  T. at 152, 158–161, 170; Pls. Ex. 5 at 17–41.  Dr. Rodden testified he knew of no theory of political science which would explain these results other than candidate name order effects.  T. at 162–63.  Dr. Barber also could not provide any convincing explanation.  *See* T. at 748–53.  Dr. Rodden further opined that, given the "heterogeneity" of the candidates in down-ballot races and the various other factors that affect electoral outcomes, this result was "surprisingly strong" and consistent across time and geography.  T. at 175.

Dr. Barber attempted to call Dr. Rodden's analysis into question by disputing whether candidates' personal qualities which might be difficult to quantify (such as physical attractiveness, gender, regional origin, and roots in the community) played a significant role in their electoral success, or lack thereof, and thus confounded Dr. Rodden's analysis.  As proof of this, Dr. Barber pointed to the 2018 election for Florida Commissioner of Agriculture, won by Democrat Nikki Fried.  T. at 677; Ints. Ex. 3 at 3–10.

39

Dr. Rodden, however, explained that he accounted in his analysis for the wide variation in candidate qualities (such as height, physical attractiveness, and regional origin) which might be less objectively measurable but which could still have been reflected in the result.  T. at 198–200.  If this "heterogeneity" had a significant effect, Dr. Rodden explained, one would expect it to "introduce a whole lot more noise and make it even harder to find an effect."  T. at 200.  But instead, the results showing the impact of candidate name order effects were "surprisingly strong," T. at 175, meaning the statistical strength of the Dr. Rodden's study was not affected by the heterogeneity of the candidates in the races.  Put more simply, the results of Dr. Rodden's study reflect the impact of candidate name order effects accurately and the hard-to-quantify personal qualities of candidates did not meaningfully interfere with his analysis.  This also strengthen's Dr. Rodden's conclusions with respect to his analysis of statewide races.  As to the specific example of Commissioner Fried, this Court finds it illogical to rely upon a single outlier to disprove a general conclusion, particularly a conclusion about an average effect across a large number of samples.[20] This Court finds Dr. Rodden's methods and analysis reasonable, reliable, and credible, and further finds Dr. Barber's criticisms of Dr. Rodden's analysis are unreasonable and incredible.

---

[20] Dr. Barber agrees that extrapolating from his example of Commissioner Fried would be improper.  T. at 759 ("Q. And you would agree that certainly you can't draw conclusions about trends among voters from one datapoint?  A. I agree.").

Dr. Rodden also investigated whether changing Florida's ballot order scheme might have a material impact on election results in Florida by comparing Florida to North Carolina, a state which recently changed its ballot order scheme from a system like Florida's, where candidates of the governor's party were listed first, to an alphabetical system incorporating a random drawing to determine which letter to begin the alphabetical ordering with.  T. at 175–77; *see also* N.C. Gen. Stat. Ann. § 163A-1114(c) (2018) (requiring candidates to be listed in "either alphabetical order or reverse alphabetical order by the last name of the candidate, which order shall be determined each election by drawing at the State Board of Elections and Ethics Enforcement after the closing of the filing period for all offices on the ballot"). This resulted in a roughly even split between Republican and Democratic candidates being listed first in North Carolina's voting precincts.  T. at 178.  Comparing the results of precincts in 2016, when Republican candidates were listed first in all partisan races, with the results from those same precincts in 2018, when Republicans were listed first only in roughly half of the precincts, Dr. Rodden found Democrats obtained approximately 1.5% more of the votes cast in those precincts in which Republicans were no longer listed first in 2018, than they had in 2016 when Republicans were listed first in those precincts.  Pls. Ex. 5 at 6, 45–46.  In seats where the incumbent was not running, this effect was as large as eight percentage points, and in races where the same candidates faced each other in 2018 that had

41

faced each other in 2016 the effect averaged four percentage points. *Id.* at 6, 47–48.

Dr. Rodden testified that these results

> gave [him] a clear sense of causality associated with reform and ballot order practices. It allowed [him] to see what happens, holding a lot of other things constant . . . when we just compare the change in the Democratic vote share from 2016 to 2018; we can compare that in the so-called treatment and control precincts and get a very clean causal inference about the impact of reform.

T. at 179. Dr. Barber not only did not offer any substantive critique of this analysis, he has also relied upon comparisons between Florida and North Carolina in the course of his expert testimony in a North Carolina case. T. at 706–08. This Court finds Dr. Rodden's methods and conclusions to be reasonable, reliable, and credible. This Court also finds that Dr. Barber's testimony did not in any way undercut Dr. Rodden's analysis, and that Dr. Rodden's analysis buttresses Dr. Krosnick's analysis by reinforcing the conclusion that candidate name order effects award a statistically significant electoral advantage to the first-listed candidate, and that these effects are even more pronounced in down-ballot races.

Finally, Plaintiffs called Dr. Paul Herrnson, a professor of political science at the University of Connecticut, to explain an additional aspect of the advantage candidate name order effects award to first-listed candidates. T. at 405–11; Pls. Exs. 4–8. Dr. Hernnson testified that voters intending to vote for the first-listed candidate make fewer "proximity errors" than do voters intending to vote for candidates listed in lower positions within an office block. T. at 418–21. Proximity error is a simple

42

human error in filling out a ballot which "results in the voter being unable to accurately translate his or her voting intention into the candidate or, in some cases, ballot issue they hope to select." T. at 413. Instead, they unintentionally select the option immediately before or immediately after the option they intend to select. *Id.* Dr. Herrnson testified that this sort of error primarily advantages candidates listed first in each office block and disadvantages those listed in subsequent positions. *Id.* In races with more than two candidates, the second-listed candidate is most disadvantaged. T. at 419. The reason for this is simple. Voters will make a number of proximity errors due to factors such as fatigue, haste, or inattention, but if a voter intends to vote for the first- or last-listed candidate, they can only err in one direction, while voters intending to select the second-listed candidate out of three can err in either direction. *See* T. at 417–20. Dr. Herrnson also explained the empirical basis for this effect, including an experiment he himself conducted to investigate its effects. T. at 420–35.

Dr. Barber opined that Dr. Herrnson did not address candidate name order effects of the type at issue in this case. T. at 698. This Court disagrees. Dr. Herrnson's study of proximity error helps provide an empirical explanation for a portion of the advantage a first-listed candidate receives by virtue of being listed first in their office block. One reason candidate name order effects favor first-listed candidates is that, in certain elections, voters are more likely to make errors in favor

43

of first-listed candidates and are also less likely to make errors which disadvantage first-listed candidates.   In this way, the systematic placement of one party's candidates in the second position within their respective office blocks forces those candidates to labor under the double disadvantage of the primacy effect and of a greater likelihood of proximity error to their detriment.  The effect of Florida's ballot order scheme, then, is to systematically place the candidates affiliated with the party of the last-elected governor on the favorable end of these errors, solely on the basis of their political affiliation.  This Court finds Dr. Herrnson's testimony credible, and his methods and conclusions reasonable and reliable.  This Court further finds Dr. Herrnson's testimony gives further support to the credibility of Dr. Krosnick's analysis by reinforcing the conclusion that candidate name order effects influence the share of the vote a candidate receives, and particularly that primacy effects award a statistically significant electoral advantage to the first-listed candidate.

After a full and careful review of the evidence in the record in this case, this Court finds Dr. Krosnick's testimony credible and his methods and conclusions reasonable and reliable.  Dr. Krosnick's conclusions are supported by, and consistent with, virtually all the decades of academic literature in the record, which is itself almost universally consistent.   Furthermore, this Court finds Dr. Krosnick's evaluations of his original analysis, into which he incorporated Dr. Barber's concerns, to be reasonable, reliable, and credible.  This Court also finds Drs. Rodden

and Herrnson's testimony credible, and their methods and conclusions reasonable and reliable. This Court further finds Dr. Barber's testimony emphatically not credible and his opinions offered in this case to be unreliable. This Court finds that, even when Dr. Krosnick indulged Dr. Barber's speculative critiques of his initial analysis, Dr. Krosnick's results did not undergo a material change, which further supports Dr. Krosnick's credibility, as does the fact that Dr. Krosnick performed that second analysis to investigate the validity of Dr. Barber's suggestions. This Court further finds Dr. Barber's criticisms of Dr. Rodden's testimony to be disproven to the extent they were not wholly speculative, and illogical in their reliance on a single outlier to disprove a general rule. Additionally, this Court finds Dr. Barber's opinion concerning the significance of Dr. Herrnson's analysis to be unpersuasive.

Plaintiffs have proven—and this Court hereby finds—that candidates of the major parties in Florida receive an average primacy effect vote of approximately five percent when listed first in their office block on the ballot, and that this advantage accrues to a candidate because of the candidates' name order, which in turn is prescribed by section 101.151(3)(a), Florida Statutes. Furthermore, given Florida's history of election results in which the margin of victory or defeat is less than three to five percentage points, this Court finds section 101.151(3)(a) has impacted Plaintiffs' First and Fourteenth Amendment rights by systematically allocating that small but statistically significant advantage to Republican candidates in elections

where the last-elected governor was a Republican, just as it awarded that advantage to Democrats in elections when Florida's last-elected governor was a Democrat. This Court need not find a precise percentage attributable to every election uniquely to determine whether Florida's ballot order scheme violates Plaintiffs' rights, particularly because Plaintiffs seek declaratory and injunctive relief.  Rather, this Court need only find—and does hereby find—that Florida's ballot order statute systematically awards a material advantage to candidates affiliated with the political party of Florida's last-elected governor solely on the basis of their party affiliation, and therefore systematically disadvantages other candidates on the basis of their party affiliation.  Additionally, the record reflects a vast number of Florida's elections have been decided by less than three to five percent of the votes cast—in other words, by a smaller margin than the advantage Florida's ballot order scheme awards to the candidates affiliated with the party of Florida's last-elected governor. Defendants offer no reason to expect the future will be any different, or that Floridians are any different from voters in other states or countries (with the apparent exception of Afghanistan) with respect to their susceptibility to psychological phenomena like candidate name order effects.

In summary, this Court finds Plaintiffs have proven the candidate listed first in their respective office block in Florida elections receives, on average, a five-percentage-point advantage over their competitors for that office by virtue of being

the first-listed candidate.  This Court further finds that, even when Dr. Barber's speculative critiques are incorporated, first-listed candidates receive an advantage of approximately three-and-a-half percent.  This Court finds these amounts to be statistically significant and the calculations which produced them to be reliable, reasonable, and credible.  This Court finds Dr. Krosnick, Dr. Rodden, and Dr. Herrnson credible, and finds their respective analyses reinforce and add depth to one another's conclusions.  This Court finds Dr. Barber's critiques do not undermine Plaintiffs' experts' methods, analyses, or conclusions.  This Court finds Dr. Barber's critiques speculative, unreasonable, and not credible.

Although these findings are based exclusively on the evidence in the record before this Court, it is worth noting that they are hardly an aberration.  Other courts confronted with this question have also discussed the influence of ballot position on candidates' electoral outcomes and reached similar conclusions.  *See, e.g.*, *McLain v. Meier*, 637 F.2d 1159, 1166 (8th Cir. 1980) (stating "[i]n concluding that there was no error in the district court's finding of ballot advantage in the first position we are not the first to so hold," and citing numerous cases).  And a majority of the States use nonpartisan ballot order schemes that would tend to minimize the impact of candidate name order effects, presumably to control for this widely understood

phenomenon.[21]   There is nothing new or surprising about the conclusion that Florida's ballot order scheme confers a small but statistically significant advantage to candidates of one political party.  Finally, as previously noted, Intervenors clearly believe some advantage presently accrues to Republican candidates as a result of Florida's ballot order scheme.  Otherwise, they would not have intervened in this case and would not be spending such significant time and resources defending the statute.  This fact casts doubt on Intervenors' assertion that Florida's ballot order scheme does not have any significant effects and changing Florida's ballot order scheme would not affect Republican electoral efforts. It is also entirely consistent with Dr. Krosnick and Dr. Rodden's conclusions—which this Court finds credible—that Florida's ballot order does indeed make a difference to the outcome of elections in Florida.

The advantage conferred by the primacy effect is relatively small percentage taken in isolation, but the records of Florida's elections which are before this Court demonstrate it is more than the margin of victory or defeat in a great many elections

---

[21] *See* Ala. Code § 17-6-25; Alaska Stat. § 15.15.030(6); Ark. Code Ann. § 7-5-207(c)(1); Cal. Elec. Code § 13111; Colo. Rev. Stat. § 1-5-404; Haw. Rev. Stat. § 11-115; Idaho Code Ann. §§ 34-903(4) & 34-2419; Kan. Stat. Ann. § 25-610; Ky. Rev. Stat. Ann. § 118.225; La. Rev. Stat. Ann. § 18:551(C); Me. Rev. Stat. Ann. tit. 21-A, § 601; Miss. Code Ann. § 23-15-367(2); Mont. Code Ann. § 13-12-205(2); Nev. Rev. Stat. § 293.267; N.H. Rev. Stat. Ann. § 656:5(II); N.J. Stat. Ann. § 19:14-12; N.M. Stat. § 1-10-8.1; N.C. Gen. Stat. Ann. §163A-1114; N.D. Cent. Code §§ 16.1-11-27 & 16.1-06-05; Ohio Rev. Code Ann. § 3505.03; Okla. Stat. Ann. tit. 26, § 6-106; Or. Rev. Stat. § 254.155; R.I. Gen. Laws § 17-19-9.1; S.D. Codified Laws § 12-16-3.1; Utah Code Ann. § 20A-6-302(1)(b); Vt. Stat. Ann. tit. 17, § 2472; Va. Code Ann. § 24.2-613.

in Florida.  Of course, many factors determine the total percentage of the vote a candidate ultimately receives, but Plaintiffs' experts have proven to a high degree of probability that a small but statistically significant portion of the votes earned in any election are attributable to the primacy effect.  It would be unreasonable to contend that candidate name order effects are the *only* reason a candidate wins or loses an election.  There are a multitude of factors which contribute to a candidate's success, or lack thereof, but as Dr. Krosnick explained, candidate name order effects have often been outcome determinative.  *See* T. at 358–63.  But although no single raindrop bursts a dam, and a single small transaction rarely is the sole cause of a bankruptcy, the dam still fails and the debtor still becomes insolvent.  Similarly, candidate name order effects are not the only reason elections are won and lost, but they do contribute substantially to candidates' successes or failures at the polls.

As to the character of the injury, this Court concludes section 101.151(3)(a) is discriminatory because it awards the primacy effect vote to candidates based solely and uniquely upon their political affiliation.  By listing the candidates affiliated with the governor's party first in each partisan race, Florida's current ballot order scheme ensures those candidates receive a statistically significant advantage in that election, conferred by the primacy effect; and it does so on the explicit basis of the candidates' party affiliation.  It is in no way politically neutral.  Intervenors argue the statute is nonpartisan because it can benefit—and historically has

49

benefitted—whichever party controls the Governor's Mansion. But this does not make the statute nonpartisan. Rather, it means the direction of the statute's partisanship changes depending on circumstances.[22] Florida's ballot order scheme is a fair-weather friend to the party in power, whichever party that may be, and although its inclination may change depending on the prevailing political breeze it is unquestionably a partisan provision. The character of Plaintiffs' injury, therefore, is politically discriminatory. By systematically awarding a statistically significant advantage to the candidates of the party in power, Florida's ballot order scheme takes a side in partisan elections.

## *Legitimacy and Strength of Justifications*

Next, this Court must "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed" by section 101.151(3)(a). *Anderson*, 460 U.S. at 789. This Court must consider whether those justifications are legitimate, determine how strong the interests they support are, and examine the extent to which those interests make it necessary to impose these specific burdens on Plaintiffs' rights. *Id.*

Defendant Lee asserts Florida's present ballot order scheme is supported by Florida's interest in "upholding the policy choices of Florida's duly-elected

---

[22] By Defendants' logic, because he held opposite allegiances at different times, Benedict Arnold was a neutral party.

representatives," preventing voter confusion, "promoting uniformity," and "promoting voter confidence in the integrity of the election administrations process." ECF No. 199 at 34.[23]  Some of these overlap.  For example, Defendant Lee argues Florida's current ballot order scheme promotes voter confidence by ensuring "people know that their ballot is being arranged consistent with the choices their elected officials made, in a manner that makes it easy to find candidates of their choice on the ballot, in a manner that is uniform throughout the State, and in a manner that allows for accurate vote tabulation." *Id.*  Similarly, Florida's asserted interest in uniformity is justified in part by its tendency to "reduce voter confusion." *Id.*

It is important to note at the outset that Defendant Lee's asserted justifications for Florida's current ballot scheme are not quite on point with the *Anderson*/*Burdick* standard.  That framework requires this Court to consider whether the state's asserted interests "justify the *specific* restriction . . . at issue." *Anderson*, 460 U.S. at 796 (emphasis added).  For the most part, Defendant Lee asserts justifications which would tend to support any ballot order system—or, more generally, any election law at all—and militate against changing it to another; but they are not, for the most part, justifications for the specific ballot order scheme Florida uses as opposed to any alternative one.  In effect, Defendant Lee asks this Court to weigh

---

[23] In their closing argument, Intervenors relied in large part on Defendant Lee's arguments with respect to the justifications for Florida's current ballot order scheme.  *See* ECF No. 200 at 27.

the burden on Plaintiffs' rights against Florida's general interest in having election laws, whatever they may be, without reference to the unique necessity for those laws. What *Anderson/Burdick* requires this Court to do is to compare the specific burden imposed by a challenged law to its specific justifications and necessity, and then determine which is weightier (with, of course, the appropriate level of scrutiny calibrating the scale).

Take, for example, the asserted interest in "promoting uniformity to reduce errors in ballot layout and vote tabulation, and to reduce voter confusion." ECF No. 199 at 34. To the extent Plaintiffs suggest candidates' names should be rotated within office blocks to reduce any overall primacy effect, this could be interpreted as reducing uniformity; but under that system Florida's ballots would be organized according to a single framework, and notwithstanding any rotation, that would nevertheless be a uniform system of ballot order. Even more obviously, the asserted interest in promoting voter confidence is, in plain English, an interest in ensuring that voters know their ballot is organized as the law requires it to be. This has nothing to do with the substance of how the law actually requires the ballot to be organized, so long as it is organized according to some system imposed by law. It does not militate in favor of any particular system of organization. Therefore, to the extent they are true of any ballot order scheme and not specifically related to the

scheme laid out in section 101.151(3)(a), Florida Statutes, this Court finds Defendant Lee's asserted justifications to be extremely weak.

To the extent they relate specifically to Florida's current ballot order scheme, the justifications Defendant Lee asserts are a mixed bag. First, the interest in "upholding the policy choices of Florida's duly-elected representatives," *id.*, is not particularly persuasive. Florida certainly has a valid and important sovereign interest in defending the Florida Legislature's enactments, but the undoubted importance of this interest should not be conflated with the weight it should be accorded under the *Anderson/Burdick* standard. If the Florida Legislature adopts an unconstitutional law, Florida's interest in having made that legislative choice will not render that law constitutional. *See Marbury*, 1 Cranch at 177–80 (explaining the foundations of judicial review of legislative action); *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 61 (1st Cir. 1999) ("Even where they exist, strong state interests do not make an otherwise unconstitutional law constitutional."). A state's legitimate interests may prevent a law which impacts constitutional rights from rising to the level of a constitutional violation, *see, e.g.*, *Anderson*, 460 U.S. at 789 (requiring courts to balance the burdens on individuals' rights against state's interests and justifications to determine whether the challenged law violates the Constitution); but a state has no legitimate interest in preserving and enforcing a law

which violates the Constitution.[24]  *See Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 238 (6th Cir. 2011) (concluding disparate treatment of voters resulted "not from a 'narrowly drawn state interest of compelling importance,' but instead from local misapplication of state law" (quoting *Crawford*, 553 U.S. at 190)); *Bishop v. Holder*, 962 F. Supp. 2d 1252, 1289–90 (N.D. Okla. 2014) (concluding that, although a provision of the Oklahoma Constitution which discriminated against homosexuals "rationally promoted the state's interest in upholding one particular moral definition of marriage, this is not a permissible justification" for the provision under rational-basis scrutiny).  Defendant Lee essentially argues Florida's current ballot order scheme is necessary because the Florida Legislature has decided it is. Although legislative discretion to formulate policy is an important element underpinning this analysis, it is not dispositive of the outcome, particularly in cases such as the present one where the burden on voting rights is not minimal.  *See Burdick*, 504 U.S. at 434.  This Court does not discount this justification entirely, but accords it little weight in view of the fact it bears only tangentially upon the merits of the issue.

---

[24] Defendant Lee does not argue that Florida's ballot order statute reduces confusion by making it more convenient for Republicans to locate their preferred candidates, and Florida would have no legitimate interest in such a goal.  *See McLain*, 637 F.2d at 1167 (explaining that the asserted interest in placing incumbents first "virtually admits that the state has chosen to serve the convenience of those voters who support incumbent and major party candidates at the expense of other voters").

Second, Florida's asserted interest in preventing voter confusion is legitimate, but not particularly strong on the specific facts of this case.  The only evidence Defendants offered in favor of Florida's current ballot order statute was speculation that, in a county-by-county rotation scheme, some voters might be confused by seeing sample ballots from other counties.  This Court finds those suggestions are not credible.  Sample ballots state which county they pertain to, so even in areas with multicounty media markets, voters are unlikely to become confused and are even less likely to be more confused by county-by-county rotation than they are by the differences between counties' ballots in the current system.  And even within a county, ballots vary from precinct to precinct, yet voters do not find it confusing that their precinct's ballot does not match exactly the county-wide sample ballot provided by their respective supervisor of elections.  Finally, any minimal concerns about increased voter confusion under a county-by-county or precinct-by-precinct rotational system are entirely nullified in a system which arranges candidates in a uniform manner statewide according to alphabetical order within office blocks.[25]  This Court finds this justification relevant, but concludes it should be accorded only minimal weight at most.

---

[25] As a logical matter, the same would be true of systems which order candidates' names in order of qualification or by random lottery.

Florida's asserted interest in promoting uniformity is, though legitimate, similarly weak here.  At the heart of this asserted interest is the desire to minimize tabulation errors and avoid the costs associated with modifying Florida's election software and hardware to facilitate different ballot order schemes.  The upshot of the testimony presented in this case is, although it may be possible for Florida to adapt its election machinery to rotate candidates' names from county to county or from precinct to precinct, no one is sure precisely what that would entail or what hidden gremlins might emerge in the process.  It is apparent that Florida's voting systems would have to be recertified were such a rotational scheme to be employed, and witnesses raised further concerns regarding the possible impacts on the amount of time necessary to prepare ballots in individual counties.  It is not, however, certain that rotation would increase the danger of tabulation errors, since votes are tabulated based on a unique candidate number assigned at the state level and not by the county, but it was unclear what precise adjustments, if any, would be necessary to Florida's tabulation mechanisms to permit county-by-county or precinct-by-precinct rotation to be used.  This does not, however, translate into a necessity for Florida's present ballot order scheme.  Rather, it is evidence of the predicted administrative burden associated with changing that entrenched ballot order scheme to one possible alternative.

This is not the perspective the *Anderson/Burdick* analysis requires this Court to take.  Instead, *Anderson/Burdick* requires courts to consider the necessity for, and justifications supporting, a particular voting regulation on its own merits, not merely because it is the status quo.  That said, to the extent it relates to Florida's present ballot order scheme *per se*, this justification demonstrates that a county-by-county or precinct-by-precinct rotational system would impose administrative burdens that Florida's current ballot order scheme avoids.  This weighs in favor of Florida's current ballot order scheme as compared with those alternatives.  With respect to alphabetical ordering, ordering by date and time of qualification, and order based on random lottery, however, there is no similar concern about administrative burdens or tabulation errors because candidates would be listed in a uniform order on all ballots statewide.   It would not be necessary to adapt Florida's election administration machinery to adopt alphabetical ordering, because Florida already uses it in certain elections.  *See* § 101.151(4)(a), Fla. Stat. (2019).[26]  Therefore, although Florida's legitimate interest in uniformity carries moderate weight with regard to county-by-county and precinct-by-precinct rotation, it carries none with

---

[26] The same is true for order-of-qualification ballot ordering.  *Id.* § 101.151(3)(b).  Although it was not specifically dealt with in depth during the trial of this cause, there is no reason for this Court to suspect ordering candidates by date and time of qualification or by random lottery would present any more difficulty than the current system, either.

respect to nonpartisan alternatives such as alphabetical listing of candidates within office blocks.

Florida's interest in uniformity also relates to testimony elicited during trial that employing county-by-county rotation would expose both the State and the individual county supervisors of elections to increased litigation by candidates dissatisfied with their ballot placement. *See* T. at 464–68. Defendants' concern is that candidates for offices whose districts are entirely contained within a single county would not benefit from any rotation of names, and would therefore potentially sue both the State and their local supervisor of elections. This is no justification at all for Florida's current ballot order scheme. First, any change to an existing statute will produce litigation concerning the meaning of the new version, and this justification therefore does not relate to Florida's specific ballot order scheme as opposed to any alternative one. This Court doubts any law, no matter how carefully drafted, will ever be so clear that a sufficiently clever attorney will find nothing in it to be litigated. Second, even assuming it is relevant and legitimate, this justification is particularly weak because, on its face, county-by-county rotation could only reduce the amount of potential litigation related to Florida's ballot order scheme. Under Florida's current ballot order scheme, any second-listed candidate in any partisan race could sue both the Secretary of State and each county supervisor of elections on whose ballots they appear. In a county-by-county rotational system,

meanwhile, only second-listed candidates contesting elections in districts encompassing a single county or part of a single county—that is, districts whose candidates' names would not be rotated—would have a claim to bring. It is plain that county-by-county rotation would in fact reduce the possibility of litigation by significantly reducing the number of possible plaintiffs. This Court finds the witness testimony to the contrary to be oppugnant to common sense, and not credible. It is equally plain that, for the same reasons, an alphabetical system of candidate name order would reduce the possibility of litigation still further. This justification is too weak to bear even the mild scrutiny this Court employs in this Order.

Finally, a state has no legitimate interest whatsoever in promoting its citizens' confidence in adherence to an unconstitutional law; but to the extent Florida's asserted interest in this case is legitimate and relevant, there is at best no reason to believe Florida's citizens draw more confidence from one sort of ballot order scheme than from any other. If anything, voter confidence in the integrity of Florida's elections process would actually be undermined by Florida's present ballot order scheme. Taking Defendant Lee's argument on this score at face value, Florida's ballot order would promote citizen confidence to the same degree whether it requires candidates affiliated with the last-elected governor's party to be listed first, as it does now, or whether it lists them alphabetically, in order of qualification, or completely randomly. Although some testimony was presented to suggest a county-by-county

rotation scheme would reduce voter confidence in the election system, this Court finds that testimony not credible for two reasons. First, Defendant Lee links voter confidence to voters knowing that the ballot is ordered as the law requires. Therefore, even if the candidates are rotated on a county-by-county basis, voters presumably are no less ignorant from one day to the next and will gain confidence from knowing the ballot was organized as the law requires. Second, this Court concludes voters could actually lose confidence in the integrity of Florida's election system from the knowledge that the order of candidates' names on the ballot was determined on a partisan political basis rather than a neutral one. With respect to the necessity for Florida's present ballot order scheme in terms of voter confidence, therefore, this Court finds that, at best, Plaintiffs have shown there is no necessity for it *vis-à-vis* the alternatives, and at worst Florida's present ballot order scheme is less effective at promoting voter confidence than several alternatives.

*Scrutinizing the Statute*

Taking all this together, this Court must now determine which level of scrutiny to apply and balance the burdens on Plaintiffs' rights against Defendants' asserted justifications for those burdens. In the *Anderson/Burdick* framework, when a court concludes a law imposes only "reasonable, nondiscriminatory restrictions" on voting rights, *Anderson*, 460 U.S. at 789, the court scrutinizes the challenged law only on a level akin to rational basis review. *Id.* If, however, the burden is more

60

severe, the level of scrutiny undergoes a concomitant increase. *Burdick*, 504 U.S. at 434. The *Anderson/Burdick* framework thus incorporates a sliding scale of scrutiny linked expressly to the burden on the plaintiff's rights.

As burdens on voting rights go, Florida's ballot order scheme is not on the same order of magnitude as a complete denial of the franchise, such as preventing someone from registering to vote or from casting their vote. As Defendants correctly contend, it does not prevent any individual from voting, nor does it prevent their votes from being counted. Under similar circumstances, other courts have found it appropriate to apply a rational-basis standard. *See McLane*, 637 F.3d at 1167 (reasoning that "although ballot format has an effect on the fundamental right to vote, the effect is somewhat attenuated" and explaining that "[i]n these circumstances, most courts have applied the rational basis test"). The present case is different for two reasons. First, as explained above, Florida's ballot order statute is not neutral; instead, it affects Plaintiffs' rights in a politically discriminatory way. Second, although a donkey vote of three or even five percent is not, in and of itself, a large proportion of the total vote, it is often a decisive proportion in terms of the spread between the candidates in a Florida election. This suggests that, although the

quantitative burden on Plaintiffs' rights is small, the practical burden is severe indeed. *Cf. Anderson*, 460 U.S. at 806 (conducting a "realistic" appraisal).[27]

This Court concludes the appropriate standard of review in this case is higher than rational-basis review. Florida's ballot order scheme is not a neutral, nondiscriminatory restriction on Plaintiffs' voting rights, and the burden it imposes is significant. But Florida's ballot order scheme is not a well-nigh insuperable burden, and Florida has legitimate regulatory interests in administering orderly elections to which this Court owes respectful deference. This Court therefore concludes neither mere rational-basis review nor strict scrutiny would be appropriate. Instead, this Court will scrutinize the State's asserted interests and justifications in a level of detail greater than the cursory examination afforded under the rational-basis standard, but this Court will not apply a stricter standard that requires the State's interest to be compelling or important—they need only be legitimate and relevant; and (pursuant to the *Anderson*/*Burdick* framework's inquiry into the necessity for the challenged restriction) the challenged law must actually serve the State's asserted interest to at least the same degree as an available alternative, otherwise it would not be necessary. Nor will this Court interpret the

---

[27] In this same sense, a $1,000 medical bill might seem insignificant or insuperable depending on one's monthly income. Severity is an objective question but the realistic context is important to the analysis.

"necessity" aspect of the *Anderson*/*Burdick* framework to signify an *absolute* necessity in this context, as stricter shades of scrutiny would require. Finally, this Court will not pry into the subjective motivations the State of Florida had in adopting its current ballot order scheme, but will instead consider only the objective interests and justifications Defendants raise and evaluate whether they are relevant, legitimate, and of sufficient strength to justify the specific burden at issue. Under the *Anderson*/*Burdick* framework, this is the correct analysis for this Court to apply. Applying that level of scrutiny, this Court concludes Florida's interests in its current ballot order scheme do not justify the burden on Plaintiffs' rights which Florida's current ballot order scheme imposes. This Court also concludes, however, that Florida's current ballot order scheme cannot satisfy even the extremely deferential rational-basis standard under the *Anderson*/*Burdick* framework. Put simply, Florida's current ballot order scheme cannot even clear the lowest available bar.

As this Court explained above, Florida's current ballot order scheme imposes a burden on Plaintiffs' First and Fourteenth Amendment rights which, although numerically small, is significant in both the statistical sense and in qualitative terms. Furthermore, that burden is of a politically discriminatory character. To weigh against that burden, Defendants have offered a variety of justifications which this Court has found vary in strength from minor to meager, to the extent they are relevant and legitimate at all. Weighing the burden on Plaintiffs' rights against the

strength (such as it is) of Florida's interests in, and the necessity of, imposing that burden, this Court concludes Florida has advanced no sufficient justification nor combination of justifications nor a necessity, reasonable or otherwise, for employing a ballot order scheme which systematically advantages candidates of one party and disadvantages candidates of another party to a statistically significant (and potentially outcome-determinative) degree.  In light of the almost total absence of any legitimate state interest favoring this system over the multiple alternatives available, it is difficult to imagine what other purpose it could possibly serve than as a thumb on the scale in favor of the party in power.  This Court holds the burden on Plaintiffs' First and Fourteenth Amendment rights conclusively outweighs Defendants' asserted interests and justifications, which are universally weak. Moreover, even under the rational-basis standard, Florida has not advanced relevant, legitimate interests which the Florida Legislature could rationally conclude justify burdening Plaintiffs' rights as Florida's current ballot order scheme does.  Under either standard, Florida's current ballot order scheme violates the First and Fourteenth Amendments.

## Permanent Injunction

This Court has concluded Florida's current ballot order scheme is unconstitutional.  The question now is, what to do about it?  Plaintiffs seek a permanent injunction to prohibit Defendant Lee from enforcing section

101.151(3)(a) as it currently stands. Plaintiffs also ask this Court to require Defendant Lee to adopt a ballot order scheme of county-by-county rotation of candidates' names until such time as the State of Florida adopts a replacement ballot order scheme. To obtain a permanent injunction, Plaintiffs must show that (1) they have suffered an irreparable injury; (2) their remedies at law are inadequate; (3) the balance of hardships weighs in their favor; and (4) that a permanent injunction would not disserve the public interest. *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Plaintiffs have satisfied each element of this standard.

"[T]he irreparable-injury requirement may be satisfied by demonstrating a history of past misconduct, which gives rise to an inference that future injury is imminent." *Thomas v. Bryant*, 614 F.3d 1288, 1318 (11th Cir. 2010). Moreover, "the irreparable-injury requirement cannot be met absent a real or immediate threat that the plaintiff will be wronged again." *Id.* Injuries are irreparable if they cannot be undone through monetary remedies. *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987). And irreparable injury is presumed when "[a] restriction on the fundamental right to vote" is at issue. *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012). This Court has elsewhere explained that injuries to fundamental voting rights are irreparable because "[t]his isn't golf: there are no mulligans." *Fla. Democratic Party II*, 215 F. Supp. 3d at 1258. This Court finds Plaintiffs have conclusively demonstrated a history of injury and have established a real and

immediate threat that, absent equitable relief from this Court, they will be wronged again. Plaintiffs satisfy the first factor.

Second, remedies at law are not sufficient to redress Plaintiffs' injuries. Damages would in no way remedy these violations of Plaintiffs' rights. *Cf. Cunningham*, 808 F.2d at 821. The injury Plaintiffs suffer is the result of holding elections with ballots organized pursuant to Florida's current ballot order scheme. This Court finds Plaintiffs have satisfied the second factor.

Third, the balance of hardships weighs in Plaintiffs' favor. As this Court has explained at length, Plaintiffs suffer from a substantial burden on their First and Fourteenth Amendment rights, and the countervailing hardship the State of Florida would suffer ranges from minimal to nonexistent. *See Laube v. Haley*, 234 F. Supp. 2d 1227, 1252 (M.D. Ala. 2002) ("The threat of harm to the plaintiffs cannot be outweighed by the risk of financial burden or administrative inconvenience to the defendants."). This Court finds Plaintiffs have satisfied the third factor.

Fourth and finally, a permanent injunction will not disserve the public interest. It is beyond question that the public's interest is served by upholding constitutional rights. *Cf. Laube*, 234 F. Supp. 2d at 1252 ("[T]here is a strong public interest in requiring that the plaintiffs' constitutional rights no longer be violated . . .."); *Republican Party of Minn.*, 416 F.3d at 753 ("It can hardly be argued that seeking to uphold a constitutional protection . . . is not per se a compelling state interest."); *see*

66

*also League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012) ("The vindication of constitutional rights . . . serve[s] the public interest almost by definition."). Voting is at the heart of representative systems of government, and dispensing with unconstitutional obstacles to free and fair elections is unquestionably in the public interest. *Cf. Fla. Democratic Party II*, 215 F. Supp. 3d at 1258 (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)). This Court finds Plaintiffs have satisfied the fourth factor.

This Court concludes Plaintiffs are entitled to a permanent injunction, and must next consider what the terms of that injunction will be. Courts have broad discretion to fashion equitable relief which is appropriate to the circumstances of the case in question. *See Democratic Exec. Comm.*, 915 F.3d at 1327–28 (explaining that crafting a "Goldilocks solution," rather than approaching equitable relief as an all-or-nothing proposition, is "well within [a court's] discretion"). The circumstances of the present case make this a relatively simple process. Plaintiffs seek a permanent injunction which both prohibits enforcement of Florida's current ballot order scheme and requires Defendant Lee to employ a county-by-county rotational scheme until such time as the State of Florida adopts a new ballot order scheme on a permanent basis. *See* ECF No. 201-1 at 62–63. This Court concludes a permanent injunction against enforcement or application of section 101.151(3)(a) is warranted, but that an injunction requiring Defendant Lee to specifically adopt

county-by-county rotation until the State of Florida chooses a replacement would not be appropriate.

The alternatives for ballot order schemes can be divided into two categories based upon the way in which they would reduce the burden on, or altogether avoid burdening, Plaintiffs' rights, while also serving Florida's legitimate regulatory interests. The first category are the rotational schemes, which would rotate candidates' names within their office blocks on a county-by-county or precinct-by-precinct basis. These schemes attempt to minimize the burden on Plaintiffs' rights by distributing the candidate name order effects more evenly across all candidates rather than awarding it solely to candidates of one party. Rotational ballot order schemes satisfy the requirements of the First and Fourteenth Amendment by equalizing the burden on voting rights—they do not remove it, but they do burden all persons equally to the extent reasonably possible. This is one set of ways to solve the problem.

The second category of ballot order schemes alleviate the burden on First and Fourteenth Amendment rights by cleansing the partisan taint from the process. If candidates' names are arranged in alphabetical order, or in the order in which candidates submitted their qualifying paperwork, or in an order determined by random lottery, the "donkey vote" would still exist and its magnitude would be unchanged; but it would not be distributed on the basis of candidates' political

affiliation, and no constitutional issue would arise on that basis. With respect to this category of ballot order schemes, the balance is most favorable to Plaintiffs because Defendants' justifications are at their weakest.

This Court will not require that Florida adopt a particular ballot order scheme from among the alternatives described above, nor that Florida choose only from among the alternatives this Court and the parties have identified. If there were only one alternative ballot order scheme which satisfied the Constitution, this Court's conclusion on this question might be different; but, as described above, there are several alternatives which do not systematically award the advantage of the primacy effect vote to candidates of one party based on their party affiliation and which do not impose significant burdens on the State. The State of Florida is empowered, by its sovereignty, to adopt any ballot order scheme that comports with the requirements of the Constitution and other applicable law. *Cf. Democratic Exec. Comm.*, 915 F.3d at 1331 (explaining that, "rather than undermining Florida's sovereignty," the narrowly tailored injunction issued in that case "actually respected it"). Moreover, the issue in this case is not whether Florida is failing to do something it ought to do, but rather whether the Constitution permits it to act in a particular way. Therefore, this Court concludes a negative injunction rather than an affirmative one is appropriate.

69

Florida may choose to adopt county-by-county rotation, precinct-by-precinct rotation, alphabetical-by-surname listing, or any number of other alternative ballot order schemes which comport with the Constitution. But Florida may not continue to order candidates' names on its ballots in a way that systematically awards the statistically significant advantage conferred by candidate name order effects to candidates of one political party on the basis of their partisan affiliation.[28] As this Court has previously noted, "[w]hile the vast majority of supervisors of election are upstanding professionals who follow the law and court orders . . . there may be some who selectively interpret parts of this Court's orders or otherwise avoid compliance." *Rivera Madera v. Lee*, No. 1:18cv152-MW/GRJ, 2019 WL 2077037, at *3 (N.D. Fla. May 10, 2019). This Court will therefore be blunt. Compliance with this Order is not optional, and this Court will not hesitate to use every tool available to enforce its authority and ensure compliance with its orders. *See* Fed. R. Civ. P. 65(d)(2)(C) (binding "other persons who are in active concert or participation" with the parties and their officers, agents, and employees); 28 U.S.C. § 1651(a) (2018) (endowing courts with the authority to "issue all writs necessary or appropriate in aid of their

---

[28] As to the immediate effect of the injunction this Court issues, concerns were expressed during the trial of this case regarding whether Florida's election systems could be recertified to permit county-by-county or precinct-by-precinct rotation to be implemented in time for the 2020 general election. This Court notes that there are other options, such as alphabetical ordering or ordering in order of qualification, that Florida already uses and therefore that Florida's election systems already are capable of, and thus those ballot order alternatives could be implemented immediately. *See* §§ 101.151(3)(b) & 101.151(4)(a), Fla. Stat. (2019).

respective jurisdictions and agreeable to the usages and principles of law"). This Court does not anticipate any such extraordinary measures will be necessary. It's not hard—the way for Florida to conduct a free and fair election is, to conduct a free and fair election.[29]  Accordingly,

**IT IS ORDERED:**

1. The Clerk shall enter judgment stating: "This Court hereby **DECLARES** that the ballot order scheme described in section 101.151(3)(a), Florida Statutes, violates Plaintiffs' rights under the First and Fourteenth Amendments of the United States Constitution. This Court **GRANTS** Plaintiffs' request for a permanent injunction. Pursuant to the Secretary of State's responsibility for "general supervision and administration of the elections laws," § 15.13, Fla. Stat. (2019), and her authority to "[o]btain and maintain uniformity in the interpretation and implementation of the elections laws," § 97.012(1), Fla.

---

[29] One could be forgiven for thinking otherwise, given the difficulty Florida seems to have with the concept. *See Rivera Madera*, 325 F. Supp. 3d at 1283–84 (noting "[i]t is remarkable that it takes a coalition of voting rights organizations and individuals to sue in federal court to seek minimal compliance with the plain language of a venerable 53-year-old law," the Voting Rights Act); *Fla. Democratic Party I*, 2016 WL 6090943, at *1 (explaining some of the manifold ways in which "the State of Florida has consistently chipped away at the right to vote"); *Rivera Madera v. Lee*, 2019 WL 2077037, at *4 (explaining the Voting Rights Act "has been the law of the land since 1965 and supervisors of elections should have been complying with the law for more than 50 years without court intervention."); *Hand*, 285 F. Supp. 3d at 1310 (noting "[m]ore than *one tenth* of Florida's voting population—1.7 million as of 2016—cannot vote because they have been decimated from the body politic" and "[m]ore than one in five of Florida's African American voting-age population cannot vote." (internal marks and footnotes omitted)); *Fla. Democratic Party II*, 215 F. Supp. 3d at 1257 (explaining Florida's voter registration framework "completely disenfranchise[d]" hundreds of thousands of potential voters by failing to include a provision extending the registration period in the event of an emergency or natural disaster).

Stat. (2019), and pursuant to Federal Rule of Civil Procedure 65(d)(2)(C),
neither Defendant Lee, her successors in office, deputies, officers, employees,
agents, nor any other person in active participation or concert with Defendant
Lee shall enforce, nor permit enforcement of, the ballot order scheme
described in section 101.151(3)(a), Florida Statutes.  Defendant Lee and her
successors in office, as well as her deputies, officers, employees, agents, and
any other person in active participation and concert with Defendant Lee shall
take all practicable measures within the scope of their official authority to
ensure compliance with the terms of this Order.  From the date of this Order
forward, no ballot shall issue which is organized pursuant to the ballot order
scheme described in section 101.151(3)(a), Florida Statutes.  No supervisor of
elections of any Florida county, nor their successors in office, deputies,
officers, employees, agents, nor designees, shall issue any ballot which is
organized pursuant to the ballot order scheme described in section
101.151(3)(a), Florida Statutes."

2. **Within fourteen days after the issuance of this Order**, Defendant Lee shall
provide written guidance to the supervisors of elections of Florida's counties
informing them that this Court has declared the ballot order scheme described
in section 101.151(3)(a), Florida Statutes, unconstitutional.  Defendant Lee

shall include a true and correct copy of this Court's order in her written guidance.

3. Once Defendant Lee has provided said written guidance to the supervisors of elections, Defendant Lee shall file a notice of compliance in this Court **within twenty-one days after issuance of this order**.  Defendant Lee shall make and maintain written records of all actions taken pursuant to this Order sufficient to document compliance with all requirements of this Order.

4. Pursuant to this Court's authority to monitor the status of its injunction, when the State of Florida adopts a new permanent ballot order scheme to replace the ballot order scheme described in section 101.151(3)(a), Florida Statutes, Defendant Lee shall file a notice in this Court informing this Court that the State of Florida has done so, and shall append thereto a copy of the final text of the ballot order scheme adopted.  If the State of Florida, through Defendant Lee or by any other means, adopts a temporary or interim ballot order scheme to replace the ballot order scheme described in section 101.151(3)(a), Defendant Lee shall file a notice in this Court informing this Court the State of Florida has done so, and shall append thereto a copy of the temporary or interim provision adopted.

5. The Clerk shall close the file.

**SO ORDERED on November 15, 2019.**

**s/Mark E. Walker**
**Chief United States District Judge**